**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-01856-MSK-BNB

GAIL WATERS, as personal representative of the Estate of Alonzo Ashley,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
DENVER ZOOLOGICAL FOUNDATION, INC., a nonprofit corporation
ANDRE DERRITT, an employee of the Denver Zoological Foundation, in his individual capacity,
ERIC FLUEGEL, an employee of the Denver Zoological Foundation, in his individual capacity,
AARON LAWYER, an employee of the Denver Zoological Foundation, in his individual capacity,
JAMES TOTTEN, an employee of the Denver Zoological Foundation, in his individual capacity,
PHILIP COLEMAN, a Denver Police Department Officer, in his official and individual capacity,
PETE CONNER a Denver Police Department Lieutenant, in his official and individual capacity,
JOE GASCA, a Denver Police Department Officer, in his official and individual capacity,
JUSTIN JONES, a Denver Police Department Officer, in his official and individual capacity,
JOHN DOE I-V, employees of the Denver Police Department, in official and individual capacities; and
JOHN DOE VI-X, employees of Denver Zoological Foundation, in official and individual capacities,

      Defendants.

---

**DENVER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Defendants, **THE CITY AND COUNTY OF DENVER**, **PHILIP COLEMAN**, **PETE CONNER**, **JOE GASCA**, and **JUSTIN JONES** ("the Denver Defendants"), by their undersigned attorneys, hereby move for summary judgment on all of Plaintiff's claims in the Second Amended Complaint [Doc. # 63] pursuant to Fed. R. Civ. P. 56, D.C.COLO.RCivP 56.1, and MSK Civ. Practice Standards V.I.3.

## I.  CONFERRAL CERTIFICATION

Pursuant to D.C.COLO.RCivP 7.1A, defense counsel conferred with Plaintiff's counsel regarding the grounds for this motion and the relief requested herein. Plaintiff opposes the motion.

## II.  INTRODUCTION[1]

On July 18, 2011, Alonzo Ashley violently assaulted a Denver Zoo security guard, failed to comply with commands given by Officer Justin Jones, the first Denver Police Officer who arrived at the scene, and eventually attacked Officer Jones, resulting in a violent struggle between Mr. Ashley, Officer Jones, and zoo security officers who were trying to help restrain Mr. Ashley until several other police officers arrived on scene. Mr. Ashley's violent resistance continued even when several police officers, including officers Coleman, Conner, and Gasca, tried to gain control of his arms and legs. Mr. Ashley continued to struggle even after the officers gained enough control over Mr. Ashley to finally get him handcuffed.

Sometime after he was handcuffed Mr. Ashley stopped breathing. A Denver police officer started chest compressions; however, when the paramedics arrived on scene and began to administer medical treatment, they were unable to restore a viable heart rhythm. Mr. Ashley was eventually transported from the scene by ambulance and pronounced dead at the hospital.

As a result of the incident, Plaintiff alleges nine claims against the Denver Defendants:

- **First Claim for Relief**:  42 U.S.C. § 1983 – Fourth Amendment Excessive Force against Defendants Jones, Coleman, Conner, and Gasca;

---

[1] Pursuant to MSK Civ. Practice Standards V.I.3.1.c at fn.1 and "Sample Summary Judgment Motion" at fn. 3, the undisputed facts are also set forth in the sections addressing the elements of the claims that cannot be proven by Plaintiff.

- **Additional Claim for Relief**: Although not alleged in the Complaint, and therefore, should not be considered, Plaintiff also contends that Defendants Jones, Coleman, Conner, and Gasca failed to provide adequate medical treatment to Mr. Ashley. Such a claim would be asserted pursuant to § 1983 for an alleged violation of Mr. Ashley's Fourteenth Amendment due process rights;

- **Second Claim for Relief**: Wrongful Death pursuant to C.R.S. § 13-21-202 against Defendants Jones, Coleman, Conner, and Gasca;

- **Third Claim for Relief**: Survival Action pursuant to C.R.S. § 13-20-101 against Defendants Jones, Coleman, Conner, and Gasca;

- **Fourth Claim for Relief**: Conspiracy to Violate § 1983 against Defendants Jones, Coleman, Conner, and Gasca;

- **Fifth Claim for Relief**: § 1983 – Failure to Supervise;

- **Sixth Claim for Relief**: § 1983 – Inadequate Policies and Training;

- **Twelfth Claim for Relief**:  Assault against Defendants Jones, Coleman, Conner, and Gasca; and

- **Thirteenth Claim for Relief**: Battery against Defendants Jones, Coleman, Conner, and Gasca.

*See Second Amended Complaint* [Doc. #63]. A review of the undisputed facts in this case, as set forth below, demonstrates that Plaintiff is unable to meet her burden with respect to the above-referenced claims. Accordingly, for the following reasons, the Denver Defendants are entitled to summary judgment.

### III.   CLAIMS UPON WHICH SUMMARY JUDGMENT IS SOUGHT[2]

**A.   Officers Jones, Coleman, Conner and Gasca are entitled to Summary Judgment on Claim 1: Fourth Amendment Excessive Force**

1.   <u>Burden of Proof and Elements</u>

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  After a defendant asserts qualified immunity, the burden shifts to the plaintiff to satisfy a "heavy two-part burden." *Id.* at 1128.  Plaintiff must demonstrate that (1) defendant's actions violated a constitutional or statutory right, and (2) the right was clearly established at the time of defendant's conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In order for the law to be considered clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Martinez v. Carr*, 479 F.3d 1292, 1295 (10th Cir. 2007) (citations omitted). "After identifying the constitutional rights allegedly violated, courts must determine whether the conduct was objectively reasonable in light of the clearly established law at the time it took place." *Weigel v. Broad*, 544 F.3d 1143, 1151 (10th Cir. 2008) (internal quotation and citation omitted).

---

[2] Pursuant to this Court's "Sample Summary Judgment Motion" at fn.3, this Motion does not contain a recitation of the summary judgment standard.  The applicable summary judgment standard discussed in *In re Riobzyme Pharmaceuticals, Inc. Securities Litigation*, 209 F.Supp.2d 1106 (D. Colo. 2002), is incorporated by reference.

If the plaintiff fails to carry either part of this "heavy two-part burden," the defendant is entitled to qualified immunity. *Medina*, 252 F.3d at 1128.   In analyzing questions of qualified immunity, courts are not required to address these inquiries in any specific order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Here, for ease of analysis, the Denver Defendants take up the two parts in order.

In making an arrest, "an officer has the right to use some degree of physical coercion or threat to affect the arrest. *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989) (citing *Graham v. Conner*, 490 U.S. 386, 394 (1998)). Thus, to establish that any of the Defendant officers used excessive force in violation of the Fourth Amendment, Plaintiff must show that the force used was objectively unreasonable in light of the totality of the circumstances. *Graham*, 490 U.S. at 397; *Estate of Larsen v. Murr*, 511 F.3d 1255, 1259-60 (10th Cir. 2008). In analyzing a Fourth Amendment excessive force claim, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.  Under this standard, courts must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007).

In determining whether the use of force is reasonable in a particular situation, courts consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396. The reasonableness of an officer's particular use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight," making allowances "for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396-97.

Further, "[a]nyone who 'causes' any citizen to be subjected to a constitutional deprivation is . . . liable . . . . The requisite causal connection is satisfied if the defendant[s] set in motion a series of events that the defendant[s] knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Trask v. Franco,* 446 F.3d 1036, 1046 (10th Cir.2006) (quoting *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978) and *Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir.1990)) (internal citations and quotation marks omitted). Thus, to prevail on its § 1983 claims against the officers, Plaintiff must show that each officer's conduct was the both the "but-for and the proximate cause" of Mr. Ashley's death. *See Trask*, 446 F.3d at 1046. Even if a plaintiff establishes a constitutional violation, the analysis does not end. To succeed against the individual officers, the specific right at issue must have been clearly established at the time. *Medina*, 252 F.3d at 1128.

Applying these standards to the undisputed facts of this case, all of the Defendant officers are entitled to qualified immunity from Plaintiff's excessive force claim. As demonstrated below, Plaintiff cannot prove a constitutional violation, causation or that clearly established law put the officers on notice that the force each used under the circumstances was objectively unreasonable.

   2.   <u>Elements that Cannot be Proven by Plaintiff:</u>

      a.      *The officers' force was not objectively unreasonable*

When determining whether objectively unreasonable force has been used, the Court must consider the specific involvement of each defendant separately. *Casey v. City of Federal Heights*,

509 F.3d 1278, 1282 (10th Cir. 2007) (court must examine use of force by considering whether each officer's conduct violated the constitution). Therefore, in this case, the facts should be viewed in light of the order in which the various officers arrived on scene. Police work often requires officers to rely on the observations, statements, and conclusions of their fellow officers, and an officer's reliance on the conclusions of a fellow officer is protected by qualified immunity as long as the officer's reliance was objectively reasonable. *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998).

        i.    <u>Consideration of the totality of the circumstances does not show that the force used by any of the officers was excessive</u>

**<u>Officer Justin Jones</u>** - On July 18, 2011, around 5:00 p.m., Officer Jones responded to a dispatch call concerning a possible domestic violence incident inside the Denver zoo near the pachyderm house. Ex. 1, Declaration of Officer Justin Jones ¶ 2; Ex. 2, Affidavit of Andre Derritt, ¶ 3. It was reported that a male (later identified as Alonzo Ashley) was threatening a female he was with, possibly his girlfriend. Ex. 2, ¶ 4. Officer Jones arrived at 5:07 p.m., and he was the first officer to arrive on scene. Ex. 3, Police Agency Incident Report; Ex. 2, ¶ 6. At the time, he walked through the exit gates at the zoo entrance, and guests who were leaving the zoo started pointing him in the direction of the disturbance. Ex. 4, Deposition of Officer Justin Jones, 30:19-34:11; Ex. 1, ¶ 5.

     As Officer Jones started walking in the direction of the pachyderm house, he was met by a zoo security guard (Defendant James Totten) who informed him that a member of the zoo security team (Defendant Andre Derritt) had been assaulted by Mr. Ashley and that zoo security were keeping an eye on Mr. Ashley. Ex. 4, 30:19-34:11; Ex. 1, Decl. ¶ 5. When Officer Jones and Mr. Totten rounded the corner near the elephant exhibit, Officer Jones saw Mr. Ashley who

appeared very agitated and enraged.  Ex. 4 at 34:15-25.  Zoo employees were standing at a distance around Mr. Ashley, in sort of a semi-circle, and Mr. Ashley was yelling at them.  *Id.* at 35:12-15.  However, Officer Jones was not close enough to hear what Mr. Ashley was yelling. Zoo guests were also standing in the area watching what was happening.  Ex. 1, ¶ 4.

Officer Jones perceived Mr. Ashley to be very agitated and, as a result, he believed that Mr. Ashley posed a significant threat, especially since he was the only officer on scene and Mr. Ashley had reportedly assaulted a zoo security guard prior to his arrival.  Ex. 4, 33:8-34:6; Ex. 1 ¶ 5.  When Officer Jones was approximately six feet away from Mr. Ashley, he brought out his TASER in an attempt to gain compliance. *Id.* at ¶ 5. At the time, Officer Jones identified himself as a Denver police officer, pointed the TASER at Mr. Ashley's chest, and told him to get on the ground.  *Id.*

Mr. Ashley immediately sat down on the ground in compliance with the order and looked at Officer Jones.  Ex. 4, 39:7-20.  He gave no indication that he did not understand who Officer Jones was or what Officer Jones was telling him. Officer Jones then instructed Mr. Ashley to lie on his stomach with his arms out to his side.  Ex. 1, ¶ 6.  However, rather than complying with the order, Mr. Ashley jumped back up to his feet and assumed a fighting stance.  Ex. 4, 40:25-41:14; Ex. 5, Deposition of James Totten, 43:5-13.  Around this time, Officer Jones called for "code 10" backup, requesting other officers in the area to respond to the zoo as quickly as possible to provide assistance.  Ex. 1, ¶ 7; Ex. 3 at 002659.  Mr. Ashley also began telling Officer Jones to "get the fuck away from him" or "get the fuck out of [his] face."  Ex. 1 ¶ 6; *see also* Ex. 6, Deposition of Christina Rudolph, 27:24-28:14.

