*Gail Waters vs.*

*City and County of Denver, et al.*

*Deposition of Justin Jones*

*July 11, 2013*



216 16th Street, Suite 1600
Denver, CO 80202
303-988-8470 (Office) 303-988-8478 (Fax)
www.SKReporting.com

Original File JonesJ071113

**Exhibit 4**

Case 1:12-cv-01856-MSK-NYW   Document 129-4   Filed 10/18/13   USDC Colorado   Page 2 of 9

Gail Waters vs.
City and County of Denver, et al.

Deposition of Justin Jones
July 11, 2013

**Page 29**

1 from your perspective as to what happened?
2   A   I don't recall, specifically. If I could
3 look at it. I mean, obviously, it's my report.
4   Q   Right.
5   A   I don't recall, specifically. I remember
6 the individual was -- had thrown a cinder block at his
7 neighbor and then was armed with a pickaxe when I arrived
8 on scene.
9   Q   All right. And you detained that
10 individual?
11   A   Yes.
12   Q   And was it through the detention that they
13 were saying that you used excessive force?
14   A   Yes. When I attempted to put him in
15 handcuffs, he tried to turn around and hit me.
16   Q   I see. And what did you do in response to
17 that?
18   A   I took him down to the ground.
19   Q   And did you -- what type of maneuver did
20 you use to take him to the ground?
21   A   Well, I already had control of him with
22 his arms, and I just pulled him and he fell.
23   Q   I see. So do you remember which arm you
24 had?
25   A   No.

**Page 30**

1   Q   Okay. But, essentially, you pulled him
2 down to the ground with you?
3   A   He went down first, and then I came down
4 on top.
5   Q   Okay. And that particular investigation
6 wasn't founded; is that right?
7   A   It was unfounded, yes, sir.
8   Q   Any other internal investigation that
9 you're aware of?
10   A   Not that I'm aware of.
11   Q   All right. I'm going to take you now to
12 July 18, 2011. Prior to that day, had you been called to
13 the zoo on any sort of problems at the zoo, I guess?
14   A   Occasionally, we get thefts in the parking
15 lot, things like that.
16   Q   Any other calls relating to assaultive
17 behavior?
18   A   Not that I can recall.
19   Q   Okay. Do you remember the time that you
20 were called to appear at the zoo on the 18th of July?
21   A   I do not.
22   Q   Okay. All right. And do you remember
23 where you were when you got the call?
24   A   I was on Colorado Boulevard. I'm not sure
25 what hundred block.

**Page 31**

1   Q   Okay. And how did you proceed to the zoo?
2   A   Northbound Colorado, westbound 23rd.
3   Q   Lights and sirens?
4   A   No.
5   Q   Just regular traffic?
6   A   Yes.
7   Q   And what was the -- what were you told
8 from dispatch was the call about?
9   A   A domestic violence.
10   Q   And so what gate did you enter, then, at
11 the zoo?
12   A   The front entrance gates, the main
13 entrance. I actually went in through the exit side of
14 the entrance gates.
15   Q   Okay. So where the public would enter the
16 zoo?
17   A   Correct.
18   Q   And that's on the north side of the zoo?
19   A   Yes.
20   Q   And were you alone?
21   A   Yes.
22   Q   Do you know if any officers were also
23 coming to assist the call when you arrived?
24   A   I think Officer Coleman was dispatched
25 with me.

**Page 32**

1   Q   When you got to the zoo, did you see any
2 other police officers?
3   A   No.
4   Q   Where did you then proceed after going
5 through the front gates?
6   A   To the right, which would be west, towards
7 the elephant enclosure.
8   Q   All right. And that's probably what, 100
9 or 150 yards from the entrance?
10   A   Yeah, maybe sightly more, but --
11   Q   Okay. And why were you going to that
12 location?
13   A   Well, primarily, dispatch had told me it
14 was towards that location.
15   Q   I see.
16   A   Citizens were flagging me down and
17 pointing me to that location, and zoo security had
18 contacted me and was escorting me to that location.
19   Q   Okay. So let's first talk about the
20 citizens that were sending you that way. Did you know
21 any of the individuals that were flagging you?
22   A   No.
23   Q   The zoo personnel that were also
24 suggesting that you go that direction, did you know any
25 of them?

