IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 12-cv-01856-MSK-BNB

---

GAIL WATERS, as personal representative of the Estate of Alonzo Ashley,

Plaintiff,

v.

CITY AND COUNTY OF DENVER,
DENVER ZOOLOGICAL FOUNDATION, INC.,
ANDRE DERRITT,
ERIC FLUEGEL,
KELLIE GORMAN,
AARON LAWYER,
JAMES TOTTEN,
ADAM BECHTOLD,
JEFFREY BEHNKE,
DAMON BOWSER,
PHILIP COLEMAN,
PETE CONNER,
JENNIFER CURTIS,
JOE GASKA,
JUSTIN JONES,
MARCO MARTINEZ,
ALBERTO PAEZ,
ALVIN SHELL,
CHERYL SMITH,
SEAN STEVENSON, and
CHARLES WHEELING,

Defendants.

---

DEPOSITION OF: JOHN CARVER, M.D.
August 16, 2013

---

Exhibit 19

John Carver, M.D.

Page 26

 1 And if a long enough time has passed, you
 2 can see that sometimes you can -- you know what's
 3 happening when you cut into the heart tissue just
 4 looking at it with your eyes. Other times, you'll
 5 see the changes only under the microscope. So
 6 that's what -- that's what I mean by -- that's a
 7 myocardial infarction.
 8     Q. Heart attack?
 9     A. And -- it's a heart attack, but I think the
10 term heart attack gets used in a broader sense to
11 encompass the larger group of people for whom the
12 cause of death is arteriosclerotic cardiovascular
13 disease, but most of whom don't survive long enough
14 to see those changes.
15     Q. With that foundation, let's go to this
16 case.
17     A. Correct. Cardiorespiratory arrest right
18 here is not really a medical diagnosis in the sense
19 that it does not identify a specific natural disease
20 process at work here. Cardiorespiratory arrest just
21 means his heart stopped beating, and he stopped
22 breathing.
23     That doesn't really tell you the underlying
24 reasons why. This case and frequently cases like
25 this, are, you know, very multifactorial, and what

Page 27

 1 you end up doing is using a term cardiorespiratory
 2 arrest and then describing all of the additional
 3 potential contributing stressors that cause the end
 4 result of the heart no longer beating and the lungs
 5 no longer breathing, cardiorespiratory arrest.
 6     So cardiorespiratory arrest just means he
 7 died. He died because he's dead, it's not really
 8 helpful understanding why. So everything else
 9 that's listed underneath that depiction that
10 contributes to that end result.
11     Q. Is it fair to say that virtually every dead
12 person has cardiorespiratory arrest?
13     A. That's absolutely correct.
14     Q. Okay. So what we're knowing about that,
15 then, is there is a cessation of pulmonary and
16 cardiac function attendant to death, but in terms of
17 what actually brought that about, we haven't gotten
18 that far yet; is that fair to say?
19     A. That's correct.
20     Q. What you then did in your report was
21 undertake to try to inventory the various --
22     A. Describe everything that may have -- that
23 contributed to that result.
24     Q. Contributed or may have contributed; is
25 that a fair way to put it?

Page 28

 1     A. Yes. Correct.
 2     Q. Now, as you analyzed that sort of a
 3 situation from a forensic pathology standpoint, one
 4 of the things that you want to do is just try to
 5 gather together all of the remarkable or abnormal or
 6 notable indicators and then start to analyze them?
 7     A. Correct.
 8     Q. So in the structuring of your report, one
 9 of the things that did you, of course, under the
10 cardiorespiratory arrest section, which is Roman
11 Numeral I, is you've listed some key indicators,
12 fair to say?
13     A. Correct.
14     Q. Now, one of the indicators that you put
15 down was that there had been a Taser applied or
16 potentially applied; is that fair to say?
17     A. Correct.
18     Q. Now, under section Roman Numeral E, excuse
19 me, Roman numeral I(e), sub ii --
20     A. Correct.
21     Q. -- you say there's no visible indication on
22 the body of application site. Am I understanding
23 this correctly to mean that you can't spot on the
24 body a wound or mark left by a Taser or that you
25 know to be a Taser injury?

Page 29

 1     A. Correct.
 2     Q. Is it sometimes possible to see on a living
 3 or dead body the physical marks left by the
 4 application of a Taser?
 5     A. Yes. It is.
 6     Q. Is it common to have a Taser application
 7 that would be direct enough to produce a flow of
 8 current through the body without leaving any marks
 9 at all?
10     A. Can you repeat that?
11     Q. Sure. Is it common to have a situation
12 where a Taser is applied directly enough that it
13 results in the appreciable passage of current
14 through the body and leave no marks whatsoever?
15     A. I don't know how to answer that.
16     Q. So in terms of the percentage of times a
17 Taser is applied directly with enough contact to
18 have an effect that don't leave marks, you don't
19 have any kind of statistical sense of that or
20 whether it's even likely?
21     A. I don't.
22     Q. All right. Have you studied any -- let me
23 start my question a different way.
24     Have you performed any specific studies to
25 make yourself familiar with the physiological

John Carver, M.D.

### Page 42

1  that raises is whether this hypertensive condition,
2  if present, was likely to have played a role in what
3  caused a shutdown of his cardiorespiratory system?
4      A.  Did you ask a question or --
5      Q.  There should be a question mark at the end
6  of that.
7      A.  Okay.  Let me try one more time.
8      Q.  I'll ask it again.
9          Is it fair to say that you consider this
10 hypertension, which might have been present, to be a
11 possible contributing factor in his death?
12     A.  Correct.
13     Q.  And from the standpoint of what you know
14 now, are you able to go so far as to say that
15 hypertension, as a contributing factor in death, is
16 a probability or a mere possibility?
17     A.  I think I'm still at possibility.  I'm not
18 at probability.
19     Q.  Okay.  Now, one of the other points is that
20 we see Tetrahydrocannabinol in his blood or
21 metabolized thereof?
22     A.  Correct.
23     Q.  And is there any synergistic interaction
24 between the metabolites of marijuana and the
25 metabolites of cocaine?