Mr. Ashley then began walking towards the exit at a swift pace. Ex. 1, ¶ 7.   Officer Jones was concerned that he might be involved in a foot chase with Mr. Ashley; therefore, he reholstered his TASER and followed Mr. Ashley, repeatedly ordering him to stop and get on the ground. Ex. 1, ¶ 7.   Officer Jones was extremely concerned that Mr. Ashley seemed intent on leaving the zoo because of the safety risk he posed.[3] However, Mr. Ashley ignored Officer Jones' orders and began to repeatedly yell, "If you touch me (or put your hands on me) you're gonna end." Ex. 4, 34:18-35:24, 37:10-20, 39:3-44:2;  Ex. 1, ¶¶ 4-6; *see also* Ex. 5, 44:12-52:22.

After walking approximately fifteen yards, Mr. Ashley stopped near a planter. Ex. 1, ¶ 8. Officer Jones stopped approximately 4-5 feet away from Mr. Ashley and ordered him to get on the ground.   Ex. 4, 43:2-18.   Around this time, Officer Jones noticed that Mr. Ashley was sweating profusely.   *Id.*   However, it was also a hot summer day, with the recorded high temperature registering at 98.4 degrees, and, at that time, Officer Jones did not believe he was dealing with a mental health issue.   *Id.;*  Ex. 7,  Historical Weather Data for City Park Zoo for July 2011.

Mr. Ashley then ran between Officer Jones and a bush by the planter and reached out to grab Officer Jones.   Ex. 4, 46:8-24; *see also* Ex. 6, 80:17-21; Ex. 5, 6:7-25.[4]   Officer Jones unsuccessfully tried to grab Mr. Ashley's arms and Mr. Totten rushed in to help take Mr. Ashley to the ground and all three of them fell to the ground in front of the planter. Ex. 1, ¶ 7; Ex. 4, 46:11-48:10; Ex. 5, 56:7-59:7.

---

[3] Officer Jones also needed to investigate the domestic violence allegation and arrest Mr. Ashley for assaulting Andre Derritt. Ex. 1, ¶ 7.
[4] Ms. Rudolph testified that she believed Mr. Ashley was dangerous to anybody close to him. Ex. 6, 87:17-21.

Mr. Ashley landed on his side and he immediately twisted and punched Officer Jones in the face. Ex. 4, Jones depo 48:5-13;  Ex. 1, ¶ 9. Officer Jones struck Mr. Ashley twice in the abdominal area in an attempt to gain control over his arms and continued to give Mr. Ashley commands to bring his arms behind his back.  Ex. 4, 48:14-19.  However, his two strikes had no effect and Mr. Ashley continued his violent resistance.  *Id.*

As Officer Jones continued to try to gain control over one of Mr. Ashley's arms so that he could bring the arm behind Mr. Ashley's back to start the process of handcuffing, he noticed that Mr. Ashley appeared to be incredibly strong.  *Id.* ¶ 10. As a result, Officer Jones did not think that he was going to be able to get Mr. Ashley's get arm behind his back by himself.  Ex. 4, 49:10-18.   Therefore, in an attempt to gain compliance, Officer Jones pulled out his TASER and removed the cartridge so that he could use the TASER in drive-stun mode.  Ex. 4, 50:9-51:3.

A TASER operates in two different modes, probe deployment and drive-stun mode.  Ex. 8, Deposition of Theodore James Maher, 18:20-19:22.   In "drive-stun mode," the TASER cartridge is removed and the user applies the TASER probes directly to the subject, which causes pain at the site of contact. *Id.* at 20:6-9. The purpose of using "drive-stun mode" is for pain compliance and the pain continues only as long as the TASER is in direct contact with the subject. *Id.* at 21:6-21.

At the time Officer Jones pulled out his TASER, Mr. Ashley was flailing wildly, kicking, punching, and trying to get up. Ex. 1, ¶ 10. Several zoo security employees, including Mr. Totten, were trying their best to hold onto Mr. Ashley to prevent him from getting up. Ex. 5, 60:6-23; Ex. 4, 51:4-12; Ex. 9, Deposition of Eric Fluegel, 48:18-23. Officer Jones applied the TASER in drive-stun mode to the upper region of Mr. Ashley's back for one cycle.  *Id.*

Unfortunately, the TASER did not seem to have any effect as Mr. Ashley continued to violently struggle and resist arrest.  Ex. 4, 52:3-25, Ex. 5, 65:7-24.

Officer Philip Coleman arrived around this time.  Ex. 4, 53:1-3. Officer Jones tried to hold Mr. Ashley down by placing a knee in the area of his shoulder and Mr. Ashley reached up between Officer Jones' legs and grabbed and squeezed his testicles.  *Id.* at 53:4-19.  Mr. Ashley also grabbed Officer Jones' TASER and tried to take it.  Ex. 4, 20:-25; Ex. 9, 49:21-50:16; Ex. 5, 65:7-13. As a result, Officer Jones drove the TASER into the concrete in an attempt to keep it away from Mr. Ashley.  Ex. 1, ¶ 11.

By the time Officer Jones regained control of the TASER, Mr. Ashley had rolled onto his side. Therefore, Officer Jones applied the TASER in drive-stun mode for a second time in the area below Mr. Ashley's lateral muscle, approximately six inches below his armpit, for one cycle.[5]  Ex. 4, 54:25-55:24. As the TASER cycled, Mr. Ashley's motion ceased for only a second; however, when the cycle ended, it was like the TASER had never been used and Mr. Ashley continued to violently resist arrest.  *Id.* at 55:20-56:6; Ex. 9, 51:9-19. During the struggle, Officer Jones' holster broke so he was unable to reholster it.  Ex. 1, ¶ 12. As a result, he slid it across the ground in an attempt to prevent Mr. Ashley from trying to take the TASER for a second time. Officer Jones did not use the TASER again.  Ex. 1, ¶ 12.

At no time during the struggle did Officer Jones apply the TASER to Mr. Ashley's neck or spine, nor did he see any other officer apply the TASER to his neck or spine.  Ex. 1, ¶ 17. In fact, Officer Jones was not aware that any other officer used the TASER on Mr. Ashley.  *Id.*

---

[5] A TASER cycle is 5 seconds.  Ex. Maher Depo, p. 34, l. 15-21.

As Officer Jones, Officer Coleman and zoo security continued to try to gain control over Mr. Ashley, Lieutenant Pete Conner and Officer Cheryl Smith arrived to assist. Ex. 4, 56:7-17. As the struggle continued, other officers began to arrive and at some point, Officer Jones heard Lieutenant Conner call for an ambulance. Ex. 1, ¶ 13; Ex. 3 at 002659; Ex. 10, Denver Health Paramedic Division EMS Patient Care Report. Because Officer Jones was aware that others were trying to control Mr. Ashley's legs, he tried to hold one of Mr. Ashley's arms down. However, he realized that his body was in the way of getting Mr. Ashley's arm behind his back so that he could be handcuffed. Therefore, Officer Jones let go of Mr. Ashley's arm, slid backwards, and stumbled away from the melee. Ex. 4, 56:19-57:12. Officer Jones had no further physical contact with Mr. Ashley. *Id.*

When Officer Jones moved away, he saw that one of Mr. Ashley's hands was cuffed and other officers were attempting to pull Mr. Ashley's other arm behind him to cuff his other hand. Ex. 4, 58:3-18. At the time, Mr. Ashley was lying on his stomach and still kicking. *Id.* Even after Mr. Ashley was in handcuffs, he continued to struggle as officers attempted to control him. Ex. 4, 60:9-13; *see also* Ex. 6, 87:4-12 and Ex. 11, Deposition of Elina Sengprachanh, 69:18-70:16; 142:24-143:25 (both witnesses testifying that from the time the first officers arrived at the scene to the time he finally went motionless, Mr. Ashley struggled and fought with the officers).[6]

At no time did Officer Jones lie on top of Ashley or in any way place weight on Mr. Ashley so as to prevent or restrict his breathing. Ex. 1, Jones decl. ¶ 17. Officer Jones also did not see anyone lie on top of Mr. Ashley or place any weight on his back during or after the struggle. *Id.*

---

[6] At the time of the incident, Ms. Sengprachanh was Mr. Ashley's girlfriend. Ex. 11, 15:14-16:12.

Shortly thereafter, Officer Jones noticed that Mr. Ashley had vomited and had been rolled onto his side. *Id.* at ¶ 15. Officer Jones heard someone ask if Mr. Ashley was breathing and he saw an officer take Mr. Ashley's pulse. Officer Jones also heard Lieutenant Conner contact dispatch to ask that the ambulance "step it up" and Officer Sean Stevenson began giving Mr. Ashley chest compressions. *Id.*

Given these undisputed facts, all of the *Graham* elements weigh in favor of finding, based upon the totality of the circumstances, that the force used by Officer Jones was objectively reasonable. Not only did the initial call for service relate to a possible domestic violence incident, but upon his arrival at the zoo, Officer Jones was informed that Mr. Ashley had also assaulted a zoo security guard, which is a severe crime. Ex. 2, Derritt affidavit. ¶¶ 5-6; Ex. 5, 31:12-20; Ex. 4, 33:8-20. Under such circumstances, due to the significant safety threat Officer Jones believed Mr. Ashley posed, including Mr. Ashley's angry, irate and violent state in a public location, Jones' understanding that Mr. Ashley had assaulted a zoo security guard prior to his arrival, and the fact that Officer Jones was the only officer present, it was objectively reasonable for Officer Jones to pull out his TASER in an attempt to gain compliance without further incident and order Mr. Ashley to the ground.

Although Mr. Ashley initially complied with Officer Jones' commands to get on the ground, Mr. Ashley jumped back up and started to try to leave the zoo. Ex. 1, ¶ 6; Ex. 4, 40:25-41:14; Ex. 5, 43:5-13. Mr. Ashley then began walking towards the exit at a swift pace. Ex. 1, ¶ 7. Thus, it is undisputed that Mr. Ashley was trying to evade arrest and he was also making threatening statements to Officer Jones. Ex. 1, ¶ 4-6; *see also* Ex. 6, 27:24-28:14; Ex. 4, 34:18-35:24, 37:10-20, 39:3-44:2; *see also* Ex. 5, 44:12-52:22. Nevertheless, by this time, the

only force displayed by Officer Jones was showing his TASER at the time of his initial contact with Mr. Ashley in an attempt to gain compliance.

Plaintiff contends that instead of the measured approach he took, Officer Jones should have used *more* force against Mr. Ashley initially, arguing that Officer Jones should have immediately deployed the TASER probes either during his initial contact with Mr. Ashley or at least by the time that Mr. Ashley started to walk toward the entrance.  Ex. 12, Deposition of Dan Montgomery, 121:7-122:3, 125:24-126:2, 360:17-20, 361:4-9, 363:1-17.  However, the Constitution only prohibits the use of *excessive* force. The Fourth Amendment of course does not prohibit on officer from using his discretion to employ a *lesser* form of force, even if the officer may have arguably been justified in using even greater force than he chose to apply. *See, e.g., Neal-Loman v. Las Vegas Metro. Police Dept.*, 574 F.Supp.2d, 1170, 1188 (D. Nevada 2008) ("[T]he test is not whether an officer attempted all other available methods of responding to the situation but whether an officer reasonably could believe his conduct was lawful under the circumstances confronting him."). Moreover, Plaintiff's contention that Officer Jones should have deployed the TASER probes at least by the time Ashley began to walk swiftly toward the exit is exactly the kind of hindsight second-guessing that must be avoided when determining the reasonableness of an officer's conduct.  *See Graham*, 490 U.S. at 396 (reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

The situation escalated due to Mr. Ashley's decision to run between Officer Jones and the bush and reach out toward Officer Jones, which Officer Jones viewed as an attempt to grab him. "A law enforcement agent, faced with the possibility of danger, has the right to take reasonable

steps to protect himself." *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993). [7] Because Mr. Ashley unquestionably posed an immediate threat to Officer Jones' safety as well as to the safety of zoo employees and guests, Mr. Ashley was taken to the ground by Officer Jones and Mr. Totten. Ex. 6, 58:19-59:15; 87:5-8 (zoo guest feared for her own safety); Ex. 9, Fleugel depo 77:19-78:13.