Case 1:12-cv-01856-MSK-NYW   Document 129-4   Filed 10/18/13   USDC Colorado   Page 3 of 9

Gail Waters vs.
City and County of Denver, et al.

Deposition of Justin Jones
July 11, 2013

Page 33

1   A   No.
2   Q   And how did you know they were zoo
3   personnel?
4   A   They were wearing a Denver Zoo uniform.
5   Q   All right. Did you get any of their names
6   at the time that you arrived?
7   A   Not at the time.
8   Q   So as you proceeded from the entrance of
9   the zoo to the elephant area, were you having
10  conversations with anyone about what was going on?
11  A   There was an individual who met me near
12  the gate who was telling me what was -- what he had going
13  on down by the elephants.
14  Q   And would you be able to recognize that
15  individual today if you --
16  A   Probably not.
17  Q   Okay. What did that individual tell you
18  as you were walking towards the elephants?
19  A   That they had eyes on an irate male who
20  had assaulted a member of their security team.
21  Q   And did they give you the name of their
22  security team that was assaulted?
23  A   No.
24  Q   Did you see an assault take place while
25  you were traveling to the elephant exhibit?

Page 34

1   A   No.
2   Q   Okay. So the zoo employee was telling
3   you, essentially, before you arrived there was an irate
4   individual and there had been an assault of a zoo
5   employee?
6   A   Yes.
7   Q   Did you know any other information before
8   you got to the elephant exhibit?
9   A   The original call from dispatch was a
10  domestic, that the male was shouting at a female,
11  possibly his girlfriend.
12  Q   Once you got on scene, did you learn any
13  information about that particular allegation?
14  A   No.
15  Q   So tell me about what you saw or what you
16  perceived as you went towards the elephant exhibit.
17  A   What do you mean? Pertaining to?
18  Q   This event. Just what did you see?
19  A   I saw the zoo security or zoo personnel
20  sort of standing in a semicircle around an enraged male.
21  Q   Can you describe what you saw -- what was
22  the enraged male presenting? What did he look like?
23  What was your first reaction?
24  A   He was -- like I said, he was enraged.
25  Everything that that word brings to mind is what --

Page 35

1   Q   Did he have all of his clothes on?
2   A   Yeah.
3   Q   Did you notice anything physically about
4   him that you thought was unusual?
5   A   Well, I mean, besides his level of
6   agitation?
7   Q   Right.
8   A   No, not at that time.
9   Q   Okay. Did you see that he was sweating
10  profusely?
11  A   Not at that time.
12  Q   Okay. Did you walk up, then, to the
13  individuals that were sort of in a semicircle next to
14  this individual?
15  A   I walked up.
16  Q   Okay. What happened next?
17  A   The individual was shouting and cursing,
18  and I removed my Taser from my holster and ordered him to
19  the ground.
20  Q   Why did you immediately pull your Taser
21  from the holster?
22  A   I felt that he posed a significant threat,
23  based on his actions and based on the way he was acting
24  and my lack of cover.
25  Q   When did you ask him or order him to do

Page 36

1   anything prior to pulling your Taser?
2   A   I would say it was simultaneous as I was
3   ordering him to the ground.
4   Q   And what color was your Taser?
5   A   I don't recall. We've switched models
6   since then.
7   Q   Yeah.
8   A   So I'm not sure if -- which model I had.
9   Q   Okay. Can you describe for me at all your
10  recollection of what the Taser looked like?
11  A   Well, they're shaped similar to, I guess,
12  what you would call a standard firearm.
13  Q   Right.
14  A   Barrel extending forward from the edge of
15  the Taser.
16  Q   The handle that you put your hand around?
17  A   Yeah.
18  Q   And a trigger, right?
19  A   Yes.
20  Q   Sometimes they're different colors,
21  yellow, red, green, right?
22  A   I've never seen red and green. I have
23  seen yellow and black, is my experience.
24  Q   All right. So do you believe that this
25  Taser that you had on this particular day was either

Case 1:12-cv-01856-MSK-NYW Document 129-4 Filed 10/18/13 USDC Colorado Page 4 of 9

Gail Waters vs.
City and County of Denver, et al.