### Page 43

1      A.  I don't know.
2      Q.  From the standpoint of the behavior that he
3  was anecdotally reported to be exhibiting in the
4  sense of violent, agitated, or aggressive behavior,
5  is there any potential connection that you're aware
6  of between drug use and that behavior?
7      A.  There are connections between that type of
8  behavior and drug use.  And it's usually based upon
9  the presence of a stimulant type drug, either
10 cocaine or methamphetamine would be the two prime
11 actors, but it's present in the blood.  It's
12 actively in the bloodstream.
13     Q.  Are you aware of any residual behavioral
14 effects that can be caused by cocaine use that
15 persist even after it is no longer measurable as
16 serum?
17     A.  I am not -- I'm not saying that there
18 aren't, but I'm not aware of it.
19     Q.  So if the question on deck is whether or
20 not cocaine use can lead to long-term personality
21 changes or psychological effects even after the drug
22 has run its course, the answer is, you defer to
23 other specialists?
24     A.  The answer is, I'm not the expert to ask.
25     Q.  Okay.  Now, one of the things that we see

### Page 44

1  here in the toxicology section of your report, which
2  follows where we had been previously focusing is --
3      A.  Are we on -- this is --
4      Q.  The same page.
5      A.  -- Exhibit 15?
6      Q.  Yeah, the same page, page 2.
7      A.  Okay.
8      Q.  We see here the concentration level of
9  blood Delta-9 THC at two nanograms per milliliter in
10 the blood.  Is that considered high?
11     A.  I don't have an opinion right now.  There
12 may be articles that talk about blood levels of THC.
13 I'm not currently familiar.  I can't say anything
14 about it right now.
15     Q.  Are you aware of the potential ranges of
16 THC level that have been considered as potentially
17 useful in determining whether someone should be
18 charged with driving a motor vehicle while under the
19 influence of marijuana in light of the fact that
20 Colorado has now legalized marijuana use?
21     A.  I know there's been articles in the paper
22 about that recently.  My recollection is that they
23 were going to be using five nanograms of THC as the
24 cutoff.  I don't know if that's accurate or not.  I
25 do know there's certainly controversy within

### Page 45

1  well-known members of the forensic toxicology
2  community about whether that makes any sense at all.
3      Q.  And that's because there's a widely variant
4  degree of tolerance from person to person --
5      A.  Correct.
6      Q.  -- with respect to those metabolites?
7      A.  Correct.
8      Q.  So in terms of how much impact or effect
9  any given level of THC would have on Alonzo, we have
10 no way to know that; is that fair to say?
11     A.  Correct.
12     Q.  But we do know that we had two nanograms
13 per milliliter in blood, and then there is a second
14 number of 29 nanograms per milliliter, and I'm
15 wondering what that is.
16     A.  It's a metabolite, and I can't -- of
17 Delta-9 carboxy THC, and I can't even recall.  I
18 don't even know if that's an active metabolite or
19 not.  I would have to go back to my toxicology text
20 to know.
21     Q.  And but 29 nanograms per milliliter
22 obviously is much, much higher than two nanograms
23 per milliliter?
24     A.  Correct.  But I don't know that that's an
25 active ingredient.

John Carver, M.D.

### 54

1  A. Correct.
2  Q. You don't expect someone to die of scraped
3  knees or scraped shoulders --
4  A. No.
5  Q. -- or having lots of scrapes?
6  A. Correct.
7  Q. And, in fact, if those were the only
8  injuries he sustained, you would not expect those to
9  be even remotely life threatening?
10 A. Correct.
11 Q. Would you describe Mr. Ashley as a
12 well-muscularized individual at the time of his
13 death?
14 A. He looked like a fit individual, yes.
15 Q. Very little body fat and well defined
16 muscle tone?
17 A. Yes.
18 Q. Did you see signs of any kind of serious
19 injury in terms of the application of force and
20 the -- let me rephrase my question.
21     Did you see any signs of injury caused by
22 the application of force that you would consider to
23 be a serious injury or a life threatening injury?
24 A. I identified no injuries which in and of
25 themselves could be considered lethal.

### 55

1  Q. Did you see any evidence that he had been
2  struck or beaten other than scraping on the
3  sidewalk?
4  A. There is some hemorrhage in the left
5  sternocleidomastoid muscle which seems not likely to
6  be related to scraping it on a sidewalk.
7  Q. What I would like to do now is take a
8  recess and give you a chance to walk around, if you
9  need one, but during the recess, I'd like you to
10 take a look at these pictures while we're off the
11 record, and I'm going to give you some yellow
12 stickies. If you could tag one or more photos that
13 show that anatomical region for us, okay?
14     MR. GODFREY: So let's go off the record.
15     (Recess from 10:19 a.m. to 10:34 a.m.)
16 Q. (By Mr. Godfrey) Doctor, during the
17 recess, you had an opportunity to examine these
18 photos to see if you could spot some that show us
19 the sternocleidomastoid anatomy that you were just
20 describing?
21 A. All of those are external pictures. This
22 was an internal bleed high up in the left side of
23 the neck. There's no photograph that depicts it.
24 Q. We'd have to get the set that shows after
25 the dissection commenced?