When he was taken to the ground, Mr. Ashley did everything in his power to violently resist arrest, including punching Officer Jones in the face, grabbing and twisting Officer Jones' testicles, persistently kicking, flailing, struggling and trying to get up off the ground, refusing to give the officers his arms so he could be handcuffed, biting Officer Coleman and Mr. Totten and trying to take Jones' TASER. In fact, Mr. Ashley continued to struggle even after he was handcuffed. Mr. Ashley therefore presented an immediate threat to the officers' safety, as well as the safety of bystanders, one of whom testified that she feared for her safety due to Ashley's behavior.

Officer Jones only escalated the force he used against Mr. Ashley *after* Mr. Ashley continued to violently struggle while on the ground. The force used by Officer Jones was limited to two abdominal strikes, two drive-stun TASER applications, placing a knee on Mr. Ashley's shoulder area (which resulted in Ashley grabbing and twisting his testicles) and holding one of Mr. Ashley's arms down on the ground. Ex. 1, ¶¶ 9-13. Under such rapidly evolving circumstances, it was objectively reasonable for Officer Jones to escalate the amount of force he was using. *See Latta v. Keryte*, 118 F.3d 693, 698 (10th Cir. 1997) (plaintiff's own actions in which his reaction to his encounter with law enforcement resulted in escalating volatility and

---

[7] Resisting arrest and assault on a police officer are severe crimes, indeed the crime of assault on a police officer constitutes a felony. *See* C.R.S. §§ 18-3-203(1)(c), 18-8-103.

danger justifying subsequent actions of law enforcement including cuffing his hands and legs and placing him on the ground); *Harris v. Lumbard*, [11-cv-02461-CMA-KMT], 2013 WL 4781598, at *9 (D. Colo. Sept. 6, 2013) (because plaintiff continued to resist arrest by throwing his elbows and kicking while he was on the ground, it was reasonable for the officers to strike plaintiff several times and to pull his arm from beneath his body and place it in a twist lock); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781 (10th Cir. 1993) (use of TASER numerous times against resisting subject was reasonable); *Cf. Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) (handcuffing is an appropriate response to officer safety concerns).

The facts here are similar to those in *Hinton*, where the plaintiff struggled against two police officers in an effort to prevent his arrest, including kicking his feet, flailing his arms, and biting the officers, requiring one of the officers to use an electrical stun gun numerous times to subdue the plaintiff. *Hinton*, 997 F.2d at 777. The court found that the force the officers used was not excessive because it was undisputed that plaintiff was actively resisting the officers' attempts to handcuff him. *Id*. at 781.

When viewed in their totality, the facts of this case demonstrate that Officer Jones' conduct was objectively reasonable under the circumstances. *See Harris v. Lumbard*, 11-cv-02461-CMA-KMT, 2013 WL 4781598, at *8 (D. Colo. Sept. 6, 2013) (officer did not use excessive force when he deployed TASER after initial attempt to restrain plaintiff was unsuccessful, and officer's subsequent use of TASER was also not excessive in light of the fact that prior TASER discharges were unsuccessful); *see also Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012) (officers' application of a TASER twice in drive stun mode against a

resisting arrestee was reasonable).  For all these reasons, Plaintiff's Fourth Amendment claim against Officer Jones should be dismissed.

**__Officer Phillip Coleman__** - Officer Coleman was the second officer to arrive at the scene. When he arrived, he was only aware of the potential domestic violence incident.  After he exited his car, Officer Coleman asked someone for directions to the elephant exhibit and he began running in that direction.  When he arrived at the scene, he saw that a struggle was occurring on the ground with Officer Jones, Mr. Totten, and Alonzo Ashley. Officer Coleman went "hands on" to assist Officer Jones and attempted to control one of Ashley's arms so he could be handcuffed. After he was already in contact with Mr. Ashley, he noticed how sweaty he seemed to be and that he was very rigid and was flailing to prevent the officers from pulling his arm back.  During the struggle, Officer Coleman saw Mr. Ashley grab the TASER from the ground so he moved towards the direction of the TASER and knelt down near Mr. Ashley's head to get the TASER out of Mr. Ashley's grasp.  Ex. 13, Deposition of Officer Phillip Coleman, 35:16-22. At that time, Mr. Ashley bit him on the left calf.  *Id.* at 35:23-36:2.  Once Officer Coleman took the TASER away from Mr. Ashley, he applied the TASER two times in drive-stun mode to Mr. Ashley's left shoulder area.[8]  Ex. 13, 36:18-37:8.

---

[8] *See* Ex. 30, Declaration of Captain Joseph Padilla. The TASERs used by DPD officers are all equipped with the capability to electronically download from the TASER unit information regarding that unit's use, including date and time of use and duration of use.  After the incident involving Mr. Ashley on July 18, 2011, information from Officer Jones' TASER which was used during the incident was downloaded.  A hard copy print out of the download reports, dated August 11, 2011 and October 21, 2011 are included as part of the Internal Affairs Bureau file, Case No. P2011-07048.  True and accurate copies of the download reports of Officer Jones' TASER unit, reflecting the TASER use relating to this case, are attached to Captain Padilla's declaration.   The Supplementary Report, which is part of the Internal Affairs Bureau file, indicates that there is a time discrepancy between the CAD and TASER times, which led to the second download report.  The Report indicates the internal TASER time was six minutes and six seconds ahead of the actual CAD time.  A true and accurate copy of the Supplementary Report which reflects this information is attached to Captain Padilla's declaration.

Just like before, Mr. Ashley had no response to the first TASER cycle.   Ex. 13, 38:9-11. Mr. Ashley had a slight reaction to the second deployment as he paused for "a millisecond;" however, once the cycle ended, Mr. Ashley continued to violently struggle so Officer Coleman discarded the TASER.  *Id.* at 38:12-22.  Officer Coleman did not use the TASER again.  *Id.* at 37:21-25.

As Mr. Ashley continued to resist arrest, other officers began to arrive, including Lieutenant Conner and Officer Smith who tried to control Mr. Ashley's legs by using their Orcutt Policy Nunchaku (OPNs).  Ex. 13, 41:14-18; Ex. 14, ¶ 6.  As the struggle continued, Officer Coleman saw Lieutenant Conner fall onto Officer Smith.  *Id.* 41:19-42:10. Officer Coleman was eventually able to cuff one of Mr. Ashley's arms, but Mr. Ashley nevertheless continued to struggle. Ex. 13, 40:11-17.   Once Mr. Ashley was finally in handcuffs Officer Coleman adjusted the handcuffs and then disengaged, and he had no further physical contact with him.  Ex. 14, Declaration of Officer Phillip Coleman, ¶ 7.

Officer Coleman saw Mr. Ashley vomit shortly after he was handcuffed and he saw other police officers turn Mr. Ashley over onto his side and move him away from the vomit.  Ex. 13, 44:6-20. Officer Coleman also saw another officer monitor Mr. Ashley's breathing and was aware that medical treatment had been summoned.  Ex. 14, ¶ 7.

Officer Coleman did not hit, kick, or use any instrument to strike Mr. Ashley.  At no time did Officer Coleman lie on top of Ashley or in any way place weight on Mr. Ashley so as to prevent or restrict his breathing.  Ex. 13, 29:8-44:20; Ex. 14, ¶¶  7-8.  Officer Coleman also did not see any other officer lie on top of Mr. Ashley or place any weight on his back during or after the struggle.  *Id.*

None of these facts suggest that the force Officer Coleman used was excessive under the totality of the circumstances.  Rather, when he arrived, Mr. Ashley was already resisting Officer Jones' efforts to place him under arrest. Consequently, Mr. Ashley was committing a severe crime (assaulting a police officer and resisting arrest), he unquestionably posed an immediate threat and he was actively resisting arrest.  Thus, all of the *Graham* factors also weigh in Officer Coleman's favor.

Officer Coleman only used force against Mr. Ashley while Mr. Ashley was violently struggling, and despite Mr. Ashley biting him on the leg,[9] the only force he used was his deployment of the TASER in drive-stun mode for two applications and pulling on Mr. Ashley's arm until he could finally get his arm behind his back so that he could be handcuffed. Accordingly, Officer Coleman is also entitled to qualified immunity from Plaintiff's excessive force claim.  *See Latta*, 118 F.3d at 698; *Harris v. Lumbard*, [11-cv-02461-CMA-KMT], 2013 WL 4781598, at *9 (D. Colo. Sept. 6, 2013); *Hinton*, 997 F.2d at 781; *Fisher*, 584 F.3d at 894.

**<u>Lieutenant Reuben Conner</u>** - Lt. Conner first learned of the incident at the zoo when he heard Officer Jones call out over the radio that he needed help.  Ex. 13, 10:2-5; 11: 5-8.  When he responded to the scene, he was aware that the incident was occurring by the elephant exhibit, and zoo guests pointed him the right direction when he entered the zoo. *Id*. at p. 11:15-16, 19-21; 12:1-3. Officer Curtis arrived around the same time.  When Lt. Conner came around the corner, he saw that Mr. Ashley was lying on his left side and Officers Jones,  Coleman and two zoo staff members, who were all standing towards Mr. Ashley's head, were trying to hold Mr. Ashley down while trying to pull Mr. Ashley's arms out from underneath his body. *Id*. at p. 15:2-7,19-

---

[9]Mr. Ashley bit Officer Coleman so hard it left a scar.  Coleman Depo., p. 45, ll. 16-18.

25; 16:1-13. Because no one was controlling Mr. Ashley's legs, Lt. Conner applied his OPN to Ashley's right ankle to try to use pain compliance to stop his struggling. *Id.* at 17:10-16; 21:13-25; 22:1-6.  However, Mr. Ashley had no reaction to the pain and kicked Lt. Conner off of his leg.  *Id.* at 23:8-10, 20-21; 23:11-23. Because Lt. Conner did not have the chance to apply the OPNs for any significant period of time before he was kicked off, he reapplied the OPN with a stronger grip; however, the OPN broke and caused him to fall into Officer Smith who was applying her OPN to Mr. Ashley's left ankle. *Id.* at 24:2-21.

Lt. Conner then moved up to Mr. Ashley's right arm and assisted a zoo employee with handcuffing Mr. Ashley's right arm.  *Id.* at 25:10-17, 21-25; 30:11-25; 31:1-5. Mr. Ashley continued to struggle and resist arrest.  Mr. Ashley was on his left side at that time, so Lt. Conner told the officers to stretch him out to get control of his left arm.  Handcuffs were then eventually placed onto Mr. Ashley's left wrist.  Lt. Conner had no further physical contact with Mr. Ashley. Ex. 14, ¶ 5.

As soon as Mr. Ashley was in handcuffs, Lt. Conner immediately called for an ambulance.  *Id.* at p. 34, l. 11-16; p. 37, l. 1-16; Ex. 3 at 002659 and Ex. 10.  Lt. Conner initially believed that Mr. Ashley was under the influence of drugs due to his super-human strength and imperviousness to pain.  *Id.* at p. 34, l. 17- p. 35 l. 12.   Because he was concerned about Mr. Ashley's condition, Lt. Conner went to speak to young woman he understood was Mr. Ashley's girlfriend, who was standing off to the side.  Ex. 14, ¶ 7.   Lt. Conner asked Mr. Ashley's girlfriend what type of drugs Mr. Ashley may have taken and she denied that he had taken any. *Id.*  Nevertheless, Lt. Conner contacted dispatch to report that Mr. Ashley might be on drugs so that the paramedics could be informed of the same.  Ex. 3 and Ex. 10.