Deposition of Justin Jones
July 11, 2013

Page 37

1 yellow or black?
2     A  Yes.
3     Q  But you just don't remember which color?
4     A  I'm not sure which one I had that day.
5     Q  Okay. And so -- but immediately in
6 contacting this individual, you could tell that he was
7 enraged, and you pulled your Taser and ordered him to the
8 ground; is that right?
9     A  Correct.
10    Q  Any other statements that you made to him
11 prior to ordering him to the ground?
12    A  Well, my first action is to identify
13 yourself as a Denver police officer.
14    Q  All right. I'm presupposing some things.
15 Tell me about exactly what you did when you first came to
16 the scene and what you said to Mr. Ashley.
17    A  I don't recall exactly what I said.
18    Q  What would you normally say in this sort
19 of situation?
20    A  Denver police, get down on the ground.
21    Q  Okay. And in this situation, you
22 determined as soon as you walked up that you needed to
23 pull your Taser to make sure the individual knew you were
24 being serious?
25    A  No. You never -- you would never display

Page 38

1 it as a threat.
2     Q  Okay.
3     A  You don't threaten somebody with a Taser
4 to try and gain their compliance.
5     Q  How were you holding the Taser when you
6 ordered him in the ground?
7     A  In my right hand.
8     Q  Okay. In a manner in which you were
9 trained?
10    A  Yes.
11    Q  So you were pointing it at him?
12    A  Correct.
13    Q  How close were you to him when you ordered
14 him to the ground?
15    A  Approximately 6 feet, I would say.
16    Q  So you were close enough that if you
17 wanted to deploy the probes at that point, you could have
18 done that and hit the individual?
19    A  Six feet is a little short. You would
20 rather be outside of 7, to be honest.
21    Q  Okay. But you could have taken a step
22 back and then deployed the probes?
23    A  I suppose it's possible.
24    Q  And I'm not -- there's always the armchair
25 quarterbacking. I understand that. But I just want to

Page 39

1 get a sense of where you were at and what you were
2 thinking.
3     So why did you pull your Taser if not to
4 threaten him?
5     A  Because I wanted to have it ready in case
6 I needed to use it.
7     Q  Okay. And in the event that you needed to
8 use it, you would have stepped back to deploy the Taser?
9     A  Yeah.
10    Q  Okay.
11    A  Yeah.
12    Q  All right. So after you pulled the Taser,
13 you request or demand him to get to the ground. What
14 happens next?
15    A  Sat down on the ground.
16    Q  So he sat immediately on the ground?
17    A  Yeah.
18    Q  In what sort of position?
19    A  Just straight down, caught me off guard
20 how quickly and deliberately straight down.
21    Q  All right. So he fell to the ground. Did
22 he fall into a sitting position, sort of crosslegged?
23    A  I don't remember if he was crosslegged or
24 just had his legs in front. But he went down onto his
25 rear end.

Page 40

1     Q  Okay. Where were his hands when he was
2 sitting? Do you remember?
3     A  I don't recall.
4     Q  Okay. What happened next?
5     A  I ordered him to lay forward onto his
6 stomach and put his arms out to his sides. My intent was
7 to handcuff him in the prone position.
8     Q  And while you were asking him to do that,
9 you still had the Taser in your hand; is that right?
10    A  Correct.
11    Q  All right. What happened next?
12    A  I can't recall if I had already asked for
13 more cars or if I did it at that point. I'm not sure.
14    Q  So, potentially, before you approached him
15 while he was sitting on the ground, you may have called
16 for backup?
17    A  Yeah. I can't recall if it was before or
18 after.
19    Q  All right. So at least for today -- I
20 don't know if it makes that much of a difference, unless
21 you think it does. Does it make a difference whether you
22 called before or after the next interchange with the
23 suspect?
24    A  I suppose not now.
25    Q  So what happened next? After he's sitting

Case 1:12-cv-01856-MSK-NYW Document 129-4 Filed 10/18/13 USDC Colorado Page 5 of 9

Gail Waters vs.
City and County of Denver, et al.