### 56

1  A. There may be -- as we talked about earlier,
2  there may be a set of autopsy photographs that shows
3  that.
4  Q. We'll look for those later.
5      Now, let's talk about what that tells us,
6  though. Did you see signs of injury in the --
7  anywhere in the region of the sternocleidomastoid
8  that you could say as a probability are indicative
9  of any life threatening injury?
10 A. All it is is a marker of pressure on the
11 neck, period.
12 Q. Now, there is no physiologic evidence that
13 you noted of death by asphyxiation, is there?
14 A. There were no autopsy -- well, there are no
15 autopsy findings that by themselves can prove
16 asphyxia. There are autopsy findings that can
17 suggest pressure on the neck. There were no
18 petechial hemorrhages, for instance, in the eyes and
19 the eyelids, so it does not appear that blood flow
20 from the head was interfered with, for instance, by
21 a neck hold long enough to cause the creation of
22 petechial hemorrhages.
23 Q. Now, would it be fair to say then, that in
24 relation to what you just told us, you could not say
25 as a medical probability that he suffocated or died

### 57

1  as a result of asphyxia, fair to say?
2  A. Mr. Ashley was held in a prone position on
3  the ground with a number of other factors, arms
4  handcuffed behind his back, pressure either on his
5  back or shoulders, legs crossed and folded and
6  pressed up towards his buttocks. So there is weight
7  on his body which is creating extra work of
8  breathing. I regard that as a stressor. It does
9  not pinpoint asphyxia as the single mechanism
10 resulting in Mr. Ashley's death.
11 Q. Does it indicate a probability of asphyxia
12 or merely that it might have been a part of the
13 constellation of things?
14 A. I believe it is a part of the constellation
15 of things.
16 Q. Now, did you have any indication that at
17 the time of the application of that type of force
18 that you've just described that might have
19 contributed to some extra work and breathing, that
20 there were any zoo personnel in contact with
21 Mr. Ashley?
22 A. I can't recall which individuals at which
23 particular moments were -- it may have been a
24 shifting cast of characters over a period of time
25 either involved in a struggle or actually holding

15 (Pages 54 to 57)

John Carver, M.D.

**Page 58**

1 him on the ground. And I don't recall when or which
2 zoo employees were involved.
3   Q.  Did you see or read or hear any reports of
4 persons present, including either officers, zoo
5 people, patrons of the zoo, et cetera, saying that
6 Mr. Ashley was yelling right up to the point in time
7 where he lost consciousness?
8   A.  I don't recall.
9   Q.  Did you see --
10  A.  I've got no specific recollection of that.
11  Q.  Did you see a statement where one of the
12 things that happened was that right before he went
13 still, he's yelling, I'm going to die?
14  A.  I think I do recall that, I'm going to die.
15  Q.  Now, if a person is able to yell, that
16 tends to indicate that they're able to breathe, does
17 it not?
18  A.  They're able to phonate. It does not
19 indicate that there's an absence of extra work of
20 breathing.
21  Q.  But they're able to pass air in and out of
22 their lungs in order to make the sounds, are they
23 not?
24  A.  Correct.
25  Q.  Now, in terms of what's found then on the

**Page 59**

1 third page of your report where we had left off,
2 there is reference to excited delirium. Do you see
3 that?
4   A.  Yes.
5   Q.  About six lines down.
6       What is excited delirium? You have that in
7 quotes. What does that phrase mean?
8   A.  It's, I think, a clinical diagnosis
9 describing someone's behavior who is usually acutely
10 under the influence of drugs and is exhibiting
11 violent and irrational behavior. They may have
12 additional objective physiologic changes going on,
13 excessive sweating, increased body core temperature,
14 hyperthermia. Those kinds of things.
15  Q.  Do you believe it is likely that Mr. Ashley
16 had hyperthermia at the times described in your
17 report?
18  A.  I think it's possible. You know, my
19 understanding of it is that the -- as I stated in
20 the opinion, the great majority of time, there's
21 usually an active drug like cocaine or
22 methamphetamine on board, which there is not in the
23 case of Mr. Ashley.
24      I think it's also possible that the heat of
25 the day factored into this somehow, too. And, you

**Page 60**

1 know, people who were under heat stress and maybe
2 approaching heat stroke, too, can exhibit irrational
3 behavior as well.
4   Q.  In addition to the irrational behavior, one
5 of the things that you noted in your report was
6 unexpected strength?
7   A.  Correct.
8   Q.  Do you have any thoughts for us about what
9 could have caused unexpected strength along with the
10 other manifestations that you have noted here?
11  A.  All I can say is he's in an abnormal
12 physiologic state, and that this exhibition of
13 increased strength is often described in scenarios
14 described -- characterized as excited delirium.
15  Q.  So in terms of whether that was brought
16 about by drug use or some underlying
17 pathophysiological abnormality, we simply can't say;
18 is that fair to say? It is accurate to say that we
19 don't know?
20  A.  I would say it's usually described in cases
21 of drug use where there's active drugs on board.
22 It's also sometimes described in people who have a
23 known diagnosed mental illness, which I've got no
24 history of that I know of for Mr. Ashley.
25  Q.  Did you see his criminal jacket?

**Page 61**

1   A.  No.
2   Q.  Or what I want to refer to loosely as his
3 rap sheet?
4   A.  I don't recall it.
5   Q.  So are you aware of whether or not
6 Mr. Ashley had a history of violent encounters,
7 fighting, or combative behavior?
8   A.  I can't recall, except the previous
9 hospital record we looked at where he's at the
10 emergency department and he's says he's been in a
11 fight and his finger was bit. That's all I recall.
12  Q.  That's one incident?
13  A.  Right.
14  Q.  Now, at this stage in the game, is it fair
15 to say that you just can't comment one way or the
16 other concerning whether there was an underlying
17 mental illness?
18  A.  I said it was possible when I wrote that.
19 I felt like I was stretching to find some
20 explanation.
21  Q.  The reports that you reviewed were not only
22 numerous, they were somewhat consistent in terms of
23 describing a mysterious type of behavior; would you
24 agree with that statement?
25  A.  People either assumed he was under the

John Carver, M.D.