Sometime after Mr. Ashley was handcuffed and an ambulance was called, Lt. Conner saw Mr. Ashley vomit for the first time.  Ex. 15, Deposition of Lt. Reuben Conner, 34:11-16; 31:14-32:3.  Lt. Conner directed the officers to move Mr. Ashley and turn him on his side to prevent aspiration.  *Id.* at 36:1-8.  He instructed one officer to hold Mr. Ashley's head to prevent any head and neck injuries.  *Id.* at 36:24-37:11. He also directed an officer to stay with Mr. Ashley and ensure that his airway stayed clear. *Id.*  After Mr. Ashley was moved, Lt. Conner started commanding the scene. *Id.* at 37: 21-38:1-5.  However, a short time later, Lt. Conner saw Mr. Ashley vomit a second time.   Lt. Conner called dispatch to tell the ambulance to "step it up" because Mr. Ashley was not breathing.  Ex. 16, Declaration of Lt. Reuben Conner, at ¶ 9. An officer checked Mr. Ashley's pulse and a second officer immediately started CPR.

Lt. Conner did not hit, kick or use any implement to strike Mr. Ashley, nor did he see any other officer hit, kick or use any implement to strike Mr. Ashley.  *Id.* at ¶ 10.  He also did not have any part of his body on Ashley's back, head, or neck, and he did not observe any other individual putting pressure on Ashley's back in such a way to restrict his breathing.  Ex. 15, 27:25-28:20; Ex. 16, ¶ 10.

For the same reasons discussed above with respect to Officers Jones and Coleman, the totality of the circumstances fails to show that any of the force used by Lt. Conner was objectively unreasonable. When Lt. Conner arrived, Mr. Ashley was actively resisting arrest, including kicking and flailing his legs. Therefore, Lt. Conner applied his OPNs to Mr. Ashley's right leg in an attempt to gain pain compliance. Because Mr. Ashley kicked him off the first time the OPNs were applied, Officer Conner applied the OPNs a second time. However, the OPNs had no affect on Mr. Ashley as he continued to struggle and then the OPNs broke.  Lt. Conner

then assisted Mr. Totten to obtain control over one of Mr. Ashley's arms so that he could be handcuffed.  Thus, Plaintiff's claims against Lt. Conner should also be dismissed.

**Officer Joey Gasca** - On July 18, 2011, Officer Gasca was partnered with Officer Jennifer Curtis. When they heard the dispatch call concerning a report of a possible domestic violence incident inside the Denver zoo, they did not immediately respond since they were working in the gang unit and not on patrol.   Ex. 18, Declaration of Officer Joey Gasca, ¶2.  A short time later dispatch aired that cars should respond Code 10, meaning on an emergency basis with lights and sirens activated, and Officers Gasca and Curtis responded.  *Id.*

When they arrived at the zoo, Officer Gasca saw a District 2 officer running toward the front entrance and he also saw four or five fully marked police cars in the parking lot. *Id.* at ¶ 3. The officers were guided in by zoo employees indicated the incident was taking place by the elephants. As Officer Gasca approached, he could hear yelling and officers giving commands. *Id.*

Officer Gasca then saw Mr. Ashley lying on his stomach, being extremely combative with the officers who were trying to control him. *Id.* at ¶ 3.  At the time, Officer Gasca could not see whether Mr. Ashley was handcuffed, but it did appear that his hands were behind his back. Officer Gasca observed that one police officer was resting at least one knee on Mr. Ashley's left shoulder and a zoo employee had his knee on Mr. Ashley's right shoulder. *Id.* at ¶ 4.  Officer Gasca saw that two other officers were positioned to the side of Mr. Ashley's back and at least one officer had her OPNs around Mr. Ashley's ankle. Officer Gacsa also noticed that another officer had broken OPNs and that Mr. Ashley had apparently vomited.  *Id.*

Because Mr. Ashley was continuing to kick, Officer Curtis took out her OPNs and applied them to Mr. Ashley's free ankle.  Officer Gasca noticed that even with the use of the OPNs on both ankles, Mr. Ashley's legs were not under control.  Ex. 17, Deposition of Officer Joey Gasca, 124:21-125:5.   The OPNs were completely ineffective and he continued kicking and struggling.  As a result, Officer Gasca stepped in, instructing the officers to release his ankles.  *Id.* at 126:4-10.  In an attempt to gain control over the lower part of Mr. Ashley's body, Officer Gasca took both of Mr. Ashley's ankles, crossed them, and leaned  Mr. Ashley's legs so that his heels were resting on his buttocks.  *Id.* at 127:11-15.  Officer Gasca then leaned into Mr. Ashley's legs to prevent Mr. Ashley from kicking.  *Id.*

At this point, it appeared to Officer Gasca that Mr. Ashley seemed to stop struggling, so he released the pressure on Mr. Ashley's legs.  *Id.* at 136:18-25; 142:4-10.  Shortly thereafter, he saw Mr. Ashley vomit once or twice more.  Lt. Conner ordered the officers to move Mr. Ashley to his side. *Id.* at 131:12-23.  Officer Gasca saw Officer Stevenson begin chest compressions and then the paramedics arrived and took over.   Ex. 18, ¶ 6.

At no time during the struggle did Officer Gasca hit, kick or use any implement to strike Mr. Ashley.   *Id.,* ¶ 7.  At no point during the struggle did Officer Gasca lie on top of Mr. Ashley or place any significant weight on his back.  *Id.*  Officer Gasca also did not see any other officer lie on top of Mr. Ashley or place any significant weight on his back during or after the struggle.  *Id.*  Further, to Officer Gasca's knowledge, a TASER was not deployed when he was present. *Id.* at ¶ 8.

As with all of the other Defendant Officers, the totality of the circumstances confirms that the nature of Officer Gasca's physical contact with Mr. Ashley, who was actively resisting

arrest, did not constitute excessive force.  In fact, the only force Officer Gasca used was to bend Mr. Ashley's legs at the knees, cross his heels and leaned them on Mr. Ashley's buttocks so that he could gain control over Mr. Ashley's legs. *Id.* at ¶ 5.  It is undisputed that prior to Officer Gasca employing this tactic, the officers who were using OPNs were unable to successfully gain control over Mr. Ashley's legs, despite their numerous attempts to use pain compliance to do so. Ex. 17, 125:6-15.  Even Plaintiff's expert concedes that Officer Gasca's actions followed nationally accepted police practices and tactics.  Ex. 12 at 309:6-310:3   Officer Gasca's actions, just like all of the officers who responded to the scene, were taken in response to Mr. Ashley's persistent resistance and refusal to allow the officers to arrest him.

The fact that Mr. Ashley suffered injuries and tragically died at the conclusion of his physical battle with the police does not substantiate the use of excessive force by any of the officers, including Officer Gasca.   *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 864 (7th Cir. 2010) ("[A]" plaintiff cannot ask a jury to infer that an officer used excessive force based solely on the fact that an injury occurred.  The plaintiff must instead identify the specific conduct of the officer that is alleged to be excessive and unreasonable; the fact of an injury while in police custody is not enough.").

**None of the officers used deadly force** - There is also no support for Plaintiff's contention that the officers used *deadly force* against him.  *See Second Amended Complaint* [Doc. #63], ¶ 33.  "Deadly force is such force that creates a substantial risk of causing death or serious bodily harm." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009) (quotations marks, alteration marks and citation omitted). Deadly force may only be used "if a reasonable officer in Defendants' position would have had probable cause to believe that there

was a threat of serious physical harm to themselves or to others." *Estate of Larsen*, 511 F.3d at

1260 (quotation marks, citation and emphasis omitted).

As set forth above, the force used by the officers is unquestionably less than deadly:

- Officer Jones: (1) pulled out his TASER during his initial contact with Mr. Ashley because he believed he was a significant threat; (2) took Mr. Ashley to the ground along with Mr. Totten only after Mr. Ashley grabbed for him; (3) hit Mr. Ashley twice in the abdomen with his fist after Ashley punched him in the face; (4) tried to hold Mr. Ashley's upper body down by placing a knee in his shoulder area; (5) used a TASER in drive-stun mode for two cycles (once on his upper back after Mr. Ashley grabbed him by the testicles and once in the area approximately six inches below his arm pit after Mr. Ashley grabbed his TASER); and (6) held one of Mr. Ashley's arms down on the ground.

- Officer Coleman: (1) attempted to control one of Mr. Ashley's arms so he could be handcuffed; (2) used Officer Jones' TASER in drive-stun mode for two cycles (both times on his left shoulder); (3) assisted with getting Mr. Ashley handcuffed.

- Lieutenant Conner: (1) applied his OPNs to Mr. Ashley right ankle to try to control his legs; and (2) moved to Mr. Ashley's right arm after his OPNs broke and worked with a zoo employee to get Mr. Ashley's right hand cuffed.

- Officer Gasca: grabbed Mr. Ashley's ankles, bent Mr. Ashley's knees and crossed his legs so his heels were resting on his buttocks and then sat or leaned into Mr. Ashley's legs so that he could no longer kick.

*See Sisneros v. Office of Pueblo County Sheriff*, No. 09-cv-10646-PAB-MJW, 2011 WL 882618

(D. Colo. March 10, 2011) (unpublished decision) (deputy who grabbed plaintiff by shoulder or

neck and pushed him forcefully to ground which caused plaintiff's head to hit the ground with

great force did not constitute deadly force); *Guseman by Guseman v. Martinez*, 1 F.Supp.2d

1240, 1259 (D. Kan. 1998) ("Almost any type of force can cause death in aberrant

circumstances. The limits on the use of 'deadly force' under the Fourth Amendment, however,

apply to that 'that force which is reasonably likely to cause death.'").

Plaintiff may contend that restraining Mr. Ashley in a prone position during at least part of the struggle constituted deadly force. However, there is no evidence that Mr. Ashley died from asphyxiation.[10] Exh. 19, Deposition of Dr. John Carver at 104:10-105:1;  Ex. 20, Deposition of Dr. Judy Melinek, 178:25-179:4; 222:10-14;  Ex. 21, Report of Dr. Gary Vilke, p. 13-14.  The evidence does establish, however, that an ambulance was called while Mr. Ashley was still struggling, Mr. Ashley was still breathing after being placed in handcuffs, and he was monitored by officers once he was under control. Ex. 14, ¶ 9.

More importantly, "[a]uthorities must be allowed 'to graduate their response to the demands of any particular situation.' " *United States v. Montoya de Hernandez,* 473 U.S. 531, 542 (1985) (quoting *United States v. Place,* 462 U.S. 696, 709 n.10 (1983)); *see also Latta v. Keryte*, 118 F.3d 693, 698 (10th Cir. 1997) (plaintiff's own actions in which his reaction to his encounter of law enforcement resulted in escalating volatility and danger justifying subsequent actions of law enforcement including cuffing hands and legs placing him on ground); *see also Gunter v. Township of Lumberton*, 2013 WL 3929048 at *3-4 (3rd Cir. July 31, 2013) (holding that officers' incremental increase of force in response to plaintiff's violent resistance was objectively reasonable even though the plaintiff died after the struggle and was diagnosed with excited delirium); *Burdine v. Sandusky County, Ohio*, 2013 WL 1606906 at *3-4 (6th Cir. Apr. 16, 2013) (holding that summary judgment appropriate on plaintiff's excessive force claim even though evidence reflected that officers laid across plaintiff, applied the TASER three times,

---

[10] Dr. Carver, who conducted Mr. Ashley's autopsy, concluded that the cause of Ashley's death was cardiorespiratory arrest and the manner of death was homicide. NEED CITE. The use of the term "homicide," however, is not meant to indicate that any of the officers acted unreasonably, excessively, or that their application of force was not justified.  Rather, the term is merely a medical term and is not meant to assign any legal culpability. [*See* Dr. Carver Deposition, **Exh.. __**, pp. 26:17-27:7, 72:15-73:18.]  Dr. Carver could not identify the mechanism of death and there was nothing about Ashley's body that identified why he died.  [Dr. Carver Deposition, **Exh. __**, pp. 118:14-119:23.]

handcuffed him, and left him lying face-down on the ground, ultimately resulting in plaintiff suffering cardiorespiratory arrest; Plaintiff's expert report claiming damaged tissue in the neck and is contrary to all other evidence does not create a genuine issue of material fact).