Deposition of Justin Jones
July 11, 2013

**Page 41**

1  on the ground, you order him to basically go on his belly
2  with his arms out to the side. What did he do next?
3      A   Springs straight back up, takes what I
4  would call a boxer stance, a fighter stance.
5      Q   Fighter stance in the sense that his legs
6  are spread apart and he sort of has his arms up in a
7  position to hit you?
8      A   Yeah, fists made with the hands, arms up.
9  We call it basing out or blading your stance, one foot
10 behind the other to create a more stable base.
11     Q   Did he say anything to you?
12     A   I don't recall if he was talking to me at
13 that point. At one point, he was telling me to get the
14 fuck away from him or, Get the fuck out of my face.
15     Q   All right. So it may have been at that
16 point or at a later point?
17     A   It was either at that point or earlier.
18     Q   Oh, I see. Okay. So what happens next,
19 after he jumps back up and gets into the boxer stance?
20     A   He begins walking towards the zoo exit.
21     Q   So is that towards you or away from you at
22 this point?
23     A   Towards me.
24     Q   Okay. What did you do as he was walking
25 towards you?

**Page 42**

1      A   At that point, he had walked and he was in
2  a position where he was sort of back to side to me. I
3  was asking my cover to step up their response because I
4  felt that it was about to turn into a foot pursuit. So I
5  put away the Taser. I didn't want to be running with it,
6  so I holstered it. And then he proceeded toward the zoo
7  exit further.
8      Q   So he's in the boxer stance, he then may
9  or may not have said something to you, and then he starts
10 walking sort of away from you; is that right?
11     A   Yes, walking away, towards the exit.
12     Q   Okay.
13     A   And as he's walking away, telling me if I
14 touched him, I was going to end.
15     Q   Okay. You believe then you make a call to
16 step up the backup. What do you do next after that --
17 and put your Taser away. What did you do next after
18 that?
19     A   Continued following. He was walking at a
20 swift pace, but not running.
21     Q   Okay.
22     A   So I continued following.
23     Q   And how long did you follow him before
24 something else happened?
25     A   He walked up towards a bush and stopped,

**Page 43**

1  and that's where I stopped with him.
2      Q   So how far do you think he walked before
3  getting to the bush that you're talking about?
4      A   Fifteen yards, maybe, not very far.
5      Q   So what happened next?
6      A   We were standing next to the bush --
7      Q   How close were you at that point when you
8  were standing next to the bush with him?
9      A   4 to 5 feet.
10     Q   Does he say anything to you?
11     A   He's still telling me if I touch him, I'm
12 going to end. I could hear a female from behind telling
13 him to do what I was asking. I don't know who that was.
14     Q   Okay. In what --
15     A   You better just do it, just do it.
16     Q   In what --
17     A   Of course, I'm still telling him he needs
18 to stop, get down on the ground.
19     Q   In what sort of voice are you telling him
20 that?
21     A   I would say louder than conversational. I
22 wasn't screaming at him, but louder than a conversational
23 voice. You need to make sure that he hears you. The zoo
24 is an open area, so --
25     Q   Yeah. Did you get the impression that he

**Page 44**

1  heard you?
2      A   Uh-huh.
3      Q   And how did you get that impression?
4      A   My initial impression that he was
5  understanding and hearing was because when I told him to
6  get down on the ground, it was immediately executed.
7      Q   I completely understand that. But when
8  you're near the bush, how do you know that he's -- I
9  mean, does he react to you when you give him direction?
10     A   No. He was looking at me.
11     Q   All right. Describe to me, when he's
12 looking at you, what you see. Is that when you saw that
13 he was sweating?
14     A   Yeah. It was actually as we were
15 traveling towards the bush that I recognized that he was
16 sweating.
17     Q   And did that alert you to anything in your
18 training you thought you might be aware of in the way of
19 detaining this individual?
20         MS. SHEA: Object to form.
21     Q   (BY MR. FLESCH) It was a horrible
22 question. Let me try it again.
23     A   Okay.
24     Q   So you saw the individual was sweating
25 profusely?