**62**

1  influence of drugs or out of it in some unexplained
2  way, correct.
3      Q.  Did you form a clinical picture of a man
4  who otherwise was a mild-mannered, ordinary guy who
5  suddenly and surprisingly slipped into an otherwise
6  unexplainable rage or combative and violent behavior
7  that had no apparent explanation?
8      A.  I do.  I tried to come up with the reasons
9  I thought were possible and describe them in my
10 report.
11     Q.  But is my description of what you took in
12 in the aggregate accurate?
13     A.  Yes.
14     Q.  As we sit here now, if we were to focus on
15 the cause of that violent behavior and what appears
16 to be irrational behavior, do you have what you
17 would consider to be the top most likely explanation
18 in mind?
19     A.  In connection with this case, my then boss,
20 Dr. Martin, ended up going to like a week-long
21 seminar, and I think it was in Las Vegas that year.
22 And I think -- I didn't go, and I haven't seen
23 whatever material she got, so I can't characterize
24 it much more specifically than this.
25         But in-custody deaths and excited delirium

**63**

1  constituted big chunks of the gist of this like
2  week-long seminar.  And I recall her coming back
3  from that and on some occasion or other, this is in
4  the realm of scientific theory, but she made a
5  statement at one point to the effect that some
6  scientists are now hypothesizing that maybe
7  long-term drug use can cause some permanent -- I
8  don't know what the right term is, changes in the
9  brain.
10     Q.  Organic changes?
11     A.  I don't even want to use that term.  But
12 maybe it's possible to be in an excited delirium to
13 precipitate an episode of excited delirium without
14 the presence of drugs.  Maybe -- maybe prior drug
15 use, if it's chronic enough, might predispose you to
16 falling into a state of excited delirium.
17         I'm just remembering Dr. Martin saying
18 something like that as a result of the materials she
19 had seen at this seminar.  I've never -- I've never
20 read a paper myself that presents findings
21 suggesting or supporting that.  I'm just reporting
22 what she said at one point.
23         I think subsequently, too, I may have read
24 somewhere in an article or a text or it may have
25 been on our professional list serve of the National

**64**

1  Association of Medical Examiners, sometimes there
2  are discussions from time to time about difficult
3  topics.  And excited delirium would certainly fit
4  into that.
5          And I don't even know if I'm remembering
6  this right, but, again, it reflects the statement I
7  make in the opinion that the vast majority of time,
8  you find active drugs or there's a history of mental
9  illness, but there may be some small percentage of
10 the time when neither are present.
11         So that's -- that's what I'm left with with
12 Mr. Ashley and the possible contribution of the heat
13 of the day, too.
14     Q.  In terms --
15     A.  And I can't -- I can't exclude either one
16 of them.  But a lot of what forensic pathologists do
17 is, you know, examine things as carefully as we can,
18 eliminate all other more obvious answers for which
19 there's zero evidence, and you're left with these
20 other possibilities.
21         And sometimes, you can't eliminate one or
22 the other, hence, the overall characterization of
23 this report, cardiorespiratory arrest with all of
24 these things adding to the picture.
25     Q.  Now, did I understand correctly that you

**65**

1  said that Dr. Martin went to the seminar in
2  Las Vegas on this subject as a result of this case?
3      A.  I couldn't speak to that.  It may have
4  been.  I don't know if it was completely unrelated
5  or not.
6      Q.  But do you know whether or not she
7  undertook to do any analysis herself of this Alonzo
8  Ashley matter?
9      A.  I don't know.  I guess I would back up --
10 well, I don't know when the seminar was.  Between
11 the first version of the report and Exhibit 15
12 signed on December 15th, version one is signed
13 October 21, 2011.
14         I took like a week-long vacation shortly
15 after that report was signed.  At some point, when I
16 came back, additional testing, in fact, quantitation
17 of Benzoylecgonine in the urine had then ordered,
18 not by me, but I believe by Dr. Martin while I was
19 gone.  And where the impetus from that came from,
20 I'm not sure.
21         I have -- I have this vague recollection
22 which may be inaccurate that the City Attorney's
23 Office had requested that it be confirmed as present
24 in his urine because the first version of the report
25 said presumptive positive cocaine.

17 (Pages 62 to 65)

John Carver, M.D.

Page 70

1  them, you know, unique unto themselves.
2      So I'm not quite sure how to answer the
3  question because there can be so many factors either
4  present or absent in a particular case that would
5  distinguish it from a case of Mr. Ashley that I'm
6  not quite sure what to say.
7      Q.  If Mr. Ashley had ever used hallucinogenic
8  drugs in the past such as LSD or anything else
9  capable of producing behavioral manifestations of
10 schizophrenia or a psychotic break, would you
11 necessarily have been able to tell that from the
12 drug screen that you did?
13     A.  The most extensive -- Mr. Ashley's case has
14 got -- how to formulate this sentence.  I have not
15 done any other case where -- this is awkward.  This
16 is the most extensive toxicology testing I have ever
17 done in a single case.  I don't know what else to
18 say.
19     And the level of testing, you'd have to go
20 to the NMS catalog to find out exactly which
21 substances were screened for.  But a lot of
22 psychedelic stuff was assayed for and not detected.
23 But that doesn't mean it's never been used in his
24 past, but it just wasn't detected in the fluid
25 samples from this autopsy.