Here, Mr. Ashley was placed in a prone position with his hands and eventually his legs restrained because of the need to control him while protecting the safety of the officers, zoo employees and zoo guests from the dangers posed by Mr. Ashley's violent behavior conduct. Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 594-95 (7th Cir. 1997) (concluding that it was reasonable for officers to place individual on floor in a prone position because he was placed in that position to restrain him from injuring himself and others despite the fact that placing him in that position, when combined with plaintiff's other health problems, resulted in his death).  "[T]he question is not whether the officers' actions aggravated an undiscovered injury or condition, but whether their actions were objectively reasonable under the circumstances." *Id*. at 594 (internal citation omitted); *see, e.g.*, *Mayard v. Hopwood,* 105 F.3d 1226, 1227-28 (8th Cir.1997) (officers' actions were objectively reasonable as a matter of law when they handcuffed resisting individual's wrists, placed hobble restraints on individual's legs and placed individual face down in squad car).

Even when the undisputed facts of this case are viewed in the light most favorable to Plaintiff, the totality of the circumstances demonstrate that the decision to place Mr. Ashley in the prone position was reasonable and complied with the requirements of the Fourth Amendment.

ii.    <u>The officers' alleged failure to recognize that Mr. Ashley may have been exhibiting symptoms of excited delirium does not establish that the force they used was excessive</u>

Excited delirium is a clinical diagnosis describing a person who is usually acutely under the influence of drugs and exhibits violent and irrational behavior.  Ex. 19, 59:6-14.  People in a state of excited delirium often experience objective physiologic changes, such as excessive sweating, increased body core temperature, and hyperthermia.  *Id.*

Based upon the opinions offered by their expert, Dr. Melinek, Plaintiff jumps to the unsupported conclusion that by restraining Mr. Ashley in the prone position and participating in the struggle with him, the officers "failed to correctly treat and respond to Mr. Ashley's alleged excited delirium condition."[11]  However, police officers do not diagnose or treat medical conditions.  More importantly, the opinions offered by Dr. Melinek are the result of an "after-the-fact" or 20/20 hindsight assessment which *Graham* cautions against, as opposed to the officers' real time assessment during the rapidly evolving situation with Mr. Ashley.  However, the undisputed facts establish that this is exactly the type of situation in which the officers were confronted with "circumstances that [were] tense, uncertain, and rapidly evolving," and therefore, as instructed by *Graham*, the officers' decisions should not be second guessed.  *See Graham*, 490 U.S. at 397.

For example, while Officer Jones may have noticed upon his arrival that Mr. Ashley was agitated, he nevertheless appeared to understand Officer Jones' commands since he immediately went to the ground when he was ordered.  Ex. 4, 39:12-17.  Additionally, the comments Mr.

---

[11] This opinion was offered in correspondence from Plaintiff's counsel dated October 17, 2013, but was not included in either of Dr. Melinek's reports.  *See* Ex. 22.  The City and Defendant Officers believe this opinion has been untimely designated, but address it here in case the Court allows Dr. Melinek to offer the opinion.

Ashley made toward Officer Jones at the time of their initial contact were coherent and the fact that Mr. Ashley appeared to be profusely sweating on a hot day is not so unusual that it would have led a reasonable officer to immediately recognize that Mr. Ashley may have been suffering from some type of medical condition.  Ex. 4, 45:2-46:1.

Further, the undisputed evidence establishes that Mr. Ashley posed an immediate threat to the safety of Officer Jones, others who were present at the zoo, and even possibly himself. Not only did he violently assault Mr. Derritt prior to the arrival of any police officer, he also he jumped back up to his feet after initially complying with Officer Jones' order, took a fighting stance toward Officer Jones and then tried to evade arrest by attempting to leave the zoo. It wasn't until Officer Jones believed that Mr. Ashley was trying to grab him that Officer Jones and Mr. Totten took Mr. Ashley to the ground and then the violent struggle was on.

The evidence also does not establish that upon their various arrivals *any* of the other officers had enough information from which they could reasonably determine Mr. Ashley's may have been suffering from a medical condition, which Plaintiff contends constituted a state of excited delirium. Officers Coleman, Conner, and Gasca all arrived after Mr. Ashley was on the ground actively resisting arrest. Thus, the officers needed to immediately assist Officer Jones and the zoo employees. Under such circumstances, none of the officers would have had the time to assess whether Mr. Ashley may have been suffering from a medical condition.  Moreover, even if the officers recognized such a possibility, such recognition by any of the officers, including Officer Jones, would not make the force that they used any less reasonable under *Graham* because Mr. Ashley posed an immediate threat to the officers and zoo patrons, and he was actively resisting arrest.  *Graham v. Connor,* 490 U.S. 396; *Cavanaugh v. Woods,* 718 F.3d 1244.

Even Plaintiff's experts admit that there are times when it might be difficult to identify signs of excited delirium.  Ex. 12, 319:19-24. Assuming for the sake of argument that Mr. Ashley may have been in a state of excited delirium, the facts in this case are not sufficient to show that upon his arrival at the zoo, Mr. Ashley's alleged condition should have been immediately apparent to Officer Jones or that any of the actions he took resulted in a violation of Mr. Ashley's Fourth Amendment rights due to his alleged failure to recognize that Mr. Ashley may have been suffering from excited delirium.

Accordingly, even when viewed in the light most favorable to Plaintiff, the facts do not suggest that under the circumstances with which they confronted, any of the officers should have refrained from using force against Mr. Ashley or stopped trying to get him under control when they realized he appeared to have what some of the officers described as "superhuman strength." Even Plaintiff's expert agrees that if a suspect appears to be suffering from excited delirium, there could still be a need for a police officer to subdue or get the suspect under control.  Ex. 12, 319:25-320:10.   There is no question that such was the case here, where the officers were confronted with an aggressive and non-compliant individual in a public zoo.   Thus, the force the officers used, as described above, was not excessive in light of the circumstances they faced, even if Mr. Ashley had been suffering from the condition of excited delirium.

       *b.*       *There is no evidence that any of the Defendant officers Caused Mr. Ashley's Death*

There is no evidence that any specific action of any of the Defendant Officers was the "but-for" or "proximate cause" of Mr. Ashley's death.  The coroner who performed Mr. Ashley's autopsy, Dr. John Carver, did not find any anatomical cause of death.  Instead he determined that there were several different potential contributing factors including heat stress, hyperthermia,

dehydration, excited delirium, asphyxia, underlying mental illness, stress to Mr. Ashley's body by being held down, and stress caused by Mr. Ashley's own efforts to battle police.  Ex. 19, at 42:8-12; 56:23-57:15; 58:25-61:20; 62:14-64:24.  Dr. Carver testified that none of these factors in and of themselves caused Mr. Ashley's death, but rather it was a "compilation" of different factors.  *Id.* at 118:14-119:16.  Plaintiff's expert witness, Dr. Judy Melinek, also testified that Mr. Ashley died of excited delirium in combination with the physical aspects of the struggle, and that several stressors such as physical stress from chasing after the zoo employee, emotional arousal, and fighting the officers during the arrest were contributory.  Ex. 20, 67:8-12; 221:3-222:21.

When asked whether any specific action of any Defendant Officer was the "direct cause" of Mr. Ashley's death, Dr. Carver was only willing to say that it was one of the many "contributory" factors.  *Id.* at 124:11-125:4; 129:5-14.  Dr. Melinek testified that she was "not individually implicating any specific officer with regards to a specific behavior," and that "it wasn't important for my purposes to distinguish the degrees of involvement of any individual officer." Ex. 20, 231:22-233:6.  Dr. Carver was unable to say which of the contributing factors was any more or less likely than any other to have actually caused Mr. Ashley's death.  *Id.* at 130:24-131:9.  Dr. Melinek opined that excited delirium was the condition which brought about the struggle with police, and therefore led to his death.  Ex. 20 at 70:6-71:2.  Moreover, Dr. Carver also testified that all of Mr. Ashley's conditions (heat stroke, excited delirium, etc.) may have caused him to die even if he had not struggled with police.  *Id.* at 130:5-18.  Accordingly, Plaintiff cannot meet her burden of proof that any individual Defendant Officer proximately caused Mr. Ashley's death.

c.      *No Clearly Established Law*

In addition to not satisfying the first element to overcome the defense of qualified immunity, Plaintiff cannot show any clearly established law which should have reasonably put any of the officers on notice that the force they used against Mr. Ashley was unconstitutional. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202 (2001). The question of whether a right is clearly established must be answered "in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. That is, the question is not whether the general right to be free from excessive force is clearly established, but whether the officers violated any clearly established law under the facts of this case. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.") (citations omitted). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Klen v. City of Loveland, Colo.,* 661 F.3d 498, 511 (10th Cir. 2011). Because the existence of excessive force is a fact-specific inquiry, however, "there will almost never be a previously published opinion involving exactly the same circumstances." *Casey,* 509 F.3d at 1284. Thus, the Tenth Circuit has adopted a sliding scale: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior

case law to clearly establish the violation." *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir. 2004). Ultimately, however, it must have been "'clear to a reasonable officer that his conduct was unlawful *in the situation*.'" *Klen*, 661 F.3d at 511 (citations omitted and emphasis added).

Plaintiffs contend that the officers should have recognized that Mr. Ashley was allegedly suffering from excited delirium and refrained from engaging in conduct which may have resulted in a prolonged struggle. However, there is no clearly established law from the Supreme Court, the Tenth Circuit or even a clearly established weight of authority from other courts which supports Plaintiff's contention that a police officer may violate a person's constitutional rights by failing to recognize that the person may be in a stated of excited delirium. Nor is it clearly establish that, by using certain types of force against a person who is even arguably displaying some signs of excited delirium, one violates the Fourth Amendment, especially when the individual is actively resisting arrest.  As such, the officers are also entitled to qualified immunity qualifiedly because at the time of the incident, there was no clearly established law which would have put the officers reasonably on notice that the force they used against Plaintiff under the circumstances of this case violated the Fourth Amendment.

**B.      Defendants are entitled to Summary Judgment on Plaintiff's Additional Claim for Relief: Failure to Provide Adequate Medical Treatment**

   1.      Burden of proof and elements

Plaintiff did not plead a claim for failure to provide adequate medical treatment.  To the extent Plaintiff is now seeking to assert, and the Court permits Plaintiff to assert, this new claim, Plaintiff also bears the burden of overcoming the defense of qualified immunity on his claim that Officers Jones, Coleman, Conner and Gasca failed to provide Mr. Ashley with adequate medical treatment. *See* Section A.1 above.  Under the Due Process Clause of the Fourteenth Amendment,

pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir.1994).  Accordingly, "[a] claim for inadequate medical attention will be successful if the plaintiff shows "'deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Wilson v. Meeks,* 52 F.3d 1547, 1555 (10th Cir.1995) (Due Process provisions of the Fourteenth Amendment to the Constitution protect pretrial detainees from deliberate indifference to their medical needs), *abrogated on other grounds*, *Saucier v. Katz,* 533 U.S. 194 (2001). "An inadvertent failure to provide adequate medical care" does not rise to a constitutional violation.  *Estelle*, 429 U.S. at 105-06; *see also Walsh,* 22 F.3d at 1000 (affirming summary judgment for defendant officers and jailers where they did not seek medical treatment for plaintiff who was "obviously . . . intoxicated or under the influence of drugs"); *Cottrell v. Caldwell,* 85 F.3d 1480, 1490-91 (11th Cir.1996) (evidence did not support jury finding that defendant police officers "were consciously aware of and disregarded the risk that [decedent arrestee] would suffocate" as a result of defendants' positioning and restraining decedent arrestee in police car).