Case 1:12-cv-01856-MSK-NYW   Document 129-4   Filed 10/18/13   USDC Colorado   Page 6 of 9

Gail Waters vs.
City and County of Denver, et al.

Deposition of Justin Jones
July 11, 2013

**Page 45**

1  A   Yes.
2  Q   At the point in the moment that you're
3  sort of pursuing this individual, does that raise any
4  flags in your own mind about what you're dealing with in
5  this situation?
6  A   Just the sweat? You're just referring to
7  the sweat?
8  Q   Yeah. You had already seen all of the
9  other things before. Now you have an individual that has
10 those sort of characteristics and the sweating. Did that
11 cause you any concern in any way?
12     MS. SHEA: Object to form.
13 A   I was -- I mean, obviously, the totality
14 of the circumstances made me concerned.
15 Q   (BY MR. FLESCH) Do you know what you were
16 thinking about who you were dealing with in this
17 particular situation as you were walking with him to this
18 bush area?
19 A   What I was thinking about --
20 Q   Yeah.
21 A   -- who I was -- you mean who, like --
22 Q   What type of individual you were dealing
23 with here.
24 A   Yeah. I was dealing with someone who was
25 angry, irate, violent and now attempting to evade being

**Page 46**

1  taken into custody.
2  Q   Through your training and experience, did
3  you think that you may have a mental health case?
4  A   At that time, like, I don't remember it
5  specifically crossing my mind, mental health case.
6  Q   How about excited delirium?
7  A   No.
8  Q   All right. So what happened next? You
9  gave him the direction again, the woman is yelling behind
10 you, listen to you. What does he do next?
11 A   He was standing near the bush. He was
12 facing me, and I was standing next to the bush, and it
13 was probably a 2-foot gap between my body and the bush.
14 And he actually could have continued going the other way.
15 It was wide open. But he attempted to run between my
16 body and the bush. And as he went through, he sort of
17 reached out to grab me, so I reached in and grabbed him,
18 and we fell down towards the ground.
19 Q   So you didn't go out of your way to tackle
20 him? He basically moved into you and --
21 A   He moved at me -- between -- trying -- I
22 don't know if he was cutting between me and the bush or
23 was coming after me. I do know he reached out to grab
24 me, so --
25 Q   Right. Was the grab sort of to push you

**Page 47**

1  away or to pull you towards him?
2  A   I don't know what his intention was.
3  Q   I understand.
4  A   Yeah.
5  Q   But you reacted in the sense that you then
6  took him down to the ground?
7  A   Yeah.
8  Q   So then -- did he say anything as he was
9  going down to the ground?
10 A   Not as we were going down, I don't recall.
11 Q   All right. So what happened next?
12 A   We fell down to the ground. I remember
13 there was a third individual that was a member of the zoo
14 security team. As we fell to the ground, we sort of fell
15 in a position where we were both on our sides. He
16 twisted backwards.
17 Q   I'm going to stop you right there. When
18 you say you were both on your sides, who are you talking
19 about?
20 A   Myself and Mr. Ashley, the suspect.
21 Q   All right. And then the third individual,
22 the zoo employee, do you know who that zoo employee is
23 today?
24 A   I do not.
25 Q   All right. So that third individual, the

**Page 48**

1  zoo employee, what did they do when they got near you,
2  the two of you, Mr. Ashley and yourself?
3  A   I recall we all went to the ground. I
4  don't know what his position was as we fell.
5  Q   And so both you and Mr. Ashley then fall
6  on your sides?
7  A   Uh-huh.
8  Q   What happened next?
9  A   He sort of twists backwards at the waist,
10 punched me in the face.
11 Q   All right. And we're talking about
12 Mr. Ashley?
13 A   Correct.
14 Q   So what happens after that?
15 A   I was still in a position sort of behind
16 him on our sides. I attempted to kind of come around and
17 strike him. The only zone that I had was in the
18 abdominal area. I tried twice and it was ineffective, so
19 I abandoned that tactic pretty quickly.
20 Q   So you hit him in the abdomen and the
21 stomach area twice, no response. What happens next?
22 A   I remember really just trying to get his
23 hands, gain control of an arm and bring it behind his
24 back. I was ordering him to do the same, to bring his
25 arms behind his back. I remember hearing the other

Gail Waters vs.
City and County of Denver, et al.