Page 71

1      Q.  Are you aware of whether or not psychedelic
2  drugs such as lysergic sodium diethylamide can, even
3  after falling below measurable levels, produce
4  residual psychosis?
5      A.  I'd have to go back and review the
6  literature before I expressed an opinion on that.
7      Q.  Is it fair to say that the question of
8  whether earlier drug use of substances that did not
9  show up in the tox panel might have played a role in
10 this behavioral outburst isn't something that you
11 undertook to analyze?
12     A.  I need you to repeat that one more time.
13         MR. GODFREY:  Brandi, take a shot at that.
14         (Pending question was read.)
15         THE WITNESS:  Yes.
16     Q.  (By Mr. Godfrey)  So that's an area of
17 inquiry that you haven't delved into yet in this
18 case?
19     A.  I'd say any delving into it would be
20 entirely speculative.
21     Q.  Because there isn't enough data to perform
22 such an analysis, fair to say?
23     A.  I don't think there's any data to perform
24 such an analysis.
25     Q.  Okay.  Now, are there substances that are

Page 72

1  commonly encountered in street-grade cocaine that
2  are used to cut the cocaine which can produce
3  behavioral abnormalities?
4      A.  I don't know, but I suppose it's possible.
5      Q.  I have heard it said that sometimes cocaine
6  is cut with strychnine.  Have you ever heard of
7  that?
8      A.  I may have heard of that.
9      Q.  Do you know whether strychnine can produce
10 long term psychological effects?
11     A.  No.  I don't.
12     Q.  Through its toxic effect on the individual,
13 you don't know?
14     A.  No.  I don't know.
15     Q.  Okay.  Now, in the next paragraph of your
16 report, you say that -- you characterize this as a
17 homicide?
18     A.  Correct.
19     Q.  And it appears to me that you're adding a
20 qualifier intentionally here to show that that
21 doesn't mean murder?
22     A.  Correct.
23     Q.  Or necessarily even wrongdoing by anybody,
24 fair to say?
25     A.  Correct.

Page 73

1      Q.  Homicide, as you use the word, doesn't mean
2  that someone killed him on purpose or even
3  accidentally; is that fair to say?
4      A.  Homicide in this case means that the
5  intentional application of physical forces by
6  another individual or individuals contributed to the
7  death.  That's all that means.  It does not mean --
8  does not have any criminal significance whatsoever.
9      It does not mean that the application of
10 those forces were not justified.  That's not my
11 purview to say whether that's the case or not.  Just
12 means it's a force coming from another person which
13 was applied with that other person's volition.  It
14 wasn't them accidentally holding Mr. Ashley to the
15 ground.  It's them intentionally restraining Mr.
16 Ashley, and that those forces are physiologically
17 contributory to his ultimate cardiorespiratory
18 arrest.
19     Q.  Is that mostly through exertion or through
20 trauma?
21     A.  I'm not sure I know what you --
22     Q.  Well, I'm envisioning a situation where a
23 man on a hot day who has some drug metabolites on
24 board, is complaining of being overheated, has his
25 head in a fountain, and then just snaps, attacks a

John Carver, M.D.

**Page 102**

1  was, in connection with that bruising of the
2  sternocleidomastoid, evidence of a force sufficient
3  to produce death?
4      A.  I don't think in itself it means -- no.  As
5  I said before, anything like that is a marker of
6  force but doesn't -- that's all it is.  It doesn't
7  prove legality.
8      Q.  Is it, therefore, probable that whatever
9  force was applied to that region of the anatomy was
10 by itself nonlethal.
11     A.  It's a marker of force, and I could
12 speculate as to how it happened.  I'll never know
13 quite how it happened, but it seems probable that it
14 was an injury that occurred during the struggle with
15 Mr. Ashley when he was brought to the ground.
16 Whether somebody had an arm around his neck briefly,
17 twisted his neck, hit the side of his neck, it's
18 speculative.
19     Q.  All it tells us is that either by grappling
20 with him or holding him down, something bruised the
21 side of his neck?
22     A.  Correct.
23     Q.  And that you wouldn't characterize that as
24 a heavy bruise or a particularly deep bruise?
25     A.  Let me find the page where I describe it.

**Page 103**

1  When I looked at it grossly on page 10, you know,
2  under "Neck," this is 000117 under "Neck."  Second
3  sentence, "There is a 3 x 1 area of hemorrhage
4  involving the fascia, overlying the upper aspect of
5  the sternal head of the left sternocleidomastoid
6  muscle.  It does not appear that the hemorrhage
7  extends deep within the muscle."  So between
8  individual muscles, there could be soft tissue
9  plains, you know, kind of fibrous -- there may be
10 some nerves or blood vessels running through it, but
11 it is a connective tissue.
12     Q.  Adjacent to the fascia?
13     A.  Well, yes.  So it looked like this was
14 overlying the top portion of this left neck muscle.
15 When I cut into it, it didn't look like the
16 hemorrhage was within the muscle, which might
17 support a greater degree of force.
18     Q.  If it had been?
19     A.  If it had been.  But I wish I had put my
20 micro description in here, and I didn't.
21     Q.  But your best testimony today is that's a
22 very superficial bruise?
23     A.  I wish I had looked at the slide.  I call
24 it a contusion.  You know, there's some hemorrhage.
25 By itself, it's yet another, you know, injury that

**Page 104**

1  in and of itself, you can't call it lethal.
2      Q.  Just like this bruise on his arm over the
3  187?
4      A.  That's an abrasion.
5      Q.  Okay.  I get the point.  An abrasion,
6  meaning skin scrapped away?
7      A.  Right.
8      Q.  Presumably by cement?
9      A.  Right.
10     Q.  That wouldn't be any more likely or less
11 likely to have brought about his death than the
12 bruise on the neck?
13     A.  Only in the sense that pressure in the
14 neck, you always look at more closely.  Pressure to
15 the top of the shoulder, I hesitate to say never,
16 but I'll say, never kills anybody.  Pressure to the
17 neck can kill people, but there's no evidence here
18 from anything I got or prolonged pressure to
19 Mr. Ashley's neck which would make me think that he
20 had died of asphyxia from pressure on the neck.
21     Q.  There's no evidence of that?
22     A.  I've got nothing that tells me that.
23     Q.  So lay terms, there's no medical evidence
24 to support the assertion that the police choked him
25 to death?