　　To establish deliberate indifference, the plaintiff must set forth facts sufficient to satisfy both an objective and subjective component.  *See Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006); *see Martinez*, 563 F.3d at 1088.  The objective component is satisfied if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause" of the Eighth Amendment.  *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  A "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or

one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000) (quotations omitted); *see Mata*, 427 F.3d at 751; *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). To prevail on the subjective component, the plaintiff must present evidence that the defendant "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotation marks omitted).

       2.     <u>Elements which cannot be proven by Plaintiff</u>:

           i.     *the officers did not know Mr. Ashley faced a substantial risk of harm and disregarded that risk*

Here, it is undisputed that medical treatment was summoned promptly, that the officers monitored his condition and that medical treatment provided to Mr. Ashley after he stopped breathing.  Ex. 3;  Ex. 23, Declaration of Officer Cheryl Smith, ¶ 12; Ex. 24, Deposition of Officer Jennifer Curtis, 26:3-22; 27:23-28:11; Ex. 25, Declaration of Officer Sean Stevenson at ¶ 13.  Plaintiff nevertheless contends that the officers should have recognized that Mr. Ashley was allegedly suffering from excited delirium and called for medical assistance sooner than they did.  First, as discussed above, the undisputed facts of this case do not establish that Mr. Ashley's alleged condition was so readily apparent that any of the officers should have recognized that he might be suffering from excited delirium (as plaintiff's expect claims) and required immediate medical treatment.  Moreover, even putting aside the fact that the officers needed to get Mr. Ashley under control before medical treatment could be administered, the officers had no way of knowing that Mr. Ashley's active resistance might lead to his death and it was Mr. Ashley's own conduct which lead to the prolonged struggle.

Second, while Plaintiff's expert may contend that the officers did not summon medical assistance soon enough, the alleged "delay" does not amount to deliberate indifference by the officers. There is no indication that the officers, with a "sufficiently culpable state of mind" delayed any medical treatment. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). Rather, the undisputed facts show that medical assistance was summoned within 9 minutes of Officer Jones' initial arrival at the zoo, when Mr. Ashley was still violently resisting the police officers' attempts to get him under control.  Ex. 3. The ambulance was dispatched seven seconds later. Ex. 3; Ex. 10.  The ambulance is already on scene, approximately three minutes later, when Lieutenant Conner reports that Mr. Ashley may be on drugs and to make sure that the ambulance is responding "code 10." Ex. 3; Ex. 10. Approximately three minutes later, Lieutenant Conner advises that Mr. Ashley was not breathing and asks for medical to "step it up" and the paramedics were on scene within 30 seconds to a minute.  Ex. 3; Ex. 23 at ¶ 12.  Certainly, these facts do not show that any of the officers knew of any risk to Mr. Ashley and disregarded it. Rather, such facts establish that the police provided prompt medical care, including seeking medical assistance before he stopped struggling and became unresponsive. *See, e.g. Bowen-Soto v. City of Liberal, Kansas*, [No. 08-1171-MLB], 2010 WL 4643350 at *7-8 (D. Kan. Nov. 9, 2010) (unpublished decision) (noting undisputed facts which showed that summoning medical assistance for someone who may have been suffering from excited delirium within nine minutes of decedent being subdued did not constituted deliberate indifference despite opinion of plaintiff's expert that medical assistance was not summoned soon enough); *Gunter v. Township of Lumberton*, [No. 12-3146], 2013 WL 3929048 at *4-5 (3rd Cir. July 31, 2013) (no deliberate indifference to medical needs shown where record demonstrated that paramedics were called

within ten minutes of the officers' arrival and two minutes later, the officers used a defibrillator in an attempt to revive the decedent).  As such, this claim is also subject to dismissal because the facts of this case do not support Plaintiff's contention that Officer Jones, Coleman, Conner, or Gasca were deliberatively indifferent to Mr. Ashley's Fourteenth Amendment rights.

ii.    *Plaintiff cannot establish clearly established law prong has been met*

Moreover, there is no Supreme Court or Tenth Circuit decision on point nor does a clearly established weight of authority from other courts exist which supports Plaintiff's contention that a police officer violates a person's constitutional rights by failing to recognize an individual is alleged in a state of excited delirium or that, under the circumstances presented in this case, a police officer commits a constitutional violation by failing to immediately summon medical assistance when initially contacting such individual. *Bowen-Soto v. City of Liberal, Kansas*, [No. 08-1171-MLB], 2010 WL 4643350 at *7 (D. Kan. Nov. 9, 2010).  As such, the officers are also entitled to qualified immunity from this claim because the law is not clearly established.

**C.    Defendants are entitled to Summary Judgment on Claim 4:  Conspiracy**

1.    <u>Burden of Proof and Elements</u>

To state a cause of action for conspiracy under 42 U.S.C. § 1983, a plaintiff must prove the following elements: (1) the existence among defendants of an agreement to deprive the plaintiff of a constitutional right; (2) concerted action by the defendants; and (3) an actual deprivation of rights.  *See Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990).  Plaintiff cannot satisfy any of these elements.

2.      <u>Elements that Cannot be Proven by Plaintiff</u>:

i.      *No agreement existed to deprive Mr. Ashley of a constitutional right*

To establish the existence of a conspiracy, a plaintiff must show that there was a "single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences." *Snell*, 920 F.2d at 701-02. Proof of an agreement "will often require examination of conduct occurring prior to the deprivation." *Id.*; *Hunt v. Bennett*, 17 F.3d 1263, 1268 (10th Cir. 1994) (there must be a "meeting of the minds" among the alleged conspirators).

Plaintiff can provide no facts regarding any agreement prior to the incident to deprive Mr. Ashley of his constitutional rights. To the contrary, there was no agreement or meeting of the minds between any of the officers, but they simply all responded to the same call for service and assessed the situation encountered upon their respective arrivals on the scene. Ex. 3 (demonstrating that each Defendant officer responded separately and arrived separately). Plaintiff's conspiracy claim appears to be based merely on the perception that the officers worked together to accomplish gaining control of Mr. Ashley. However, "[p]arallel action—or inaction …—does not necessarily indicate an agreement to act in concert." *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004). More specifically, as explained by the United States Supreme Court, "when allegations of parallel conduct are set out … they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). Plaintiff has presented no facts to show any agreement between Defendants to support a conspiracy claim.

ii.       *No concerted action by Defendants*

In analyzing the concerted action element, the Tenth Circuit explained this requires "only willful participation in a joint activity …, namely to cause harm or injury to the plaintiffs." *Crabtree By and Through Crabtree v. Muchmore*, 904 F.2d 1475, 1481-82 (10th Cir. 1990). Plaintiff has presented no facts to show that Defendants acted in concert with the willful intent to cause harm or injury to Ashley. Indeed, as Plaintiff's expert concedes, there is no evidence that any of the officers intended to injure Ashley. Ex. 12, 354:8-355:20.

iii.      *Mr. Ashley was not deprived of his rights*

Conspiracy is a derivative cause of action and to support such a claim, "a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights." *Snell*, 920 F.2d at 701; *see Double Oak Construction L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003) (conspiracy is a derivative cause of action that is not actionable *per se*, but there must be an underlying unlawful action that creates an independent cause of action). In addition to the above mentioned reasons, Plaintiff's conspiracy claim can also be dismissed on the basis that the officers did not use excessive force, and therefore, they did not deprive Ashley of his constitutional rights. Without an underlying constitutional violation, the conspiracy claim is baseless. *See Peterson v. Grisham*, 594 F.3d 723, 730 (10th Cir. 2010) ("an underlying unlawful act is necessary to prevail on a civil conspiracy claim"); *Snell*, 920 F.2d at 701. For all these reasons, the conspiracy claim against the individual Defendant police officers should be dismissed.

**D.** **Defendants are entitled to Summary Judgment on Plaintiff's State Law Claims: Claim 2 (Wrongful Death - C.R.S. § 13-21-202), Claim 3 (Survival Action - C.R.S. § 13-20-101), Claim 12 (Assault) and Claim 13 (Battery)**

The Court should grant summary judgment on Plaintiff's second, third, fourth and fifth claims because she cannot prove that any Defendant Officer acted with willful or wanton conduct.

**1.** Burden of Proof and Elements

All four of Plaintiff's state law claims are tort claims limited by the Colorado Governmental Immunity Act (CGIA). C.R.S. § 24-10-101 *et seq.*; *see Steedle v. Sereff*, 167 P.3d 135, 138-39 (Colo. 2007); *DeForrest v. City of Cherry Hills Village*, 72 P.3d 384, 386-87 (Colo. App. 2002). Wrongful death, survival, assault and battery claims do not fall within any of the eight specifically enumerated waivers of immunity found in the CGIA. *See* C.R.S. § 24-10-106(1). As a result, these claims are barred unless Plaintiff can prove willful and wanton conduct by each of the individually named officers:

> A public employee shall be immune from liability in any claim for injury … which lies in tort or could lie in tort … which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton.

C.R.S. § 24-10-118(2)(a); *see also* C.R.S. § 24-10-105. Proving that Defendants' actions were willful and wanton is Plaintiff's burden. *Smith v. Board of Educ.*, 83 P.3d 1157, 1167 (Colo. App. 2003).

**2.** Element that cannot be proven by Plaintiff:  No evidence of willful and wanton conduct exists

While the phrase "willful and wanton" is not defined in the CGIA, Colorado courts have used the definition in C.R.S. § 13-21-102(1)(b) for purposes of exemplary damages as guidance.

40

*See Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994) (applying C.R.S. § 13-21-201(1)(b) to a claim of willful and wanton conduct in an alleged violation of the Fourth Amendment by police officers). That section defines willful and wanton conduct as "conduct <u>purposefully</u> committed which the actor must have realized as dangerous, done heedlessly or recklessly, without regard to consequences, or to the rights and safety of others, particularly the plaintiff." C.R.S. § 13-21-102(1)(b) (emphasis added). To satisfy this standard, the public employee "must be consciously aware that their acts or omissions create danger or risk to the safety of others, and they then act … without regard to that danger or risk." *Gray v. Univ. of Colo. Hosp. Auth.*, 284 P.3d 191, 198 (Colo. App. 2012); s*ee also Castaldo v. Stone*, 192 F.Supp.2d 1124, 1141 (D. Colo. 2011) (for willful and wanton conduct under the CGIA it must be sufficiently alleged that the defendant *purposefully* pursued a course of action or inaction that he considered would probably result in harm to plaintiff) (emphasis added).

There is no evidence that any of the officers purposefully harmed Mr. Ashley. *Gray*, 284 P.3d at 198. Even Plaintiff's expert has expressed the opinion that none of the officers had a "willful, injurious intent or a malicious intent" or "purposeful intent" to harm or injure Mr. Ashley. Ex. 12, Montgomery depo, 354:8-355:20. Because there is no evidence that any of the defendant officers intended to harm Mr. Ashley or acted willfully or wantonly, Plaintiff's third, fourth, twelfth and thirteenth claims are barred by the CGIA. Therefore, Defendants are entitled to summary judgment on all of these claims.

**E.      The City is Entitled to Summary Judgment on Claim Five: Failure to Supervise and Claim Six: Inadequate Policies and Training**

Plaintiff's fifth claim for relief is asserted against Denver and "one or more Defendants who were personally responsible for supervising other Defendants, and ensuring they did not

engage in violations of constitutional rights." *Second Amended Complaint* [Doc. #63] ¶ 69. Despite the fact that Plaintiff failed to identify the specific individual defendant against whom this claim is alleged, it is undisputed that Lt. Conner was the supervising officer at the scene.  Ex. 15, 9:19-10:1.  Therefore, it appears that a portion of Plaintiff's fifth claim for relief intends to assert a "supervisory liability" claim against Lt. Conner and the remainder of Plaintiff's fifth claim and Plaintiff's sixth claim for relief are asserted against Denver based upon an alleged failure to supervise and train and "inadequate policies." As a result, the supervisory and municipal liability claims will be separately addressed below.