Deposition of Justin Jones
July 11, 2013

Page 49

1  individual employed by the zoo telling him the same
2  thing, to bring his arms behind his back.
3      Q    And where is that individual at the time
4  that you're trying to gain control of Mr. Ashley's arms?
5      A    I have no idea.
6      Q    And I understand that. I mean, I'm asking
7  questions like you should remember frame by frame. I
8  just need to know today what you remember, so --
9      A    Okay.
10     Q    So you're trying to gain control of the
11 arms. You don't know where this other individual is.
12 What happens next?
13     A    Unable to gain any sort of control over
14 his arms; clearly stronger than I am.
15     Q    And are you on top of him at this point or
16 are you still sort of side by side?
17     A    We're still sort of side by side. I'm
18 trying to roll over, but clearly much stronger than I am.
19     Q    What happened next?
20     A    We're still trying to -- I don't remember
21 the sequence of events from there. I don't remember --
22 you know, I don't want to mess it up. I don't
23 remember -- you know, I know that I deployed the Taser.
24 I don't remember if it was before other officers arrived
25 or not.

Page 50

1      Q    Okay.
2      A    I'm not 100 percent sure on the sequence.
3      Q    And how long do you think the two of you
4  are sort of wrestling on the ground, you trying to gain
5  control of his arms?
6      A    I'm not sure, 30 seconds to a minute. It
7  felt like forever, but it was -- it's never as long as it
8  feels like.
9      Q    Right. So you're not able to gain
10 control. At some point, you realize that and you
11 determine that you need to use your Taser to try to gain
12 control?
13     A    Yes.
14     Q    All right. So what happens when -- first
15 of all, how did you deploy the Taser?
16     A    I pulled it back out. I keep it on my
17 left leg, in a drop holster.
18     Q    Yes.
19     A    Removed it, was able to get the cartridge
20 off the front.
21     Q    So you're close enough that you're not
22 going to use the probes?
23     A    Correct.
24     Q    So what did you do with those cartridges?
25     A    The cartridge, I just -- I slid it off to

Page 51

1  the side.
2      Q    All right.
3      A    I threw it.
4      Q    Okay. And what's -- as you're doing that,
5  what is Mr. Ashley doing?
6      A    Just flailing wildly, kicking, punching,
7  trying to get up.
8      Q    And why is he not able to get up?
9      A    Well, at one point, he was about halfway
10 up and I drug him back down. So, I mean, he was able to
11 get up. Really, the only thing stopping him was people
12 just holding on, other individuals on the ground.
13     Q    All right. So as far as your
14 recollection, there was you, the zoo employee, and
15 potentially other individuals that are trying to keep
16 Mr. Ashley on the ground?
17     A    At that point, it was just myself and the
18 zoo employee.
19     Q    All right.
20     A    Yes.
21     Q    No one else?
22     A    No one else.
23     Q    Okay. But the two of you, the zoo
24 employee and yourself, are keeping Ashley down --
25     A    Yes.

Page 52

1      Q    -- and he's flailing about?
2      A    He's flailing, yes.
3      Q    All right. And at that point, then, you
4  pull your Taser from your left leg, take the cartridge
5  off, slide the cartridge somewhere. And then what do you
6  do next?
7      A    I deployed it to his back.
8      Q    What part of his back?
9      A    In a contact stun.
10     Q    Right.
11     A    I would call it his -- sort of his
12 lower -- to the side.
13     Q    Do you remember which side?
14     A    I do not.
15     Q    All right. And you deployed it for how
16 long?
17     A    The standard cycle.
18     Q    So one cycle?
19     A    One cycle.
20     Q    And what's your understanding of how long
21 the length of one cycle is?
22     A    I believe it's five seconds.
23     Q    Any compliance to your demands after the
24 deployment of the Taser?
25     A    None at all.

Gail Waters vs.
City and County of Denver, et al.