**Page 105**

1      A.  Correct.
2          MR. GODFREY:  Let's take another brief
3  recess.  I want to just consult with my colleague.
4  I'm probably done or very, very close.
5          (Recess from 11:53 a.m. to 11:58 a.m.)
6          MR. GODFREY:  I have no further questions,
7  Doctor, thank you.  I know the others may, but I'm
8  done.
9                 EXAMINATION
10 BY MS. KOVACI:
11     Q.  Doctor, I have some questions for you.
12 Now, under the Colorado Coroner's Statute, one of
13 the circumstances in which a coroner has to conduct
14 an autopsy is if the death occurred while in the
15 custody of law enforcement, are you aware of that?
16     A.  Sure.
17     Q.  Is that, to your understanding, the reason
18 that an autopsy was conducted of Mr. Ashley?
19     A.  It's -- sure.  Yes.
20     Q.  Okay.  Who was present at the autopsy?
21     A.  The people who are listed in the report as
22 witnesses.
23     Q.  And those would be people listed on page 5
24 of your report?
25     A.  Correct.

27 (Pages 102 to 105)

John Carver, M.D.

Page 118

1  Q. Okay. Given the information we have
2  regarding --
3  A. Just probably not within the day or so
4  before.
5  Q. Okay. Understood.
6     Given the information known regarding the
7  cocaine use, would you consider that Ashley was
8  under the influence of cocaine at the time of his
9  death?
10 A. I don't, because it's not in his
11 bloodstream. You think of a medication or a drug as
12 having its effect when it's present in the blood,
13 not when it's present in the urine.
14 Q. With respect to the opinion or diagnosis of
15 the cardiorespiratory arrest, are you able to
16 pinpoint the mechanism of death that caused the
17 cardiorespiratory arrest?
18 A. No. It's all the factors we've talked
19 about in this deposition that are potential
20 contributors to a greater or lesser degree.
21 Q. Okay. So you can't point to any specific
22 thing that would have caused the death?
23 A. There are multiple stressors involved.
24 Q. And, indeed, the death then could have been
25 caused by any of these items that you have listed in

Page 119

1  your diagnoses?
2  A. I don't think you can pinpoint a single one
3  of these factors and say this was the mechanism.
4  They're all contributory.
5  Q. Okay. So it could just be a compilation of
6  lots of different things --
7  A. Correct.
8  Q. -- that would have caused the death?
9  A. Correct.
10 Q. And you state that full autopsy reveal no
11 anatomic cause of death, right?
12 A. Correct.
13 Q. So nothing regarding Ashley's body alone
14 showed why his heart stopped beating?
15 A. Right. You have to consider all the
16 circumstances.
17 Q. The cardiorespiratory arrest following
18 violent struggle and physical restraint, when you
19 reference the violent struggle, is that a reference
20 to both Mr. Ashley fighting and struggling against
21 being handcuffed as well as the officers' and zoo
22 security's actions?
23 A. I think it's all of the piece.
24 Q. You're aware that Mr. Ashley was violently
25 struggling against the officers and zoo security?

Page 120

1  A. Yes.
2     MR. FRANKFURT: Object to the form.
3  Q. (By Ms. Kovaci) And you're aware that
4  Mr. Ashley kicked the officers?
5  A. That's described in the interviews, too.
6  Q. And that he struck the officers?
7  A. I'm remembering kicking and biting an
8  officer.
9  Q. Okay. And you're aware that the officers
10 applied OPNs?
11 A. Correct.
12 Q. And that he actually broke the OPNs?
13 A. An OPN broke during the struggle.
14 Q. And he was able to throw officers off of
15 him?
16 A. I don't recall that being described, but
17 I'm not saying it didn't happen.
18 Q. But you do recall the officers commenting
19 about Ashley's unexpected strength?
20 A. Yes.
21 Q. When you reference the preceding agitated
22 and combative behavior related to the assault on the
23 zoo employee, how is that relevant to the cardiac
24 arrest?
25 A. To the extent that it is indicative of

Page 121

1  either excited delirium or heat stress leading to
2  heatstroke. It's a stress on the heart.
3  Q. Okay. And so when you mention the excited
4  delirium, you reference that he had symptoms of
5  excited delirium, correct?
6  A. His behavior is certainly consistent with
7  it. Although, I could not completely eliminate the
8  possibility that it was simply heat somehow
9  contributing to it, too.
10 Q. Okay. And so what you're sort of getting
11 at then is that you would normally expect to see
12 someone with excited delirium to be under the
13 influence of drugs or to have a mental illness, and
14 you stated in your report that it did not appear
15 that he had either of these two things?
16 A. Correct.
17 Q. All right. But he did have the symptoms of
18 excited delirium, and you specifically reference
19 agitation, combativeness, and unexpected strength?
20 A. He exhibited that, yes.
21 Q. And are those symptoms then also consistent
22 with heat stress?
23 A. I think that it's possible, too.
24 Q. So that the heat stress would have caused
25 those same agitation, combativeness, and unexpected

31 (Pages 118 to 121)

John Carver, M.D.