1.     Burden of Proof and Elements: "Supervisory Liability" - Lt. Conner

Claims asserted against supervisors have been often been referred to as "supervisor liability" claims. *See, e.g., Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988). However, the Supreme Court has suggested the term "supervisory liability" is "a misnomer," since this term implies vicarious liability, which is not authorized under § 1983. *See Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009); *Brown v. Montoya,* 662 F.3d 1152, 1164 (10th Cir.2011). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013) (citing *Iqbal*, 556 U.S. at 677). Therefore, to prove individual liability by a supervisor, the plaintiff must show an "affirmative link" between the supervisor and the constitutional violation.  *Schneider*, 717 F.3d at 767 (citing *Dodds v. Richardson,* 614 F.3d 1185, 1195 (10th Cir.2010)). Such a showing requires more than "a supervisor's mere knowledge of his subordinate's" conduct. *See Iqbal,* 556 U.S. at 677.  Thus, to establish a § 1983 claim against Lt. Conner based on his supervisory responsibilities, Plaintiff must show: (1) personal involvement;

(2) sufficient causal connection; and (3) a culpable state of mind. *Schneider*, 717 F.3d at 767 (citing *Dodds*, 614 F.3d at 1195). Plaintiff cannot make the requisite showing under the undisputed facts of this case.

    2.    <u>Elements that cannot be proven by the Plaintiff against Lt. Conner</u>:

       i.    *Plaintiff cannot establish sufficient personal involvement*

Individual liability under § 1983 must be based upon personal involvement in the alleged constitutional violation. *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997). In *Iqbal*, the Supreme Court articulated a stricter liability standard for establishing personal involvement than that which was previously permitted in the Tenth Circuit. *Schneider*, 717 F.3d at 768 (citing *Dodds*, 614 F.3d at 1199). Since *Iqbal*, the plaintiff must prove that the individually named governmental defendant, through his own individual actions, has violated the constitution. *Id*.

First, as demonstrated above, there is no evidence that any of the individually named officers, including Lt. Conner, violated Plaintiff's constitutional rights. For this reason alone, this claim should be dismissed.

Lt. Conner arrived on scene *after* the struggle with Mr. Ashley began and applied OPNs to Mr. Ashley's right ankle, directed the officers how to position Mr. Ashley so that he could be handcuffed, and assisted Mr. Totten in getting one of Mr. Ashley's arms pulled behind Mr. Ashley's back for this purpose was objectively reasonable under the circumstances. Lt. Conner also called for medical assistance prior to the end of the struggle, tried to obtain information from Mr. Ashley's girlfriend about Mr. Ashley's condition, instructed the officers to move Mr. Ashley after he vomited so that he was not lying in his own vomit and instructed the officers to monitor Mr. Ashley, which they did, including providing CPR. Lt. Conner even called dispatch

to ask for the ambulance to "step it up" when Mr. Ashley stopped breathing. Thus, the undisputed facts establish that Lt. Conner did not personally participate in any constitutional violation when he was at the scene and that he did not fail to intervene to prevent Mr. Ashley's constitutional rights from being violated. *Mata v. City of Farmington,* 791 F.Supp.2d 1118, 1156 (D.N.M. 2011) ("Establishing a constitutional violation [for excessive force] is a necessary predicate to any claim that an officer failed to intervene." ) (citing *Hall v. Burke*, 12 Fed. Appx. 856, 861 (10th Cir. 2001) (unpublished decision).

ii.     *Plaintiff cannot establish the requisite causal connection*

To establish the second supervisory element, the "requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" *Poolaw v. Marcantel,* 565 F.3d 721, 732-33 (10th Cir.2009). Here, the undisputed facts do not show any casual connection between Lt. Conner's conduct when he arrived on scene and a violation of Mr. Ashley's constitutional rights.  *See* facts alleged *supra* at pages 19-21.

iii.     *Plaintiff cannot show that Lt. Conner acted with a sufficient culpable state of mind*

To satisfy the third element, Plaintiff must show that Lt. Conner engaged in the alleged unconstitutional actions with the requisite state of mind. *See Schneider*, 717 F.3d at 769. The precise state of mind required depends upon the type of claim the plaintiff asserts. *See Iqbal,* 556 U.S. at 676; *Dodds,* 614 F.3d at 1204-05. Here, Plaintiff alleges a violation of Mr. Ashley's Fourth Amendment rights (excessive force) and Fourteenth Amendment rights (failure to provide adequate medical treatment). As noted above, an objectively reasonable standard is applied for excessive force and the applicable state of mind for the failure to provide adequate medical

44

treatment is deliberate indifference. The undisputed facts do not should that Lt. Conner's conduct was not objectively reasonable or that he acted with deliberate indifference. For all of these reasons, Plaintiff's attempt to impose individual liability against Lt. Conner based upon an alleged failure to supervise, fails as a matter of law.

       3.    <u>Burden of Proof and Elements: Municipal Liability</u>

Vicarious liability cannot be imposed against Denver for any alleged unconstitutional actions that the individually named officers may have committed. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978) (governmental entity "may be held liable under § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees."). Rather, to the extent that § 1983 liability may be imposed against Denver, such liability must be based on Denver's own alleged unconstitutional conduct. To establish § 1983 municipal liability Plaintiff must show: (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, (10th Cir. 1998) (citing *Monell*, 436 U.S. at 694).

A municipal policy or custom may be established by any of the following:

(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City,* 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoetlerv. Twin Peaks Charter Acad.,* 602 F.3d 1175, 1189-90 (10th Cir. 2010)) (internal quotations omitted).

Plaintiff's municipal liability claim against Denver is limited to (1) and (5), contending that Denver had "inadequate policies" and failed to adequately train and supervise it employees. To survive summary judgment on the claim that Denver had "inadequate policies," Plaintiff must prove: (1) a government policy or custom existed; (2) which caused the alleged injuries at issue; and (3) which was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury. *Schneider,* 717 F.3d at 769. A claim of unconstitutional failure to train or supervise against Denver requires Plaintiff to show: (i) the training or supervision of police officers was in fact inadequate; (ii) the officers committed a constitutional violation; (iii) the constitutional violation arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (iv) the inadequate training or supervision demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and (v) there is a direct casual link between the constitutional deprivation and the inadequate training or supervision. *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000); *see Rehberg v. City of Pueblo*, No. 20-cv-00261-LTB-KLM, 2012 WL 1326575 at *4 (D. Colo. Apr. 17, 2012) ("The failures to 'train' or 'supervise' are so similar that they are discussed together and require the same elements.") (internal citations omitted).

Regardless of the theory of municipal liability under which Plaintiff is attempting to proceed, the undisputed facts establish that Plaintiff cannot meet the applicable standard of proof.

4.      Elements that cannot be proven on Plaintiff's Municipal Liability Claims:

        i.      *The individual officers did not violate Mr. Ashley's constitutional rights*

As detailed above, the undisputed facts establish that the individually named officers did not violate Plaintiff' constitutional rights. Therefore, Plaintiff's attempt to impose municipal liability against Denver fails as a matter of law. *See Monell*, 436 U.S. at 694. Thus, Plaintiff's claims against Denver should be dismissed in their entirety.

        ii.     *A municipal policy or custom was not the moving force behind any alleged violation of Mr. Ashley's constitutional rights*

**Denver's policies meet or exceed constitutional standards** - Neither Plaintiff's discovery responses nor the opinion of Plaintiff's police practices expert identify any specific policies or customs for the Denver Police Department which fail to meet constitutional standards. *See* Ex. 26, Plaintiff's Second Amended Answers to Denver Defendants' First Combined Discovery, pg. 2, Interrogatory Nos. 7-10. Rather, Plaintiff expert opines that he had "no problem" with the DPD operations manual, which are the only policies and procedures he reviewed prior to formulating his opinions. Ex. 12, p. 160, l. 13-20; Ex. 38, Montgomery report p. 7-8 (list of specific information reviewed and considered). Plaintiffs vague allegations regarding claimed inadequacies in Denver's policies are insufficient to survive summary judgment. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) ("unsupported allegations" are insufficient to survive summary judgment).

Moreover, a review of Denver's policies demonstrates that all comply with constitutional requirements. For example, the Denver Police Department (DPD) has detailed policies in its Operations Manual.  Its Operations Manual is publicly accessible online at:

http://www.denvergov.org/police/PoliceDepartment/AboutUs/OperationsManual/tabid/442533/Default.aspx.[12] The Code of Ethics in the Manual notes that one of the fundamental duties of a law enforcement officer is to respect the Constitutional rights of all to liberty, equality and justice. Ex. 27 at DENVER 000942. The DPD also maintains a publicly accessible Department Discipline Handbook with conduct principles and disciplinary guidelines at: http://www.denvergov.org/Portals/744/documents/handbooks/DPD_Handbook_Final_6-4-2008_with_appendix.pdf.[13] Denver also has an Internal Affairs Bureau which investigates allegations of police officer misconduct and an Office of the Independent Monitor which not only actively monitors and participate in DPD Internal Affairs Bureau investigations, but also makes recommendations regarding policy issues. *See* Ex., 28, Revised Municipal Code of Denver, § 2-371 through § 2-389.

The Operations Manual contains extensive policies regarding requesting medical services, use of force, arrest procedures and tactics, including less lethal force and control options, TASER deployment, impact tools/devices such as Orcutt Police Nunchaku (OPN), and. Ex. 29 (operations manual) § 102.09 (Requests for Emergency Medical Services), Bates No. DENVER 1026; § 105.3, DENVER 1122-25. With respect to TASER use, the policy specifically addresses the areas of the body which officers should avoid when a TASER is deployed and the situations in which TASER use is authorized and not authorized. *Id.* at DENVER 001122-1124. *Id.* As relevant to this case, the TASER policy instructs when a police officer may use a TASER in the drive/contract stun" mode:

---

[12] The entire manual is almost 800 pages long. Therefore, only excerpts are included with this Motion.
[13] Because the handbook exceeds 100 pages in length, it is not being attached as an exhibit.

> Use of the Drive/Contact Stun is discouraged except in situations where the deployment of the "Probes" is not possible and the immediate application of the "Drive/Contact Stun" will control a subject displaying, at least, Active Aggression.[14]

*Id.* at DENVER 001123.

The policies articulate Denver's strong stance against the use of excessive force by its officers:

> The Denver Police Department recognizes the value of all human life and is committed to respecting human rights and the dignity of every individual, and the Constitutional right to be free from excessive force, whether deadly or not, by a law enforcement officer. The use of force, especially force likely to result in serious bodily injury or death (including a firearm), is a serious action. When deciding whether to use force, officers shall act within the boundaries of the United States and Colorado constitutions and laws, ethics, good judgment, this use of force policy, and all other relevant Denver Police Department policies, practices and training. With these values in mind, an officer shall use only that degree of force necessary and reasonable under the circumstances.

*Id.* at DENVER 001112.  The use of force policy also specifically instructs police officers to use only the amount of force which is appropriate under the Constitution and specifically sets forth the *Graham* factors to determine objectively reasonable force options:

> 1. The reasonableness of an officer's use of force under the Fourth Amendment requires careful attention to the totality of the facts and circumstances known by the officer prior to using force, including:
>
>    a. The severity of the crime at issue and
>    b. Whether the suspect poses an immediate threat to the safety of the officer(s) or others and
>    c. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.
>
> 2. Each situation is unique. Sound judgment and the circumstances of each situation will dictate the force option the officer deems necessary.

---

[14] The policy defines "active aggression" as "a threat or overt act of an assault, coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is imminent.  Exh. 29, (OPS MANUAL, p.115, DENVER 001115).

> Depending on the circumstances, officers may find it necessary to escalate or de-escalate the use of force. It is not the intent of this policy to require officers to attempt to exhaust each option before moving to the next, so long as the level of force used is reasonable and appropriate under the circumstances.

*Id.* at DENVER 001115.