Deposition of Justin Jones
July 11, 2013

**Page 53**

1    Q    What do you do next?
2    A    At some point in here, Officer Coleman
3 arrives.
4    Q    And what do you remember Officer Coleman
5 doing?
6    A    I remember looking up and thinking, Thank
7 goodness, as he was running towards us. He ran in, he
8 took a position on the opposite side of the suspect from
9 me, and we were both still really just attempting to gain
10 control of the arms. And I don't recall if he twisted my
11 testicles then or tried to take the Taser next. I can't
12 remember what he did next -- Mr. Ashley did next, but at
13 one point in there, he reached up. I sort of had one
14 knee on the ground, one foot on the ground, in a kneeling
15 position. He reached between my legs and grabbed my
16 testicles and squeezed them and twisted them. And
17 then -- I don't know if it was before or after -- reached
18 over with a hand and grabbed the Taser, attempting to
19 take it away from me.
20    Q    And, again, your Taser then was back in
21 your left leg?
22    A    No. It was in my hand still.
23    Q    I see. Okay.
24    A    He was trying to take it out of my right
25 hand.

**Page 54**

1    Q    Okay. And Officer Coleman was there at
2 that time?
3    A    Yes.
4    Q    But you don't remember exactly -- he was
5 opposite you relating to Mr. Ashley?
6    A    Right.
7    Q    Do you remember what Officer Coleman was
8 doing at the time?
9    A    No idea.
10    Q    Okay. Do you remember if he had his Taser
11 out as well?
12    A    I don't believe so.
13    Q    Okay. All right. So what happened after
14 that? The testicle twisting and the attempt -- so you're
15 saying that that was sort of one event in your memory,
16 that they both kind of happened simultaneously?
17    A    Not simultaneously, but --
18    Q    One right after the other?
19    A    Yeah, yeah, very close in progression.
20 Well, he was trying to take the Taser and drove it down
21 into the ground, and I was leaning on it because he
22 wasn't able to take it away from me as I was just leaning
23 forward on it.
24    Q    Understood. So what happened next after
25 that, then?

**Page 55**

1    A    I think I -- I guess the next would be
2 that I deployed the Taser a second time, as he had sort
3 of rolled up onto his side. And I deployed it a second
4 time to his side.
5    Q    Do you remember which side of his body he
6 had rolled?
7    A    (Deponent shook head.)
8    Q    All right. And what part of his side,
9 then, did you deploy the Taser to the second time?
10    A    Right sort of below, I guess, like the lat
11 muscle would be.
12    Q    All right. So you just indicated
13 approximately 6 inches below the armpit?
14    A    Yeah. I mean, that's my best
15 recollection.
16    Q    Sure.
17    A    Obviously, I was in the middle of --
18    Q    Of a fight.
19    A    -- an intense fight.
20    Q    Right. Okay. So, again, when you
21 deployed the Taser the second time, stun mode?
22    A    Yes, contact stun.
23    Q    Okay. And for how many cycles?
24    A    One cycle.
25    Q    Did you get any compliance with your

**Page 56**

1 demands after the second Tasering?
2    A    While it was cycling, I recall that he
3 was -- the suspect was looking at me, and it seemed to
4 sort of stop him momentarily, and I felt a great relief.
5 But as soon as the cycle was over, it was as though it
6 had never happened.
7    Q    So what happened next after that?
8    A    Other officers began to arrive. They were
9 beginning to gain some sort of control. I was --
10    Q    Before you get to that, what other
11 officers arrived, if you know?
12    A    I don't recall, like, the progression.
13    Q    Okay. Do you remember any of the names of
14 the officers that arrived?
15    A    I remember Lieutenant Conner was there and
16 Cheryl Smith were assisting, and Joe Gasca eventually, I
17 think.
18    Q    Okay. What do you remember next?
19    A    I was controlling an arm, holding it down,
20 kind of against the pavement. They had applied a
21 handcuff and they were trying to get the other hand up
22 behind his back for the cuff, and I was more in the way
23 than anything. I attempted to slide backwards to move
24 away from the suspect. And as I tried to slide backwards
25 and stand, I stumbled. I don't know who was behind me,

Case 1:12-cv-01856-MSK-NYW   Document 129-4   Filed 10/18/13   USDC Colorado   Page 9 of 9

Gail Waters vs.
City and County of Denver, et al.