**Page 122**

1  strength?
2  A. Or it's a combination of the two things
3  going on that he exacerbates.
4  Q. Do you think it's possible that he had heat
5  stress, heat exhaustion, or heatstroke at the time?
6  A. It seems to me that he would not be in a
7  state of heatstroke, but maybe heat stress. I would
8  have to go back to my reading to review all of the
9  physical signs of heatstroke.
10      When you get to the point of heatstroke,
11  your peripheral circulation shuts down, you become
12  cool and clammy and death is eminent. Whether there
13  are other physical signs of heatstroke, I'd have to
14  go back to my reading to find out.
15  Q. Okay. But it's a possibility that he may
16  have had it?
17  A. Like I say, I've got nothing to -- I think
18  he may have been on a spectrum that's headed that
19  way. I can't say he had heatstroke because you'd
20  actually need, you know, an objective finding of a
21  core temperature, core body temperature of
22  105 degrees centigrade to actually call it
23  heatstroke.
24  Q. And his body temperature wasn't recorded?
25  A. I didn't find any recordings of body

**Page 123**

1  temperature.
2  Q. Can the heat-related illnesses that you
3  reference in your report lead or cause the cardiac
4  arrest?
5  A. I think that can contribute to it, yes.
6  Q. Can they cause the cardiac arrest?
7  A. I think you can't segregate out any one of
8  these factors and say that it is.
9  Q. Now, you agree from your review of the
10  records and materials that the officers were simply
11  just trying to take Ashley into custody?
12      MR. FRANKFURT: Object to the form.
13      THE WITNESS: I'm sorry?
14  Q. (By Ms. Kovaci) You'd agree from your
15  review of the materials that the officers were
16  simply trying to take Ashley into custody?
17  A. I don't know exactly how the physical
18  interchange started, but they certainly were going
19  to prevent him from leaving the zoo, yes.
20  Q. So there's no indication that he was
21  beaten, correct?
22  A. No.
23  Q. Okay. And you would agree that officers
24  are permitted to use a reasonable degree of force to
25  accomplish taking someone into custody?

**Page 124**

1      MR. FRANKFURT: Object. I think that's --
2      THE WITNESS: That's outside the purview of
3  my expertise, I think.
4      MR. GODFREY: Attorney Dr. Carver, we think
5  your expertise has no bounds.
6      MS. KOVACI: You are an attorney.
7      THE WITNESS: Ask me about the role against
8  perpetuity as is applied to the shut-in gas clause
9  of an oil and gas lease, and yes, I'll be profound
10  for you.
11  Q. (By Ms. Kovaci) On the first page related
12  to the cardiorespiratory arrest, you represent the
13  decedent was restrained face down on the ground,
14  shoulders pressed down, hands cuffed and legs
15  crossed and pressed towards his buttocks. Now, you
16  can't say to a reasonable degree of medical
17  probability that being restrained face down on the
18  ground would have caused the death, right?
19  A. I think it creates extra work of breathing,
20  which I think is a stress or that it cannot be
21  ignored in the totality of the circumstances in this
22  case.
23  Q. Okay. But you can't say that it was a
24  direct cause of the death?
25  A. I think it's contributory.

**Page 125**

1  Q. Okay. And so you can't pinpoint to any
2  direct cause of death? Everything is just
3  contributory?
4  A. Correct.
5  Q. Including the strikes to the abdominal
6  area, can you say -- so the officers referenced in
7  their reports two strikes to Ashley's abdominal
8  area. Do you recall that?
9  A. I don't recall that.
10  Q. Assuming that had occurred, you'd agree
11  that that wouldn't cause Ashley's death, right?
12  A. I didn't see anything at the autopsy
13  indicating any serious abdominal injury.
14  Q. Okay. And you -- we previously referenced
15  that the officers used OPNs?
16  A. Yes.
17  Q. And you can't say to a reasonable degree of
18  medical probability that the use of the OPN caused
19  the death?
20  A. By itself, the use of the OPNs doesn't
21  cause the death. Holding the legs flexed and
22  pressed up towards the buttocks with weight applied
23  to the legs conceivably affects the ability to
24  breathe by limiting the excursion of the diaphragm
25  by pushing the abdominal organs upwards. So I can't

John Carver, M.D.

### 126

1  say. It seems like it's an additional possible
2  stress, again, like all of the other stresses.
3       Q.   It's all contributory?
4       A.   Correct.
5       Q.   With respect to the Taser use, you write
6  that there was five, five second discharges per
7  device interrogation. Now, you stated that you had
8  just reviewed the Taser download. So you have no
9  indication that the Taser was actually applied to
10 Mr. Ashley's body five times? It's only that the
11 Taser download indicated that the Taser went off
12 five times?
13      A.   Correct.
14      Q.   And, indeed, you didn't find any visible
15 indication on the body of a Taser mark?
16      A.   Correct.
17      Q.   And you carefully examined the body to look
18 for these marks?
19      A.   Correct.
20      Q.   And when you've conducted other autopsies
21 in the past, have you ever found marks on a body?
22      A.   Only once. And I'm not even positive they
23 were Taser marks. They could have been Taser marks.
24      Q.   Okay. But you're trained to look for Taser
25 marks?

### 127

1       A.   I always look. I guess I have not been
2  100 percent sure yet whether I have seen them.
3  There's only one case where I may have observed
4  them, and even then, I wasn't sure. Luckily, there
5  haven't been that many cases where I've had to look
6  at them -- look for them, a total of three.
7       Q.   And what do you look for when you look for
8  Taser marks on a body?
9       A.   I would just be looking for small areas of,
10 you know, burn, there's two -- at least on the end
11 of the X26 -- well, again, I'm not an expert on it.
12 I would just be looking for small areas of thermal
13 injury to the skin.
14      Q.   So small burns?
15      A.   Yes.
16      Q.   And that's specifically with respect to
17 application of a Taser in a direct contact mode,
18 right?
19      A.   Yes.
20      Q.   When a Taser is shot with the prongs, the
21 prongs actually --
22      A.   Imbed in the skin.
23      Q.   Okay. And so that would be a completely
24 different mark than when the Taser is applied in a
25 direct contact?