Denver also has an Arrest and Control Techniques and Defense Manual which addresses reasonable force considerations, pain compliance, types of resistance by a suspect, excessive force, de-escalation of force, sudden custody death syndrome (including symptoms, excited delirium and positional asphyxia, and handcuffing techniques, including prone handcuffing. Ex. 32, DENVER-GJ 1221-24.  Denver even has crisis intervention (CIT) officers who will respond to the scene if time and circumstances reasonably permit and dictate, if an officer learns or observes that a person with whom the officer is dealing may be mentally ill or otherwise emotionally disturbed.  Ex. 29, Ops Manual, DENVER 1115.

Denver also has detailed supervisory policies in its Operations Manual.  *See* Ex. 29, §§ 500-508.  The supervisory policies include complaint and discipline procedures, as well as an assessment system that vests supervisors with specific responsibilities to actively monitor subordinate officers and address any deficiencies:

> Supervisory officers will continually examine areas of the police operation under their purview, and must assume the duties and obligations of their ranks in the assessment and correction of performance deficiencies of their subordinate officers. Supervisory officers must not look to higher authority to take corrective action when performance deficiencies are detected.

> Supervisors shall take proactive measures to identify performance deficiencies of personnel under their supervision and develop and implement effective interventions to correct any performance or behavioral issues.

*Id.* at §§ 503 and 508.04(3)a and b.

Finally, the DPD also has a Research and Development Bureau, which assists in preparing policies and standard operating procedures, and prepares studies and statistics, and evaluates new police methodologies to ensure constitutional compliance. *Id.* at § 2.14, DENVER 000951-952.

The policies and procedures discussed herein were in effect at the time Mr. Ashley was arrested. Ex. 30. There is absolutely no evidence that the implementation and enforcement of any of these policies and procedures are constitutionally insufficient.

**<u>Denver's training and supervision of its officers is not inadequate</u>** - A municipality may be liable for failing to train or supervise its employees in "limited circumstances." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). It is not enough for plaintiff to show the existence of general deficiencies in a police department's training program. *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). Rather, a plaintiff must identify a specific deficiency in the training program or supervision which is closely related to the plaintiff's ultimate injury and actually prove that the deficiency in training or supervision actually caused the officers to act with deliberate indifference. *See Id.* at 761. Plaintiff cannot point to any inadequacy in Denver's training or supervision of its officers with respect to the allegations made concerning the officers in this case. In fact, Plaintiff's police practice expert did not even review any of Denver's training materials or the specific officer's training records prior to formulating his opinions in this case. Montgomery Depo., p. 159, ll. 19-25; p. 160, ll. 1-4.

The record in this case demonstrates that the training of officers is more than adequate. All Denver Police officers attend the Denver Police Academy, where they receive rigorous training for six weeks. As part of this training, new officers receive specific training on arrest control techniques and the use of force, including, but not limited to, Denver's policies and procedures noted above regarding excited delirium, requesting emergency medical services. Ex. 31, Deposition of Aaron Brill at 10:2-11:7.  Recruits are trained about excited delirium with a specific lesson plan, videos, and sudden custody death syndrome, as addressed in the Arrest Control Technique and Defensive Tactics Manual.  *Id*.; Ex. 32, DENVER-GJ 1221.

In the academy, officers receive eight-hours of training in the use of TASERs, including the specific policies of the Denver Police Department and authorized uses for a TASER in both modes, including drive-stun mode.  Ex. 8, 15:21-16:2; Ex. 33, DENVER 001724-1730; 001761-1763; DENVER 001767.  Excited delirium is also included as part of TASER training.  *Id.* After completing the training, all officers are required to pass a written examination before the officer is authorized to carry a TASER. Ex. 34 at DENVER 003040-3049.

Denver also requires its officers to be re-trained and re-certified on TASER use every two years, which is the industry's standard.  Ex. 8 at 16:23-17:5. The re-certification training includes a two hour training class, an on-line examination, and an in-person test in which officers must successfully demonstrate deployment of the TASER, reloading, and a second deployment. Ex. 8 at 25:13-27:19. The TASER class also addresses excited delirium, including through a video and written materials.  Ex. 35, DENVER 001914-1919.  At the conclusion of the training, the officers are required to complete and pass an on-line examination.  *Id.* at DENVER 1920.

After graduating from the academy, officers are also required to obtain a minimum of 16 hours of additional training each year. Ex. 31, 33:9-20. Denver offers a 40 hour crisis intervention training (CIT) which provides procedures and tactics for dealing with mentally ill individuals. Ex. 36. All of the Defendant officers in this case received CIT training. (Ex. 37 - Jones DENVER 000036; Coleman, 000039; Conner, 000057 (including an eight hour CIT Recertification for Facilitators and Coaches); and Gasca, DENVER 000063).

In total, prior to the July 18, 2011 incident involving Mr. Ashley, Lieutenant Connor (who joined DPD in 1989) received 994 hours of training, Officer Coleman (who joined DPD in 2004) received 412 hours of training, Officer Gasca (who joined DPD in 2000) received over 700 hours of training (including recertification as an Arrest Control Tactics Instructor), and Officer Jones (who joined DPD in 2006) received 224 hours of training. Ex. 37.

The foregoing establishes that Denver adequately trained its offices. The fact that Plaintiff's expert may have formed a conclusory opinion that the officers were not adequately trained, without even taking the time to review any of Denver's training materials, does not raise a genuine issue of material fact concerning the adequacy of the officers' training. *See, e.g., Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (to prevail on failure to train claim, plaintiff must show that the training given was, in fact, inadequate). Plaintiff relies merely upon what Plaintiff considers to be unreasonable police tactics. As discussed in great length above, Plaintiff is unable to demonstrate any police conduct in this case was unreasonable. In an event, it would take more than identify a mistake by a Denver police officer to establish a failure to train. *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("Adequately trained officers

occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").

Similarly, Plaintiff cannot point to any inadequacy in Denver's supervision of police officers. Plaintiff's expert did not review the personnel records or performance evaluations of any of the police officers involved in this lawsuit and he does not opine that a lack of supervision existed. Without competent evidence, Plaintiff's failure to supervise claim also fails.

> iii.    There is no evidence of deliberate indifference

Regardless of the municipal liability theory offered by Plaintiff, to survive summary judgment, Plaintiff must also prove deliberate indifference. *City of Canton*, 489 U.S. 388-89 (only if plaintiff can show that the municipalities conduct amounts to deliberate indifference to the rights of persons with whom the police come into contact can such a shortcoming be properly thought of as a 'policy or custom' that is actionable under § 1983).  The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citations and internal quotations omitted).  Such notice is rarely demonstrated by a single incident of deficient action or inaction. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). In fact, deliberate indifference may be found in the absence of a pattern only in narrow circumstances when the violation of a federal right is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train its employees in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations. *See Barney*, 143 F.3d at 1307- 08.

Deliberate indifference may be shown where a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction. *Id*. at 1308. Thus, proof that any Denver policymaker disregarded a known or obvious consequence of his action is required. *See Id*. Deliberate indifference is a stringent standard of fault. *Brown*, 520 U.S. at 410.

Here, as discussed above, the record is devoid of any evidence that Denver's policies are not constitutionally compliant. There is also no evidence that Denver was on notice of the need for additional training or supervision of its police officers, including the Defendant officers in this case, which is closely related to Plaintiff's alleged constitutional violations concerning the use of excessive force or the failure to provide adequate medical services. Consequently, Plaintiff will be unable to show that the "need for more or different action [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

There is no evidence that Denver was aware of and ignored risks associated with inadequate training or supervision of its police officers or evidence that any inadequacy in training or supervision was likely to result in the constitutional rights violations Plaintiff alleges in this case. The opinions offered by Plaintiff's expert, Dan Montgomery, are not sufficient to establish deliberate indifference. Ex. 38, p. 18, 20-25. Merely listing various actions in an expert report and claiming that those actions would not have taken place if the officers were well-trained or supervised is not enough to show deliberate indifference. *See Carr*, 337 F.3d at 1230 ("[T]he fact that someone with the opportunity to prepare an expert report at leisure opines that

well-trained officers would have performed differently under pressure does not rise to the legal standard of deliberate indifference on the part of the City…").

iv.    *The evidence is not sufficient to establish causation*

To establish causation, "the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717 F.3d at 770 (citations omitted). It is not enough for Plaintiff to merely identify conduct attributable to Denver; rather, Plaintiff must also demonstrate that through its deliberate conduct, Denver was the "direct cause" or the "moving force" behind the constitutional injury alleged. *Tuttle*, 471 U.S. at 820; *Brown*, 520 U.S. at 404. Causation is intentionally a difficult burden to meet to ensure that the law does not evolve into "*de facto respondeat superior liability*." *City of Canton*, 489 U.S. at 392; *see also Brown*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.").

To carry its burden, Plaintiff must come forward with evidence that connects Denver's alleged inadequate policies, training or supervision to the Defendant officers. *See, e.g., Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005) ("The actions taken by Solitro that constituted excessive force must somehow have been caused – at least in part – by the City's failure to train… Solitro.") Here, Plaintiff has no such evidence.

For example, Plaintiff cannot show that one or more of the Defendant officers was involved in a prior use of force that could be considered "excessive" or even that any of the Defendant officers were previously the subject of an Internal Affairs investigation which was

56

somehow inadequate and therefore, could have arguably led to the alleged use of force by the officer in this case. Plaintiffs also have no evidence that connects Denver's alleged inadequate training and supervision and the excessive force Plaintiff claims the Defendant officers used during the incident. Plaintiff's mere assertion that Denver's policies, training or supervision allegedly encourage the use of excessive force or result in a failure to provide adequate medical treatment is exactly the type of generalized allegations that the Supreme Court in *City of Canton* declared insufficient to establish causation. For all of these reasons, Denver is entitled to summary judgment.

## IV. CONCLUSION

Plaintiff cannot show that any of the officers used excessive force against Mr. Ashley or that they failed to provide adequate medical treatment.  Further, Plaintiff's theory that the officers should have acted differently with respect to the force the used and the time they summoned medical treatment is not supported by clearly established law.  As a result, the individual officers are entitled to qualified immunity.

Further, Plaintiff's attempt to impose municipal liability against Denver also fails as a matter of law.  Not only are Plaintiff's claims subject to dismissal due to her inability to establish that any of the officers violated Mr. Ashley's constitutional rights, but the evidence also establishs that Denver's policies and procedures are constitutionally sufficient and its officers are properly trained and supervised.

**WHEREFORE**, for all of the reasons set forth above, the Denver Defendants respectfully request that this Court enter summary judgment in their favor and dismiss Plaintiff's Complaint against them, in its entirety, with prejudice.

Respectfully submitted,

_____s/ Wendy Shea_____
Wendy J. Shea, Assistant City Attorney
Jessica R. Allen, Assistant City Attorney
Cristina Peña Helm, Assistant City Attorney
Office of the Denver City Attorney
 Litigation Section
210 W. Colfax Avenue, Dept. 1108
Denver, CO  80202
Telephone:  (720) 913-3112
Facsimile:  (720) 913-3182
E-mail:  wendy.shea@denvergov.org;
          jessica.allen@denvergov.org
          cristina.helm@denvergov.org

*Eric M. Ziporin*
*Monica N. Kovaci*
Senter Goldfarb & Rice, L.L.C.
1700 Broadway, Suite 1700
Denver, CO  80290
Telephone:  (303) 320-0509
Facsimile:  (303) 320-0210
E-mail:  eziporin@sgrllc.com;
          mkovaci@sgrllc.com

*Attorneys for the Denver Defendants*

`

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 18th day of October, 2013, I electronically filed the foregoing **DENVER DEFENDANTS' MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

| | |
|---|---|
| William W. Frankfurt | Brett Marshall Godfrey |
| wfrankfurt@comcast.net | Godfrey@gojolaw.com |
| | |
| Kevin Flesch | Julie Nicole Richards |
| kevinflesch@hotmail.com | Richards@gojolaw.com |

*s/ Wendy Shea*

00785211.DOC