Deposition of Justin Jones
July 11, 2013

Page 57

1 but somebody caught me and helped me walk back.
2  Q  Which arm did you have before stumbling?
3  A  I don't recall.
4  Q  All right. Okay. But as you were sliding
5 back away from the suspect, you continued to hold onto
6 his arm until you stumbled?
7  A  I was releasing my grip and moving
8 backwards, yes.
9  Q  Okay. All right. What happened next?
10  A  I stepped back. The other officers were
11 gaining some control, and that was the last time I had
12 contact with the suspect.
13  Q  Mr. Ashley?
14  A  Yes.
15  Q  So you fall back or were caught, and then
16 you take a step back. Do other officers move in on the
17 suspect at that point?
18  A  No. There wasn't, like, people waiting or
19 anything.
20  Q  Okay.
21  A  Yeah, there wasn't anything like that.
22  Q  How many officers do you think were around
23 Mr. Ashley when you stumbled and fell back?
24  A  I'm not sure.
25  Q  Okay. What do you remember next about

Page 58

1 what happened?
2  A  He was placed into custody.
3  Q  And tell me how that happened, what you
4 saw.
5  A  Well, like I said, when I stepped back,
6 they had one hand in a handcuff and they were attempting
7 to put the other -- they were able to pull his other hand
8 back and place it in the cuff.
9  Q  And how was he facing? Was his face in
10 the ground, then, when you had his hands cuffed behind
11 his back?
12  A  He was laying on his stomach.
13  Q  Prone?
14  A  Yes.
15  Q  Okay.
16  A  Yes, still kicking. I'm not sure when he
17 was biting. I didn't witness any of the biting
18 incidents.
19  Q  The leg kicking; were there officers
20 trying to control his legs?
21  A  Yes.
22  Q  And how were they trying to control those
23 legs?
24  A  Someone attempted to put a control hold on
25 his ankle with the OPNs and snapped them, which is

Page 59

1 something I've never seen.
2  Q  So they snapped an OPN while trying to
3 gain compliance around the ankles?
4  A  Yes.
5  Q  Do you remember which officer that was?
6  A  I don't. I just remember seeing a broken
7 set of OPNs on the ground.
8  Q  Got it. Did you see anyone else use a
9 Taser on Mr. Ashley?
10  A  No.
11  Q  So you know that you deployed the Taser
12 twice?
13  A  Correct.
14  Q  And that's the only time that you saw
15 anyone use a Taser on Mr. Ashley?
16  A  Correct.
17  Q  Now, the autopsy report suggested there
18 were five deployments of the Taser. Do you have any idea
19 who would have deployed the Taser the other three times?
20      MS. SHEA: Object to form and foundation.
21  A  I have no idea.
22  Q  (BY MR. FLESCH) Okay. Was Officer
23 Coleman the only other officer that you saw that had
24 pulled their Taser at some point?
25  A  Like I said, I never saw.

Page 60

1  Q  Oh, you didn't? Okay. I'm sorry.
2  A  Yeah, I already said I never saw.
3  Q  And you never saw any other officer pull
4 their Taser?
5  A  No.
6  Q  The security officers didn't have -- the
7 zoo security officers, they didn't have any Tasers?
8  A  Not to my knowledge.
9  Q  All right. So you then see the other
10 officers gain control of Mr. Ashley in the sense that
11 they have his arms in handcuffs. His feet are still --
12 he's still flailing about with his feet.
13  A  Uh-huh.
14  Q  What happened next?
15  A  The TAC unit, I think it was Gasca --
16  Q  Okay. I'm going to have to ask you what
17 TAC mean.
18  A  Oh, I'm sorry. Gang unit officers. Their
19 call sign is TAC.
20  Q  Yeah. Okay.
21  A  -- sort of crossed his ankles, and then
22 rolled him forward to control his feet, his legs.
23  Q  Okay. So Mr. Ashley is prone, the officer
24 takes his feet basically at the knees and pulls him
25 crosswise forward and then rolls Mr. Ashley -- his legs