### 128

1       A.   Correct.
2       Q.   And you didn't find any burn marks on
3  Mr. Ashley's body?
4       A.   No.
5       Q.   Would you expect that if there was direct
6  contact with skin during application of a Taser,
7  that you would find a burn mark?
8       A.   I'm sorry?
9       Q.   Would you expect that if there was direct
10 application of the Taser directly to the skin, that
11 you would find a burn mark?
12      A.   As I answered Mr. Godfrey before, I don't
13 know if there's a percentage of time where you would
14 say no mark whatsoever even if there was use
15 directly against the skin.
16      Q.   Even if the Taser discharges had made
17 contact with Ashley's body, can you say that this
18 caused the death?
19      A.   I -- my understanding of the Taser when
20 used in contact stun drive mode is, it's a local --
21 localized application of pain. It does not have
22 neuromuscular effects and shouldn't have effects on
23 cardiac activity.
24      Q.   So it wouldn't cause the death?
25      A.   I'm not saying it might not cause certain

### 129

1  individuals to struggle more even, though the motive
2  for using it is to make them comply and struggle
3  less. It can be a stressor, but I'm not -- I can't
4  say that it directly caused his death, no.
5       Q.   Would you agree that you can't say to a
6  reasonable degree of medical probability, that any
7  specific action that the police officers did
8  directly caused Ashley's death?
9       A.   I think their efforts to restrain him
10 contributed to his death.
11      Q.   But you can't say that it directly caused
12 Ashley's death?
13      A.   I think it contributed to his death.
14 That's what I can say.
15      Q.   And you'd agree though, that Ashley's
16 violent struggle against the police officers also
17 was a major contributor to his death?
18           MR. FRANKFURT: Object to the form.
19           THE WITNESS: It's a struggle. There are
20 two parties involved in a struggle. If he had not
21 been struggling, he could have been handcuffed and
22 walked away.
23      Q.   (By Ms. Kovaci) And in most likelihood, he
24 wouldn't have died?
25           MR. FRANKFURT: Object to the form.

John Carver, M.D.

**130**

1 THE WITNESS: If there had been no
2 struggle, I think it's likely he'd be alive, yes.
3 Let me clarify that.
4 Q. (By Ms. Kovaci) Okay.
5 A. He's -- we talked at length about whether
6 or not he was in excited delirium or not. We talked
7 at length about whether environmental high
8 temperatures and possible heat stress was involved
9 in his death. He was in a serious medical state,
10 but he apparently was able to start walking out of
11 the zoo under his own power. I can't say
12 100 percent he would have survived, but it looked
13 like he was headed out of the zoo under his own
14 power.
15 Q. Okay. So there were indications though
16 that he had other conditions that potentially could
17 have caused him to die anyway?
18 A. All of them being contributory, yes.
19 Q. Would you assign a greater portion of the
20 cause of death to Ashley's struggle against the
21 police officers than against being taken into
22 custody?
23 A. I'm sorry, can you --
24 Q. Would you assign a greater portion of the
25 cause of death to Ashley's actions than to the

**131**

1 police officers?
2 A. I can't -- I can't assign percentages.
3 Q. Okay. For anybody?
4 A. No.
5 Q. So it was really just a combination of
6 everything, all of these things combined?
7 A. To attempt to assign specific percentages
8 to any particular action or individual, I think, is
9 impossible.
10 Q. Okay. The abrasions we've -- that we've
11 previously talked about, you noted abrasions to the
12 face, right?
13 A. Yes.
14 Q. The forehead, right?
15 A. Yes.
16 Q. Extremities?
17 A. Yes.
18 Q. And back?
19 A. Yes.
20 Q. Okay. In your report, you state that there
21 are minor blunt force injuries. So you didn't note
22 any significant abrasions or injuries to Ashley's
23 body, correct?
24 A. All these are -- are marks on the body
25 which were consistent with the entire scenario as

**132**

1 substantiated by the interviews and the witness
2 statements.
3 Q. But they're all just minor injuries?
4 A. They're all indications of what people said
5 happened happened. There was a fight. He was taken
6 to the ground. He's got scrapes. He's got bruises
7 that are consistent with those things happening.
8 Q. On the internal injuries in your report,
9 you identify -- when looking at the body cavity, you
10 identified that the chest wall had revealed patchy
11 hemorrhage of inner surface of sternum and fractures
12 at the junction of the right ribs 3 and 4?
13 A. Correct.
14 Q. What would be the normal cause of those
15 injuries?
16 A. Blunt force.
17 Q. Okay. And would that be most likely from
18 the chest compressions and the CPR?
19 A. Can you tell me what page you're looking
20 at?
21 Q. It's on page 8 under paragraph titled "Body
22 Cavities."
23 A. Okay. Yes, it's possible it's CPR.
24 Q. And that's -- you've commented those are
25 the type of injuries that you've seen other times

**133**

1 while performing autopsies?
2 A. The location of the fractures is a little
3 bit unusual. But, quite frankly, CPR is usually
4 being performed on older people too, and so the ribs
5 may be a little bit more brittle. The fractures
6 tend to be further out to the sides with CPR.
7 So it's frequent with CPR to see some kind
8 of mottled abrasion or bruising over the sternum and
9 see lateral fractures of, you know, right and left
10 ribs, say 2 through 6. So it's -- that's a little
11 unusual, but it could be CPR.
12 Q. So you would expect that this injury though
13 is from CPR?
14 A. I'm saying what I can say, the location is
15 somewhat unusual. It is the application of blunt
16 force. I'm -- I can't say it isn't CPR. It's
17 somewhat unusual for CPR.
18 Q. But here, you would normally think that
19 this is from CPR, right?
20 A. I just told you what I thought I could tell
21 you. I can't say it's not. It's slightly unusual,
22 the fracture locations are a little unusual, but it
23 could be CPR.
24 Q. Okay. Anything remarkable about
25 Mr. Ashley's heart at all?

34 (Pages 130 to 133)