IN THE UNITED STATES DISTRIC COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  12-cv-01856-MSK-BNB

GAIL WATERS, as personal representative of the Estate of Alonzo Ashley,

                     Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
DENVER ZOOLOGICAL FOUNDATION, INC, a nonprofit corporation,
ERIC FLUEGEL, an employee of the Denver Zoological Foundation, in his individual capacity,
AARON LAWYER, an employee of the Denver Zoological Foundation, in his individual capacity,
JAMES TOTTEN, an employee of the Denver Zoological Foundation, in his individual capacity,
PHILIP COLEMAN, a Denver Police Department Officer, in his official and individual capacity,
PETE CONNER, a Denver Police Department Lieutenant, in his official and individual capacity,
JOE GASCA, a Denver Police Department Officer, in his official and individual capacity,
JUSTIN JONES, a Denver Police Department Officer, in his official and individual capacity,
JOHN DOE I - V, employees of the Denver Police Department, in official and individual capacities; and
JOHN DOE VI – X, employees of Denver Zoological Foundation, in official and individual capacities.

                     Defendants.

---

**PLAINTIFF'S RESPONSE TO DENVER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

        Plaintiff, Gail Waters, by and through her attorneys, William W. Frankfurt and Kevin C. Flesch, hereby responds to the Denver Defendants' Motion for Summary Judgment [Doc. 129] pursuant to Fed.R.Civ.P.56, D.C.COLO.RCivP 56.1 and MSK Civ. Practice Standards V.I.3 as follows:

## I.     INTRODUCTION

        On July 18, 2011, Alonzo Ashley was enjoying a day at the Denver Zoo with his girlfriend Elina Sengprachanh and her family. Temperatures that day were extremely hot and Mr.

1

Ashley began to feel ill. He attempted to cool himself off under a water fountain and fellow zoo patrons contacted zoo security to check on Mr. Ashley. A Denver Zoo security guard began questioning Mr. Ashley and the situation escalated. A physical altercation ensued between Mr. Ashley and the zoo security guard and the Denver Police Department was notified erroneously of a potential domestic violence dispute.

Officer Justin Jones was the first Denver Police Officer to arrive on scene. He immediately drew his taser, pointed it directly at Mr. Ashley and ordered him to the ground, while surrounded by zoo security officers. Mr. Ashley complied with Officer Jones request to the ground but then proceeded towards the exit of the Zoo asking to be left alone. Officer Jones followed Mr. Ashley and eventually reached out and grabbed Mr. Ashley by the arm. At this point Officer Jones and zoo security guard James Totten tacked Mr. Ashley to the ground. Officer Jones punched Mr. Ashley in the stomach twice, and deployed his taser upon Mr. Ashley twice, all while Mr. Totten and at least two other zoo security guards were restraining Mr. Ashley. Eye witness accounts indicate that while Mr. Ashley was on the ground he was not resisting the officers.

Multiple other Denver Police Officers arrived on scene including Officer Coleman, Officer Gasca and Lieutenant Conner. A total of at least eight individuals were on top of Mr. Ashley at any one time utilizing force upon him in the manner of additional taser deployments, forced head, arm, shoulder and leg restraints, administration of Orocut police nunchucks, or OPN to Mr. Ashley's legs and ultimate handcuffing. Mr. Ashley was ultimately hog-tied and sat upon by officers, despite his lack of resistance. Officers continued to apply force to Mr. Ashley after he was handcuffed in a prone position and had vomited three times. Paramedics were eventually called to the scene when it was noticed that Mr. Ashley was no longer breathing. As a direct

2

result of the Denver Police Officers' conduct in this incident, Mr. Ashley went into cardiorespiratory arrest. Emergency medical treatment was administered to Mr. Ashley and he was transported to a local area hospital, but his injuries were too great and and he was pronounced dead at 6:05 p.m. on July 18, 2011.

In this action, Plaintiff, on behalf of the Estate of Alonzo Ashley, seeks recompense for violations of State and Federal Constitutional law, including 43 U.S.C. § 1983 and state statutory and common law, arising from Alonzo Ashley's contact with Defendants on July 18, 2011.

## II.   CLAIMS UPON WHICH SUMMARY JUDGMENT IS SOUGHT

### A.  CLAIM 1: FOURTH AMENDMENT EXCESSIVE FORCE

#### 1.  Burden of Proof and Elements

The Defendant asserts a qualified immunity defense as it relates to Plaintiff's Forth Amendment Excessive Force claim. Plaintiff agrees with the Defendants' recitation of the burden of proof and the elements on this claim. However Plaintiff notes that according to the Tenth Circuit, when plaintiffs and defendants allege completely different factual circumstances surrounding a use of force, summary judgment (via qualified immunity or otherwise) is not appropriate. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) ("[T]his court will not approve summary judgment in excessive force cases – based on qualified immunity or otherwise – if the moving party has not quieted all disputed issues of material fact." (citing *Allen v. Muskogee*, 119 F.3d 837, 840-42 (10th Cir. 1997))). "A qualified immunity defense will not succeed in inducing a court to grant summary judgment when 'the facts . . ., considered collectively, present an incomplete picture of the [relevant] circumstances.'" *Olsen*, 312 F.3d at 1314 (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1137 (10th Cir. 1991)).

The circumstances here are just that: completely different factual circumstances surrounding the use of force exist. Defendants' recitations of facts in their Motion for Summary Judgment are, in fact, disputed by voluminous evidence in the record, rendering summary judgment inappropriate. See *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989).

The record clearly shows disputed material facts regarding the incident between Mr. Ashley and the Denver Defendants. In addition, the qualified immunity standard at the summary judgment stage is also satisfied due to the fact that the record establishes that the Denver Defendants violated Mr. Ashley's clearly established constitutional rights. *See Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1312 (10th Cir. 2009) (*citing Scott v. Harris,* 550 U.S. 372, 378 (2007)(The qualified immunity two-part test is still viewed in light most favorable to plaintiff)).

2. Elements Challenged by the Defendant

Plaintiff can demonstrate a triable issue of fact as to Elements (i) and (ii) of her burden of proof, which is challenged by Defendants. Plaintiff has elicited the following proof in support of her claim:

3. Proof in Support of Plaintiff's Claim

i. *Element (i) Defendants' actions violated a constitutional or statutory right*

Section 1983 of Title 42 of the United States Code creates a right of action for violations of the United States Constitution. The record is clear that the Denver Defendants violated Mr. Ashley's Fourth Amendment rights through the application of unreasonable physical force in their attempts to effectuate an arrest.

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "The `touchstone' of Fourth Amendment analysis `is always

the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *United States v. Oliver*, 363 F.3d 1061, 1066 (10th Cir. 2004) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09(1977) (per curiam)). Under *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), "claims that law enforcement officers have used excessive force … in the course of an arrest, investigatory stop, or other `seizure'" are analyzed under the same Fourth Amendment reasonableness standard.

The first step is determining whether or not there was a seizure. *Couture v. Bd. of Educ. of Albuquerque Public Sch.*, 535 F.3d 1243, 1250 (10th Cir. 2008). The record is clear that Mr. Ashley's movement was restricted by all of the named Denver Defendants. Officer Jones admits to tackling Mr. Ashley to the ground, striking him in the abdomen, dragging Mr. Ashley back to other officers were also seizing Mr. Ashley. Ex. 1, Deposition of Officer Justin Jones, 47:5-7; 48:15-18; 51:10; 52:7; 55:2; 56:19-20. *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010)(Tasing is a seizure under the Fourth Amendment). Officer Coleman admits to grabbing Mr. Ashley's arm while Mr. Ashley was on the ground, tasing Mr. Ashley twice, and handcuffing Mr. Ashley. Ex. 2, Deposition of Officer Phillip Coleman, 31:18-25; 34:7-9; 38:1-2; 40:13-14. Lieutenant Conner admits to administering Orocut police nunchucks, or the OPN, to Mr. Ashley's right ankle for pain compliance and control, on two separate occasions, while lying on top of Mr. Ashley's right leg. Ex. 3, Deposition of Lieutenant Reuben Conner, 17:10-16; 21:17-18. Lieutenant Conner also admits to handcuffing Mr. Ashley. Ex. 3, 25:22-25. Officer Gasca admits to taking control of both of Mr. Ashley's ankles, crossing them, bending Mr. Ashley's knees back up so his ankles were to his buttocks and then kneeling down on Mr. Ashley's legs in that position. Ex. 4, Deposition of Officer Joe Gasca, 127:11-15.

The record is clear that the Denver Defendants' actions constituted "a governmental termination of [Plaintiff's] freedom of movement *through means intentionally applied." Brower v. County of Inyo*, 489 U.S. 593, 597 (1989)(emphasis in original). A seizure did occur.

Once a seizure is established, the next step of the analysis is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting the officer. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Proper application of the Fourth Amendment reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest." *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1989). Although the Fourth Amendment reasonableness factors as established in *Graham* guide the analysis of an excessive force claim, they are "non-exclusive." *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011). "[T]he question is "whether the totality of the circumstances justifie[s] a particular sort of … seizure." *Garner*, 471 U.S. at 8-9.

A review of the totality of the circumstances in this matter establishes objectively unreasonable seizures on behalf of all the named Denver Defendants.

**<u>Officer Justin Jones</u>** – On July 18, 2011 Officer Jones was dispatched to the Denver Zoo. Ex. 1, 30:19-21. Dispatch reported a domestic violence incident at the Denver Zoo. Ex. 1, 31:9. However, there never was any incident of domestic violence involving Mr. Ashley on July 18, 2011. Ex. 5, Deposition of Elina Sengprachanh, 190:9-23. A zoo employee named Andre Derritt made the initial 911 call on July 18, 2011. He mistakenly described the incident as domestic violence, based on an incorrect assumption and without having spoken directly to Mr. Ashley or Ms. Elina Sengprachanh about the details of what was taking place. Ex. 6, Video Interview of Andre Derritt Denver 002884, at 13:34.

6

When Officer Jones arrived on scene, he immediately pulled his taser from the holster and pointed it at Mr. Ashley. Ex. 1, 35:18-19. He then ordered Mr. Ashley to the ground, and Mr. Ashley immediately complied with this request. Ex. 1, 39:12-15. Subsequently, Mr. Ashley stood back up and walked towards the exit of the Zoo. Ex. 1, 41:18-20. During this interaction, Mr. Ashley was not threatening anyone. Ex. 7, Deposition of James Totten, 46:22; Ex. 5, 205:4-6. During this initial interaction, when Officer Jones had his taser in his hand and was within approximately 6 feet of Mr. Ashley, Officer Jones did not deploy the taser. Ex. 1, 38:13-39:9. Mr. Ashley moved towards the exit of the Zoo for approximately 15 yards before stopping near a bush. Ex. 1, 43:2-4. Officer Jones followed Mr. Ashley and when Mr. Ashley stopped moving, Officer Jones stopped next to him, approximately 4 or 5 feet from Mr. Ashley. Ex. 1, 42:25-43:1; 43:9. While following Mr. Ashley towards the exit, Officer Jones noticed that Mr. Ashley was sweating profusely. Ex. 1, 44:24-45:1.

While standing near the bush, Mr. Ashley moved to walk past Officer Jones and Officer Jones reached out and grabbed Mr. Ashley's arm and tried to put it behind Mr. Ashley's back. Ex. 5, 209:10-21; Ex. 1, 46:15-17. According to Officer Jones, he then takes Mr. Ashley to the ground. Ex. 1, 47:5-7.  According to several other witnesses, zoo security officer James Totten stepped in and tackled Mr. Ashley to the ground. Ex. 8, Deposition of Aaron Lawyer, 45:22-25; Ex. 7, 57:9-10. Both Officer Jones and Mr. Ashley fell and Mr. Ashley was lying face down on the asphalt. Ex. 7, 59:22-60:3. Mr. Ashley was attempting to throw punches, but none were successful. Ex. 7, 60: 17-18. After Mr. Ashley was tackled, Totten moved to control Mr. Ashley's legs and put him in a figure-four lock. Ex. 7, 61:7-9. While Totten was controlling Mr. Ashley's legs, Officer Jones punched Mr. Ashley in the abdominal area twice. Ex. 1, 48:20-21. After punching Mr. Ashley, and while Totten was holding down Mr. Ashley's legs, Officer Jones

deployed his taser in contact stun mode into Mr. Ashley's back for one standard cycle of five seconds. Ex. 1, 52:3-22.

According to Officer Jones, after being tased, Mr. Ashley attempted to reach for the taser to take it from Officer Jones. Ex. 1, 53:17-19. Officer Jones testifies that he drove the taser into the ground and prevented Mr. Ashley from grabbing it. Ex. 1, 54:20-23. However, security officer Totten testifies that Mr. Ashley had possession of the taser at a certain point and Mr. Totten took the taser away from Mr. Ashley and gave it back to a police officer. Ex. 7, 61:17-18. After Totten and Jones took Mr. Ashley to the ground, two other zoo security officers, Eric Fluegel and Aaron Lawyer utilized force upon Mr. Ashley in concert with Jones and Totten. Ex. 8, 50:6-12. During this time Officer Coleman arrived and grabbed ahold of Mr. Ashley's arms. Ex. 1, 53:4-10. After Officer Coleman joined in, Officer Jones admits to tasing Mr. Ashley for a second time, on his side, approximately 6 inches below the armpit. Ex. 1, 55:8-15. After Officer Coleman arrived and engaged with Mr. Ashley, at least 3 other officers arrived on scene and began to seize Mr. Ashley along with Officer Jones, Officer Coleman, Mr. Totten, Eric Fluegel and Aaron Lawyer, for a total of at least 8 people restraining Mr. Ashley at one time. Ex. 1, 56:15-17. After deploying the taser for a second time and continuing to hold down one of Mr. Ashley's arms while other officers were engaged, Officer Jones began to let go of Mr. Ashley in an effort to move away. Ex. 1, 57:1-12. As Officer Jones moved back he stumbled and fell while still holding on to Mr. Ashley's arm. *Id.*

Officer Jones admits to deploying his taser upon Mr. Ashley twice. Ex. 1, 59:11-13. Officer Jones also states he never saw anyone else utilize a taser upon Mr. Ashley. Ex. 1, 59:14-16. In their motion, the Denver Defendants state that Officer Jones did not apply the taser to Mr. Ashley's neck. However, evidence exists in the record to establish otherwise. According to zoo

security employee Aaron Lawyer, a taser was applied to Mr. Ashley's neck. Ex. 9, Video Interview of Aaron Lawyer 002878, 21:39.

In their motion, the Denver Defendants also indicate that Officer Jones did not see anyone lie on top of Mr. Ashley, nor did he, himself lie on top of Mr. Ashley. The simple fact that Officer Jones may or may not have seen anyone lie on top of Mr. Ashley while he was seizing him, does not mean that there were not Officers or zoo employees on top of Mr. Ashley. In fact, there is evidence in the record to establish there were Officers and/or zoo employees on top of Mr. Ashley and holding down parts of his body, specifically his, shoulders, back, head, arms and legs. Ex. 5, 208:11; Ex. 4, 113:17-25; 127:11-15; Ex. 10, Video Interview of Officer Joe Gasca, 07:06; 07:42. Ex. 8, 47:7-11; Ex. 2, 31:18-25; Ex. 3, 17:10-16; 21:17-18.

Denver Defendants argue that all *Graham* elements weigh in favor of finding Officer Jones' conduct objectively reasonable. Plaintiff disagrees with this analysis. First, of the *Graham* elements, the severity of the crime at issue weighs against Officer Jones. The crime at issue in this case was not domestic violence. There is no credible evidence of any domestic violence situation ever occurring at the Denver Zoo involving Mr. Ashley. In fact, Mr. Ashley's girlfriend states clearly that there was no domestic situation between them. Ex. 5, 190:9-23. Officer Jones failed to ask anyone any details about a potential domestic violence situation so he did not know that there wasn't a domestic violence situation. Ex. 1, 34:12-14. Furthermore, Officer Jones was told by zoo personnel upon his arrival at the zoo that a zoo security officer had been assaulted. Ex. 1, 34:17-20. However, again, Officer Jones did not investigate or ask any questions further about the potential circumstance of any alleged assault. When he arrived at the zoo, Officer Jones was escorted to the location of Mr. Ashley near the elephant enclosure. Ex. 1, 32:16-18. When Officer Jones arrived at the elephant enclosure, he saw zoo security standing in a

semicircle around Mr. Ashley. Ex. 1, 34:19-20. Present with those zoo security officers, was

Andre Derritt. Ex. 11, DPD Criminal Investigation Supplementary Report 2-1 – 2-102, Bates #

000223, ¶ 4; Ex. 12, Written Statement of Aaron Lawyer, Bates # 000569, p. 2 Officer Jones had

opportunity to view Mr. Derritt and his injuries or lack thereof [1]. Ex. 13, Crime Lab Photos

000924, Derritt Photo #2. In addition, according to Andre Derritt himself, he was attacked by

Mr. Ashley but he was not injured other than a few cuts and scrapes and he did not require

medical attention. Ex. 6, 04:25-04:35. Ex. 14, 911 Audio Recording, Bates # 000922, 03:31-

03:35.

Officer Jones failed to investigate or in any way assess the severity of the crime at issue.

Had he done so, he would have discovered he was not dealing with domestic violence, but only

potentially a misdemeanor assault wherein the alleged victim, whom Officer Jones made contact

with, had no discernable injuries and the alleged aggressor utilized no weapon. [2] There is nothing

that can be drawn from the record that would indicate that a reasonable officer could have

discerned that any type of felony assault had taken place. See *Fogarty v. Gallegos*, 523 F.3d

1147, 1160 (10th Cir. 2008) (finding a crime non-severe in excessive force analysis because it

was a misdemeanor under state law); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th

Cir.2007) (same). Officer Jones was faced with somebody who had potentially committed a

misdemeanor, which reduces the level of force that was reasonable for him to use. *Id. See also,*

*Morris v. Noe,* 672 F.3d 1185, 1195 (10th Cir. 2012)(holding severity of crime *Graham* factor

*slightly* in favor of defendant officer when dealing with misdemeanor assault only because

officer was actively trying to prevent an assault; Officer Jones was not trying to prevent an

assault under these circumstances).

---

[1] The crime lab photo of Andre Derritt taken on July 19, 2011 at 11:04 a.m. depicts no discernable injury to Mr. Derritt other than a few minor scrapes and abrasions.
[2] *See* C.R.S. § 18-3-203 Assault in the Second Degree.

The next of the *Graham* elements, whether the suspect poses an immediate threat to the safety of the officer or others, also weighs against Officer Jones. Although Officer Jones testified that he believed Mr. Ashley posed a significant safety threat, a reasonable officer would not and should not have come to such a conclusion. Ex. 1, 35:22-24. Furthermore, the reasonableness of Officer Jones' actions should be viewed from the perspective of a reasonable officer on the scene, not from the subjective perspective of the officer involved. *Graham*, at 396; *Tanberg v. Sholtis*, 401 F.3d 1151, 1168 (10th Cir.2005)("Under this objective standard, evidence tending to show Officer Sholtis's subjective state of mind is irrelevant.").

Mr. Ashley did not have a weapon in his possession on July 18, 2011. Ex. 5, 205:7-9; Ex. 2, 28:305; Ex. 3, 28:21-25.Ex. 4, 134:2-5. There exists no evidence in the record that Mr. Ashley had a weapon of any kind in his possession at any point on July 18, 2011 and none of the officers had reason to believe Mr. Ashley was armed upon arrival to the scene. Ex. 4, 134:5-8. Furthermore, Mr. Ashley posed no threat to any zoo patrons. There were only a few zoo patrons standing in the vicinity of Mr. Ashley but none of them were close enough that he posed any threat. All zoo patrons were removed to a safe distance by zoo personnel away from Mr. Ashley, so far that they did not even have a clear view of everything that took place. Ex. 5, 58:10-59:9. Upon arrival to the scene and first viewing of Mr. Ashley, Officer Jones was aware that no zoo patrons were at risk and Mr. Ashley was surrounded by multiple zoo security officers. Ex. 1, 34:19-20.

Officer Jones immediately pulls his taser and points it at Mr. Ashley because, according to Officer Jones, Mr. Ashley was shouting and posed a threat. Ex. 1, 35:17-24. However, Mr. Ashley was standing away from other zoo patrons, attempting to leave the zoo with his girlfriend and shouting for everyone to just "leave me alone." Ex. 5, 205:1-3. He was not making any

threatening remarks. Ex. 5, 205:4-6. Mr. Ashley initially complied with Officer Jones' request to

go to the ground. Ex. 1, 39:12-15. He then got back up and walked slowly towards the zoo exit.

Ex. 1, 41:18-20. There is no evidence that Mr. Ashley was running or moving quickly. Officer

Jones followed Mr. Ashley for approximately 15 yards, then both parties stopped. Ex. 1, 43:2-4.

Mr. Ashley attempted to walk by Officer Jones and that is when the initial use of force began.

Without warning, Officer Jones reached out and grabbed Mr. Ashley's arm and tried to put it

behind Mr. Ashley's back. Ex. 5, 209:10-21. Then Officer Jones and security officer Totten

tackled Mr. Ashley to the ground. Ex. 1, 47:5-7. Ex. 8, 45:22-25; Ex. 7, 57:9-10. The use of force

then escalated from there. By the time Officer Jones and security officer Totten forcibly tackled

Mr. Ashley to the ground, a reasonable jury could conclude that Mr. Ashley was not a threat to

himself, others or the officers.

The third of the *Graham* elements, whether the suspect was actively resisting arrest, also

weighs against Officer Jones. Although Officer Jones may have perceived the actions of Mr.

Ashley to be resistance, there is evidence in the record that Mr. Ashley was not resisting or

struggling while he was on the ground. Civilian Witness Katie Goroncy states that she was

approximately 50 feet away from Mr. Ashley, whom she describes as the man on the ground, and

he was not flailing or struggling, he was not fighting or combative. Ex. 20, Laura Buehler

Interview Report Castellano Investigations, Bates # 00701-00702, p. 1. Furthermore, Civilian

Witness Katie Goroncy states she was with Ms. Buehler and the guy on the ground was not

fighting.. Ex. 21, Katie Goroncy Interview Report Castellano Investigations, Bates # 00699-

00700, p. 1.

The record indicates that Mr. Ashley was suffering from Agitated Delirium or Excited

Delirium Syndrome (EDS). Ex. 15, Dr. Melinek's Expert Report, p. 2; Ex. 16, Amended

Autopsy Report Bates # 000108 – 000119, p. 3. A suspect's mental health must be taken into account when considering the officers' use of force and is therefore part of the factual circumstances the court considers under *Graham*. *Giannetti v. City of Stilwater* 216 Fed.Appx. 756, 764 (10th Cir. 2007).

> Agitated Delirium or Excited Delirium Syndrome (EDS) is well described in the medical literature and is accepted as a cause of death by forensic pathologists and medical examiners nationwide. Agitated delirium is a physiologic state of agitation and sympathetic stress often brought about by acute drug intoxication or mental illness but can also be caused by other metabolic processes, such as hypoglycemia or hyperthermia. There appears to be an underlying biological predisposition to this disorder that has been associated with neurochemical receptors in the brain. Affected individuals are often sweating, highly agitated and appear impervious to pain. They may resist violently if confronted or restrained. If arrest is necessary, it is imperative to avoid prolonged prone restraint or compression of the torso and neck, as either of these can exacerbate physiologic stress by restricting breathing, further exhausting the individual, and preventing blood flow back to the heart. In the agitated state, affected individuals have increased acid in their blood and will need to hyperventilate (breathe quickly) to remove the acid from the bloodstream. Restricting their breathing can worsen the acidosis.

Ex. 15, p. 2. Officer Jones was aware of excited delirium at the time of the incident with Mr. Ashley and had received some training on how to recognize and deal with individuals suffering from excited delirium. Ex. 1, 17:8-19:14. Defense Expert Chief Clarence Robert Chapman testified that it is important for law enforcement officers to recognize that excited delirium subjects are persons with a potentially life-threatening medical condition. Ex. 17, Deposition of Chief Clarence Robert Chapman, 96:24-97:5. Furthermore, Chief Chapman testified that excited delirium subjects are often relatively impervious to pain and all pain-compliance maneuvers that are traditionally effective in controlling resisting subjects are less likely to be effective in excited delirium subjects. Ex. 17, 97:14-98:15.

 Although evidence in the record establishes that Mr. Ashley was not resisting, he was suffering from a medical condition. Officer Jones had received some training on this medical

condition and how to recognize and deal with a person suffering from said condition. Ex. 1, 17:8-19:14. Officer Jones testified that Mr. Ashley seemed to have extraordinary strength, pain compliance maneuvers were not as effective as they traditionally should be, and that Mr. Ashley was sweating profusely and shouting nonsense such as "I am a Lion." Ex. 1, 49:18; 48:18; 44:24-45:1; Ex. 7, 46:13. Officer Jones also testified that he was aware that all of these actions were indicators of excited delirium. Ex. 1, 19:7-14.

The third of the *Graham* factors is not simply, was the party resisting arrest, if so then there can be no excessive force. The analysis is whether or not the officer's actions were objectively unreasonable in light of any attempts to resist. The record reflects that there was no resistance in this case. However, evidence suggests that a reasonable officer should have utilized his training and recognized that any perceived resistance was a symptom of a medical condition and therefore restricted their use of force accordingly for protection of the suspect.

Although the Fourth Amendment reasonableness factors as established in *Graham* guide the analysis of an excessive force claim, they are "non-exclusive." *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011). "[T]he question is "whether the totality of the circumstances justifie[s] a particular sort of … seizure." *Garner*, 471 U.S. at 8-9. The analysis in this case must go further. On the other side of the reasonableness scale, the amount of force used by police against Mr. Ashley was considerable. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir.2008)(finding excessive force and noting that considerable amount of force existed when suspect was grabbed by four to five officers and thrust to the ground).

 Officer Jones tackled Mr. Ashley along with Mr. Totten when Mr. Ashley posed no threat. Officer Jones punched Mr. Ashley twice in the stomach, while Mr. Ashley was already on the ground with at least one other party (Mr. Totten) on top of him. Ex. 1, 48:20-21. Officer

Jones tased Mr. Ashley twice, while there were at least 3 zoo security personnel and one other officer restraining Mr. Ashley in addition to Officer Jones. Ex. 1, 55:8-15. Furthermore, evidence suggests one of these taser deployments was upon Mr. Ashley's neck. Ex. 9, 21:39. A total of at least 4 other officers and 3 zoo employees were engaged in restraining Mr. Ashley while Officer Jones was restraining and/or tasing Mr. Ashley. Ex. 1, 56:15-17. The amount of force utilized by all officers combined caused Mr. Ashley to believe he was going to die. He called out to his girlfriend for help and told her he believed he was going to die. Ex. 5, 161:4-6 ("That's when he's like Babe, help me, I'm dying. And that's when he looked at me and I looked at him, and then he just closed his eyes.").

Not only do the three *Graham* factors weigh against Officer Jones' actions as objectively reasonable, but the amount of force utilized by Officer Jones was considerable and must be analyzed along with the *Graham factors*. The tasing of Mr. Ashley by Officer Jones and Officer Coleman constitutes a severe intrusion upon Mr. Ashley's Fourth Amendment rights.

> In evaluating the "nature and quality of the intrusion on the individual's Fourth Amendment interests" caused by a tasing, the number and length of electric shocks given to the subject is generally relevant. Within the Tenth Circuit, however, *any* use of a taser constitutes a severe intrusion on the interests protected by the Fourth Amendment.

*Cardall v. Thompson,* 845 F.Supp. 2d. 1182, 1191 (D. Utah 2012). (quoting *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir.2010)).

Mr. Ashley's health condition and excited delirium state weigh against the use of force, particularly regarding the use of a taser. Officer Jones and other officers noted that Mr. Ashley was not in an ordinary mental state, shouting nonsensical statements (such as I'm King Kong or I'm a Lion) and otherwise acting erratically. Ex. 7, 46:13-15. See *Bryan v. MacPherson*, 630 F.3d 805, 812 (9th Cir.2010); *Estate of Mathis*, 2009 WL 1033771 (D.Colo. 2009); *Deorle v.*

*Rutherford*, 272 F.3d 1272, 1283 (9th Cir.2001)("[t]he problems posed by an unarmed, emotionally distraught individual who is creating a disturbance are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal.... In the former instance, increasing the use of force may exacerbate the situation.").

The combined excessive force of all officers working together upon Mr. Ashley led to his death. Plaintiff Expert Dr. Judy Melinek opines that Mr. Ashley died as the result of complications of a struggle with prone physical restraint due to agitated delirium from hyperthermia. Ex. 15, p. 2. Both Dr. Melinek and Dr. Carver, the doctor who conducted the autopsy on Mr. Ashley, agree that Mr. Ashley suffered from asphyxia which led to his death. Ex. 18, Deposition of Dr. Judy Melinek, 83:21-84:12; Ex. 19, Deposition of Dr. John Carver, 57:11-15. This asphyxia was brought on by the combined excessive force of a minimum of 8 police officers and zoo employees upon Mr. Ashley at the same time.

The facts of this case are similar to those in *Howe v. Town of North Andover*, 854 F.Supp.2d 131 (D. Mass.2012). In *Howe*, the suspect, Mr. Howe became engaged in a physical altercation with a police officer and even broke free and fled from officers during the altercation. Mr. Howe was seen to be resisting arrest. However, Mr. Howe was eventually taken to the ground and restrained with the combined forces of multiple officers. *Id.* at 136. Mr. Howe was held down, handcuffed, his legs were affixed with leg shackles and struck by officer hands and batons, similar to Mr. Ashley. *Id.* The Court in *Howe* ruled that the pinning of Mr. Howe to the ground in the prone position constituted excessive force as a matter of law. *Id.* at 139. In that case the issue of asphyxiation from being forced into a prone position was alleged to be part of the cause of Mr. Howe's death. *Id.* at 139-40. The *Howe* court held that such conduct, if proved, could give rise to § 1983 liability under an excessive force theory. *Id.* at 140 (citing *Champion v.*

16

*Outlook Nashville, Inc.,* 380 F.3d 893, 903 (6th Cir.2004) and *Weigel v. Broad,* 544 F.3d 1143

(10th Cir.2008)). Ultimately the *Howe* court ruled in favor of Plaintiff on Summary Judgment for

excessive force. *Id.* (holding "[n]evertheless, summary judgment in favor of the plaintiffs on the

excessive force claims is unwarranted because genuine issues of material fact remain as to the

extent of the force used and whether it was reasonable under the circumstances.").

Officer Jones actions in seizing Mr. Ashley were objectively unreasonable. A reasonable

jury could find the force used by Officer Jones greater than would have been reasonably

necessary to effect a lawful seizure. Therefore, Plaintiff's Fourth Amendment claim against

Officer Jones should not be dismissed.

### Officer Phillip Coleman

Officer Coleman arrived on scene, saw Officer Jones and Mr. Totten on the ground with

Mr. Ashley, and immediately went hands on with Mr. Ashley. Ex. 2, 31:16. Officer Coleman

decided the best way he could be of assistance was to jump into the struggle. Ex. 11, p. 2-66, ¶ 3.

At or near the time that Officer Coleman went hands on with Mr. Ashley, zoo employees Totten,

Fluegel and Lawyer were also physically restraining Mr. Ashley. Ex. 8, 50:6-12. Officer

Coleman grabbed Mr. Ashley's arm and held it while Mr. Totten and Mr. Fluegel held Mr.

Ashley's legs, Aaron Lawyer held Mr. Ashley's head and other arm and while Officer Jones

tased Mr. Ashley twice. Ex. 8, 47:15-18; 49:4-9; Ex. 2, 31:18-32:1. Officer Coleman then moved

from one of Mr. Ashley's arms to the other to try and control that arm. Ex. 11, p. 2-66, ¶ 4. Then

Officer Coleman tased Mr. Ashley two more times, after he was tased by Officer Jones and while

he was still being held down by Officer Jones, Mr. Totten, Mr. Fluegel, Mr. Lawyer and Officer

Coleman himself. *Id.* At some point during or just after the tasing by Officer Coleman and while

Officer Coleman was still restraining Mr. Ashley, other officers to include Lt. Conner and Officer Smith arrived and also utilized force upon Mr. Ashley. Ex. 2, 41:19-42:10.

After Officer Coleman tased Mr. Ashley, he heard Mr. Ashley state, "Help me, grandma." Ex. 11, p. 2-66, ¶ 4. Then Officer Coleman continued to struggle with Mr. Ashley in concert with the multitude of other officers and zoo employees until he was able to get a handcuff on one of Mr. Ashley's arms. Ex. 2, 40:15-17. The struggle continued, and the handcuffs were placed on both of Mr. Ashley's arms. Shortly thereafter, while force was still being utilized upon Mr. Ashley and while he was face down and handcuffed, he vomited. Ex. 2, 43:23-24.

Denver Defendants argue that all *Graham* elements weigh in favor of finding Officer Coleman's conduct objectively reasonable. Plaintiff disagrees with this analysis. First, of the *Graham* elements, the severity of the crime at issue weighs against Officer Coleman. The only knowledge of any crime that Officer Coleman had was that of a potential domestic violence involving threats. Ex. 2, 26:20-23. Furthermore, the second *Graham* element, whether the suspect poses an immediate threat to the safety of the officer or others, also weighs against Officer Coleman. When Officer Coleman arrived on the scene there were at least two other people actively engaged in restraining Mr. Ashley on the ground. At this point he posed no threat to zoo patrons or others other than potentially Officer Jones and Mr. Totten. Without further assessment of the situation, Officer Coleman immediately jumped into the physical struggle. Upon arrival, Officer Coleman did not witness Mr. Ashley with any weapons and had no reason to believe that Mr. Ashley had a weapon of any kind. Ex. 2, 28:3-5. There is no evidence that Officer Jones or Mr. Totten were calling for assistance or help from Officer Coleman. Not only did Officer Coleman immediately jump in and begin to apply force to Mr. Ashley, he continued

to apply force, including the utilization of the taser twice upon Mr. Ashley, while at least 7 other officers and zoo employees were restraining Mr. Ashley. Finally, Officer Coleman handcuffed Mr. Ashley. By the time the handcuffs were placed upon Mr. Ashley, he posed no threat. There can be no argument that one unarmed man poses any threat when restrained by at least 8 police officers and security personnel. *See Fisher v. City of Las Cruces*, 584 F.3d 888, 895 (10th Cir.2009)(finding that by the time officers decided to handcuff suspect forcibly behind his back, a reasonable jury could conclude that suspect was no longer a threat to himself, others, or the officers).

The third *Graham* factor also weighs against Officer Coleman. The record reflects that there was no resistance on the part of Mr. Ashley. If Officer Coleman perceived resistance, it is important to note that Mr. Ashley was suffering from excited delirium. Just like Officer Jones, Officer Coleman had received some training in recognizing and handling persons suffering from excited delirium. Ex. 2, 17:10-13. Although Officer Coleman didn't have the opportunity to observe Mr. Ashley as long as Officer Jones did, he still observed the symptoms of excited delirium in that Mr. Ashley was sweating, impossibly strong and not complying normally with pain compliance maneuvers. Ex. 2, 32:12; 38;17-20; Ex. 11, p. 2-66, ¶ 6. The record reflects, and the officers admit that they received the opportunity for training in how to handle excited delirium. This is not a 20/20 hindsight analysis but simply what a reasonable officer would have done. A reasonable officer is trained in recognition of excited delirium. Despite the excited delirium, Officer Coleman's utilization of force via taser and physical restraint in combination with physical restraint by at least 7 other officers and zoo personnel was excessive force. In addition, the handcuffing of Mr. Ashley when he no longer posed any threat and believed he was dying was also excessive force. Ex. 5, 161:4-6.

Not only do the three *Graham* factors weigh against Officer Coleman's actions as objectively reasonable, but the amount of force utilized by Officer Coleman, both physical restraint and tasing, was considerable and must be analyzed along with the *Graham* factors.

Officer Coleman's actions in seizing Mr. Ashley were objectively unreasonable. A reasonable jury could find the force used by Officer Coleman greater than would have been reasonably necessary to effect a lawful seizure. Therefore, Plaintiff's Fourth Amendment claim against Officer Coleman should not be dismissed.

### Lieutenant Reuben Conner

Lt. Conner responded to the Denver Zoo in response to a dispatch call of an officer calling for cover. Ex. 11, p. 2-67, ¶ 2. Lt. Conner did not have any information about Mr. Ashley when he arrived at the Zoo. He just arrived on scene and saw at least two officers and two zoo security personnel trying to get handcuffs on Mr. Ashley. Ex. 3, 29:6-25. Officer Cheryl Smith arrived on scene at the same time Lt. Conner arrived. Ex. 11, p. 2-67, ¶ 4. Upon arrival, Lt. Conner heard a taser being deployed, so he was aware before he went hands on with Mr. Ashley, that Mr. Ashley had already been tased at least once. Ex. 3, 21:9. Despite the already voluminous amount of force being applied to Mr. Ashley, Lt. Conner and Officer Smith immediately began administering force against Mr. Ashley through the use of Orocut Police Nunchucks (OPN). *Id*. Lt. Conner administered OPN to Mr. Ashley's right ankle and Officer Smith simultaneously administered OPN to Mr. Ashley's left ankle, all while 4 other officers and zoo security personnel were holding down and administering force upon Mr. Ashley. *Id*. The OPN is designed for pain compliance and control and causes a great amount of pain. Ex. 3, 21:18; Ex. 4, 124:8. Lt. Conner was lying across Mr. Ashley's right leg and applying the OPN. Ex. 3, 23:20-21. At some point Lt. Conner's OPN came loose from Mr. Ashley's right ankle and Lt. Conner

responded by re-applying the OPN with even more force until eventually the OPN broke and Lt.

Conner fell back into Officer Smith, injuring her. Ex. 3, 10-18. After Lt. Conner fell back, he

immediately reapplied force to Mr. Ashley by restraining his arm and handcuffing Mr. Ashley.

Ex. 3, 25:22-25. Lt. Conner also noted that someone was holding Mr. Ashley down by the head

while Lt. Conner was utilizing force upon Mr. Ashley. Ex. 3, 28:13-18. Lt. Conner notes that Mr.

Ashley was handcuffed, while on his stomach for approximately two to five minutes and during

that time period an officer was applying pressure to Mr. Ashley's legs, which were folded up and

behind Mr. Ashley in a hog-tie position. Ex. 3, 32:11-24.

Denver Defendants argue that all *Graham* elements weigh in favor of finding Lt.

Conner's conduct objectively reasonable. Plaintiff disagrees with this analysis. First, of the

*Graham* elements, the severity of the crime at issue weighs against Lt. Conner. Lt. Conner had

no knowledge of any prior crime on behalf of Mr. Ashley. He simply responded to an officer's

call for backup. Upon arrival Lt. Conner decided to join in and apply force to Mr. Ashley despite

the fact that at least four other individuals were already utilizing force and the fact that Lt.

Conner had no idea what caused the struggle. Furthermore, the second *Graham* element, whether

the suspect poses an immediate threat to the safety of the officer or others, also weighs against

Lt. Conner. When Lt. Conner arrived on the scene there were at least four other people actively

engaged in restraining Mr. Ashley on the ground. At this point he posed no threat to zoo patrons

or others.  Without further assessment of the situation, Lt. Conner immediately jumped into the

physical struggle. Lt. Conner did not witness Mr. Ashley with any weapons and had no reason to

believe that Mr. Ashley had a weapon of any kind. There is no evidence that any officers or zoo

employees were calling for assistance or help from Lt. Conner. He immediately began to apply

force to Mr. Ashley, he continued to apply force, including the utilization of the OPN twice upon

Mr. Ashley, while at least 7 other officers and zoo employees were restraining Mr. Ashley. Finally, Lt. Conner handcuffed Mr. Ashley. By the time the handcuffs were placed upon Mr. Ashley, he posed no threat.

The third *Graham* factor also weighs against Lt. Conner. The record reflects that there was no resistance on the part of Mr. Ashley. If Lt. Conner perceived resistance, it is important to note that Mr. Ashley was suffering from excited delirium. Just like Officer Jones and Officer Coleman, Lt. Conner received the opportunity for some training in recognizing and handling persons suffering from excited delirium. Ex. 3, 19:15-18. Lt. Conner observed the symptoms of excited delirium in that Mr. Ashley appeared to have no adverse effect to the pain-compliance measures. Ex. 3, 34:19-21. Furthermore, Lt. Conner testifies that at the time of the incident he believed Mr. Ashley to potentially be suffering from excited delirium. Ex. 3, 35:5-7. Lt. Conner received the opportunity for training in recognition and handling of excited delirium, and he believed that Mr. Ashley was indeed suffering from excited delirium; and yet, he still administered excessive force upon Mr. Ashley

Not only do the three *Graham* factors weigh against Lt. Conner's actions as objectively reasonable, but the amount of force utilized by Lt. Conner was considerable and must be analyzed along with the *Graham* factors.

Lt. Conner's actions in seizing Mr. Ashley were objectively unreasonable. A reasonable jury could find the force used by Lt. Conner greater than would have been reasonably necessary to effect a lawful seizure. Therefore, Plaintiff's Fourth Amendment claim against Lt. Conner should not be dismissed.

**Officer Joey Gasca**

On July 18, 2011, Officer Gasca was partnered with Officer Jennifer Curtis. Ex. 4, 101:12. Officer Gasca and Officer Jones responded to the zoo based upon a code 10 call which indicates officer in need of assistance. Ex. 4, 105:8-10. When Officer Gasca arrived on scene, Mr. Ashley was lying on his stomach, in a prone position and he was handcuffed. Ex. 11, p. 2-71, ¶ 4. Officer Gasca did not hear Mr. Ashley make any threats. Ex. 4, 117:3-6. Officer Gasca observed vomit to the side of Mr. Ashley. Ex. 11, p. 2-71, ¶ 4. Officer Gasca also observed a police officer resting his knee on Mr. Ashley's left shoulder and a security officer resting his knee on Mr. Ashley's right shoulder. *Id*. He also observed a police officer with an OPN on one of Mr. Ashley's ankles. *Id.* Officer Curtis immediately stepped in and placed an OPN on Mr. Ashley's other ankle. *Id*. Officer Gasca ordered both officers that were on Mr. Ashley's legs to disengage. Ex. 4, 127:1-2. Officer Gasca then grabbed both of Mr. Ashley's ankles, crossed them over one another, bent Mr. Ashley's knees back up and put Mr. Ashley's ankles on his buttocks. Ex. 4, 127:11-15. Officer Gasca then sat on Mr. Ashley's legs as they were bent back over Mr. Ashley's body. *Id*; Ex. 11, p. 2-71, ¶ 4. While Officer Gasca was sitting on Mr. Ashley's bent up legs, Mr. Ashley vomited two more times. Ex. 11, p. 2-71, ¶ 4. Office Gasca remained seated on top of Mr. Ashley until Lt. Conner ordered the officers to turn Mr. Ashley on his side, check his pulse and move him out of his own vomit. Ex. 4, 131:5-6; Ex. 11, p. 2-71, ¶ 4.

Denver Defendants argue that all *Graham* elements weigh in favor of finding Officer Gasca's conduct objectively reasonable. Plaintiff disagrees with this analysis. First, of the *Graham* elements, the severity of the crime at issue weighs against Officer Gasca. Officer Gasca was aware of the domestic violence call but did not respond immediately to that call. Ex. 11, p. 2-71, ¶ 2. Officer Gasca did respond to an officer's subsequent call for back up. Upon arrival

Officer Gasca decided to join in and apply force to Mr. Ashley despite the fact that at least three or four other individuals were already utilizing force and the fact that Officer Gasca had no idea what caused the struggle. Furthermore, the second *Graham* element, whether the suspect poses an immediate threat to the safety of the officer or others, weighs strongly against Officer Gasca. When Officer Gasca arrived on the scene there were at least four other people actively engaged in restraining Mr. Ashley on the ground. Mr. Ashley was already handcuffed and had already vomited. At this point Mr. Ashley clearly posed no threat to zoo patrons or others.  Without further assessment of the situation, Officer Gasca immediately jumped into the physical struggle. Officer Gasca did not witness Mr. Ashley with any weapons and had no reason to believe that Mr. Ashley had a weapon of any kind. Ex. 4, 134:6-8. There is no evidence that any officers or zoo employees were calling for assistance or help from Officer Gasca.

Officer Gasca immediately applied excessive force upon Mr. Ashley despite the fact that Mr. Ashley, had vomited, was face down, handcuffed and being restrained by multiple other officers and zoo security at the time. Officer Gasca continued to apply force despite the fact that Mr. Ashley vomited two times during the application of force and was not resisting. Ex. 11, p. 2-71, ¶ 4.

The third *Graham* factor also weighs against Officer Gasca. The record reflects that there was no resistance on the part of Mr. Ashley. Although it may have appeared to Officer Gasca upon arrival that Mr. Ashley was resisting, when Officer Gasca applied force to Mr. Ashley he was not resisting and vomited twice. *Id*. Furthermore, Mr. Ashley was suffering from excited delirium. Just like Officers Jones and Coleman and Lt. Conner, Officer Gasca was given some training in recognizing and handling persons suffering from excited delirium and knew that the appearance of superhuman strength, profuse sweating and verbalizing incoherently were all

symptoms of excited delirium. Ex. 4, 76:18; 78:3-13; 79:11-19. Officer Gasca observed all of

these symptoms of excited delirium in Mr. Ashley. Ex. 4, 123:18-21. Officer Gasca received

some training in recognition and handling of excited delirium, and he came upon Mr. Ashley

already handcuffed, recently vomited, and being controlled by multiple other officers and yet, he

still administered excessive force upon Mr. Ashley.

Not only do the three *Graham* factors weigh against Officer Gasca's actions as

objectively reasonable, but the amount of force utilized by Officer Gasca was considerable and

must be analyzed along with the *Graham* factors.

Officer Gasca's actions in seizing Mr. Ashley were objectively unreasonable. A

reasonable jury could find the force used by Officer Gasca greater than would have been

reasonably necessary to effect a lawful seizure. Therefore, Plaintiff's Fourth Amendment claim

against Officer Gasca should not be dismissed.

### ***Deadly Force***

Defendants make argument in reference to excessive force that there is a lack of evidence

to support the use of deadly force. Plaintiff contends that there is sufficient evidence in the

record that a reasonable jury could conclude the Denver Defendants utilized deadly force upon

Mr. Ashley. The concert of action of all four officers as previously discussed, particularly the

prolonged prone handcuffed restraint of Mr. Ashley could be determined to be deadly force in

that the force created a substantial risk of death or bodily harm. Ex. 15, p. 2 (If arrest is necessary

when dealing with excited delirium, it is imperative to avoid prolonged prone restraint). *See*

*Weigel,* 544 F.3d at 1154 (" [A]pplying pressure to [a suspect's] upper back, once he [is]

handcuffed and his legs restrained, [is] constitutionally unreasonable due to the significant risk of

positional asphyxiation associated with such actions."). *See also Cruz v. City of Laramie,* 239

F.3d 1183, 1188-89 (10th Cir.2001) (agitated state constituted a clue to trained officer that pressure on the chest was likely to cause positional asphyxia).

There does exist evidence in the record that asphyxiation was a cause or factor in Mr. Ashley's death. Ex. 15, p. 2 ("The mechanism of death was likely a lethal cardiac arrhythmia precipitated by hyperkalemia caused by agitated delirium, though asphyxia by aspiration of vomitus is another possible mechanism.")

Finally, and most importantly as it relates to deadly force, the analysis of deadly force and excessive force, although Plaintiff argues the existence of both, are separate. Plaintiff need not prove deadly force to be successful on her Fourth Amendment excessive force claim. *See generally Cavanaugh v. Woods Cross City,* 625, F.3d 661, 665 (10th Cir.2010)(citing *Draper v. Reynolds*, 369 F.3d 1270, 1273 (11th Cir.2004) "[t]asers may not constitute deadly force, [but] their use unquestionably "seizes" the victim in an abrupt and violent manner."). A genuine dispute of material fact exists as to whether a reasonable officer would have acted in the manner in which the officers acted in this case. Furthermore, in light of the expert testimony regarding prone restraint and excited delirium, a genuine issue of material fact exists as to whether that force utilized was deadly force. Either deadly or not, the force utilized was excessive in violation of Mr. Ashley's Fourth Amendment rights.

Plaintiff contends that there is sufficient evidence in the record to establish an unreasonable seizure via excessive force within the meaning of the Fourth Amendment. Additionally, because disputed issues of material fact remain regarding Denver Defendants' use of force, they are not entitled to qualified immunity on this claim.

> ii.   *Element (ii) Constitutional right violated by Defendants was clearly established at the time of Defendants' conduct*

The facts that Plaintiff have shown establish a violation of a constitutional right, in satisfaction of the first prong of the qualified immunity burden. *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). The next step is to determine if the constitutional rights violated were clearly established at the time of the incident on July 18, 2011.

According to the Tenth Circuit, a right may be deemed clearly established if "it would be clear to a reasonable police officer that his conduct was unlawful under the circumstances presented." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). *See also Saucier v. Katz*, 533 U.S. 194, 207 (2001). Plaintiff contends that a reasonable officer must have known that he could not behave as Officers Jones, Coleman, Gasca and Lt. Conner did. The normal inquiry for clearly established law would require a Supreme Court or Tenth Circuit decision directly on point. *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992). However, the *Graham* analysis focuses so much on the individual fact pattern of each case that new or different fact patterns cannot be seen as lacking in clearly established law. *Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir.2006). "[O]fficials can still be on notice that their conduct violates clearly established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The relevant question becomes whether the law puts officials on fair notice that the described conduct was unconstitutional. *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir.2004). *See also Holland ex. Rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir.2001)(denying qualified immunity from excessive force for officers because there were "no substantial grounds for a reasonable officer to conclude that there was a legitimate justification" for his conduct.).

The factual circumstances of this case vary from one officer to the next, but the general circumstance was that of an unarmed man on an extremely hot day, who was not close enough to

any zoo patrons to be a threat and was not threatening anyone, who calmly attempted to walk away from an officer with his girlfriend. A few officers assumed that this man may have been involved in a potential incident of domestic violence, however, there is no evidence in the record to support any domestic violence incident ever occurred and this was incorrect information relayed to dispatch. Officer Jones was aware that Mr. Ashley may have assaulted a zoo employee, but Officer Jones had every opportunity to view the alleged assault victim and that this alleged victim was not injured. At worst the severity of Mr. Ashley's potential crime was that of a misdemeanor assault.  Mr. Ashley was tackled to the ground, punched twice, tased four times, held down by his arms, ankles and head and eventually handcuffed, hog-tied and sat upon. There were at least eight different officers and zoo security employees utilizing force upon and on-top of Mr. Ashley at one time.

The facts in the light most favorable to the Plaintiff establish a non-violent misdemeanant who was not threatening anyone, nor posing a threat to any patrons or officers, and not actively resisting arrest, other than walking away from the officer and calmly asking to be left alone. It is at this point that, without warning, Officer Jones and Mr. Totten tackle Mr. Ashley to the ground. The Eighth, Sixth and Tenth Circuits have held it clearly established law that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public. *Brown v. City of Golden Valley*, 674 F.3d 491, 499 (8th Cir. 2009); *See also Kijowski v. City of Niles*, 372 Fed. Appx. 595, 601 (6th Cir.2010); *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir.2007). This principal should apply to the utilization of force by Officers Jones, Coleman and Gasca as well as Lt. Conner.

With specific regard to the tasing by both Officer Jones and Officer Coleman, the Tenth Circuit holds that the subject's mental health is relevant and a warning before the use of the taser is important. *Giannetti, Casey v. City of Federal Heights*, 509 F.3d at 1285 ("the absence of any warning – or of facts making clear that no warning was necessary – makes the circumstances of this case especially troubling"); *Cavanaugh v. Woods Cross City*, 2009 WL 4981591, at *4 (D. Utah Dec. 14, 2009)(stating "the presence of an adequate warning and opportunity to comply voluntarily is crucial" before deploying a taser). Officers Jones and Coleman were aware they were dealing with a potentially mentally unstable adult based upon the symptoms of excited delirium that they both noted in Mr. Ashley. Furthermore, they tased Mr. Ashley a total of four times, while he was already on the ground and without any warning. There is no evidence in the record that any warning was given or that a warning would not have been required prior to these taser deployments. *See also* Ex. 22, Expert Report of Dan Montgomery, p. 12 ("2. The over-reliance on the use of a TASER in the drive-stun mode was not in concert with law enforcement best practices). The officers were also aware that any use of a taser constitutes a severe intrusion upon a person's Fourth Amendment rights. Officers Jones and Coleman were on fair notice that the described conduct was unconstitutional and thereby violated a clearly established law with their excessive force.

With specific regard to pain compliance techniques other than the taser, i.e. the usage of the OPN and the abdominal punches, "a reasonable officer would have been on notice that the *Graham* inquiry applies to the use of these methods just as with any other type of pain-inflicting compliance technique." *Fogarty v. Gallegos*, 523 F.3d 1147, 1161 (10th Cir. 2008). This is especially true for the OPN in light of the testimony from Officer Gasca that the OPN causes a great amount of pain. Ex. 4, 124:8.

Furthermore, with regard to the actions of Officer Gasca, it should be apparent to a reasonable officer that utilizing force upon a handcuffed individual to restrain his legs upon his backside while that individual is not resisting is unreasonable. *See Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir.2008)(evidence that suspect was subjected to pressure for a significant period after it was clear that the pressure was unnecessary to restrain him, similar to the actions of Officer Gasca here, was seen as unconstitutional). This also relates to the failure of all officers to act appropriately when dealing with excited delirium. All officers testified that they had training on excited delirium and that they knew how to recognize the symptoms of such. All officers also testified that they recognized these symptoms in Mr. Ashley and Lt. Conner even admitted that he suspected Mr. Ashley to be suffering from excited delirium. However, all officers continued to apply excessive physical force upon Mr. Ashley and hold him at length in a prone restraint. Ex. 15, p. 2 (If arrest is necessary when dealing with excited delirium, it is imperative to avoid prolonged prone restraint). *See Weigel,* 544 F.3d at 1154 (" [A]pplying pressure to [a suspect's] upper back, once he [is] handcuffed and his legs restrained, [is] constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions."). *See also Cruz v. City of Laramie,* 239 F.3d 1183, 1188-89 (10th Cir.2001) (agitated state constituted a clue to trained officer that pressure on the chest was likely to cause positional asphyxia).

Plaintiff argues it would be clear to a reasonable police officer under the circumstances as presented in the record, that the utilization of such force upon Mr. Ashley was unreasonable in light of the circumstances.

Plaintiff has established through evidence within the record, that Defendants violated clearly established constitutional rights of the Plaintiff. Viewing the facts in the light most favorable to Plaintiff, Defendants cannot avail themselves of qualified immunity at this stage of the litigation. *See Fogarty*, 523 F.3d at 1162. Therefore, the burden now returns to the movant to

establish that there are no material issues of disputed fact. *See Faustin v. City & County of Denver*, 423 F.3d 1192 (10th Cir. 2005).

## B.  FAILURE TO PROVIDE ADEQUATE MEDICAL TREATMENT CLAIM

### 1.  Burden of Proof and Elements

Plaintiff disagrees with the Defendant's recitation of the burden of proof and elements on this claim. In light of the arguments as expressed in Defendants' Motion for Summary Judgment [Doc. 129], Defendants were clearly on notice that Plaintiff is claiming a failure to provide adequate medical treatment. However, Plaintiff believes Defendants are attempting to add to Plaintiff's burden by establishing a separate claim and set of elements for Plaintiff to overcome. Plaintiff has not pled a Fourteenth Amendment Due Process Failure to Provide Adequate Medical Treatment claim. However, Plaintiff in no way concedes to the allegations claimed regarding treatment needed and/or not provided to Mr. Ashley. Plaintiff claims that there are disputed issues of material fact as it relates to Defendant's summoning of medical treatment in a timely fashion and handling of Mr. Ashley's medical condition. Plaintiff has set forth argument relating to these issues in her Fourth Amendment Excessive force analysis as well as her Inadequate Policies and Training analysis herein.

## C.  CLAIM 4: CONSPIRACY

Plaintiff agrees to dismiss Claim Four, Conspiracy in its entirety with prejudice.

## D.  STATE LAW CLAIMS

### 1.  Burden of Proof and Elements

Plaintiff agrees with the Defendant's recitation of the burden of proof and elements on this claim..

### 2.  Elements for which there are Disputed Issues of Material Fact

Plaintiff can demonstrate a triable issue of fact as to the element of willful and wanton conduct, which is the only element of Plaintiff's state law claims challenged by Defendants. Plaintiff has elicited the following proof in support of her claim:

> 3.  <u>Proof in Support of Plaintiff's Claim</u>
>
>> i.  *Defendants actions were willful and wanton.*

"Willful and wanton conduct is `conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or the rights and safety of others, particularly the plaintiff." *O'Hayer v. Bd. Of Educ. Jefferson County Sch. Dist. R-1,* 109 F.Supp.2d 1284 (D.Colo.2000). The facts as stated in the record could reasonably give rise to an inference that Defendants were aware of their actions and acted recklessly without regard to the consequences of those actions. Certainly admission to physical contact with Mr. Ashley via tackling, abdominal strikes, multiple taser deployments, utilization of OPNs, handcuffing, twisting ankles up upon Mr. Ashley's buttocks while Mr. Ashley was handcuffed and then sitting on Mr. Ashley, creates a material issue of fact. See *Trujillo v. Goodman,* 825 F.2d 1453, 1460 (10th Cir. 1987) (deeming officer's intent a factual question properly submitted to the jury).

Officer Jones utilized the taser, abdominal punches and all other manner of force in efforts to establish pain compliance. There can be no argument that Officer Jones was unaware that these actions would cause pain and harm to Mr. Ashley. It was his purpose to cause pain and harm to Mr. Ashley through the utilization of these maneuvers.

Officer Coleman utilized the taser, the handcuffs and all other manner of force in efforts to establish pain compliance. The taser is a pain compliance device known to cause considerable pain. There can be no argument that Officer Coleman was unaware that these actions would

cause pain and harm to Mr. Ashley. It was his purpose to cause pain and harm to Mr. Ashley through the utilization of these maneuvers.

Lt. Conner utilized the OPN, the handcuffs and all other manner of force in efforts to establish pain compliance. The OPN is a pain compliance device known to cause considerable pain. There can be no argument that Lt. Conner was unaware that these actions would cause pain and harm to Mr. Ashley. It was his purpose to cause pain and harm to Mr. Ashley through the utilization of these maneuvers.

Officer Gasca utilized force by grabbing both of Mr. Ashley's ankles, crossing them over one another, bending Mr. Ashley's knees back up and putting Mr. Ashley's ankles on his buttocks. Officer Gasca then sat on Mr. Ashley's legs as they were bent back over Mr. Ashley's body. There can be no argument that Officer Gasca was unaware that these actions would cause pain and harm to Mr. Ashley. It was his purpose to cause pain and harm to Mr. Ashley through the utilization of these maneuvers.

There also exists evidence in the record to establish that the officers knew Mr. Ashley was exhibiting signs of excited delirium and yet consciously disregarded these signs and failed to act accordingly for Mr. Ashley's safety.

There is no evidence to establish that it was *not* the intention of the officers to cause harm to Mr. Ashley. Because there is sufficient evidence in the record to establish that each of the officers acted willfully or wantonly and a reasonable jury could conclude that each of the officers acted willfully or wantonly, Plaintiff's third, fourth, twelfth and thirteenth claims are not barred by CGIA. Defendants are not entitled to summary judgment on these claims.

### E.  CLAIM FIVE: FAILURE TO SUPERVISE AND CLAIM 6: INADEQUATE POLICIES AND TRAINING

The Denver Defendants are not entitled to summary judgment on claim five, Failure to Supervise, nor are they entitled to summary judgment on claim six, Inadequate Policies and Training.

The Fifth claim for relief should be allowed to proceed because the Lt. Connor was involved in using excessive force at the scene of the incident by not immediately recognizing that the Officers already engaged in attempting to subdue Mr. Ashley were involved in a medical emergency, not a criminal act in process and Lt. Conner, as the supervising officer on scene, acted unconstitutionally based on his use of excessive force and by allowing other officers whom he supervise use excessive force against Mr. Ashley.  Additionally, Lt. Conner did not attempt to get Mr. Ashley medical care immediately when he arrived on scene.  Rather, Lt. Conner called for medical assistance after Mr. Ashely was in hand cuffs and had been left on the ground face down for up to five minutes.

The Sixth claim for relief should be allowed to proceed because it is clear from the testimony of the offending Officers, and their representative training logs in this matter that they were inadequately trained by the Denver Police department to recognize the significant medical emergency Mr. Ashley presented and the proper manner in handling the situation.  The evidence is clear that the Department, while aware of the significant risk of excited delirium being a syndrome found in the field on a regular basis, did not train its officers to reasonably respond to the situations causing Mr. Ashley's death in this matter due to the insufficient training in the material created and potentially provided to its Officers and the actual follow through in the training it had promulgated.

1. <u>Plaintiff can establish that she can proceed against Lt. Connor in his supervisory capacity</u>

A defendant in a supervisory position may be personally involved in an alleged constitutional violation committed by his or her subordinates in two situations. First, supervisor liability may arise when the supervisor was personally involved in directing the subordinates to take the action that resulted in the alleged constitutional violation. *Woodward v. City of Worland*, <u>977 F.2d 1392, 1400</u> (10th Cir.1992). Second, supervisor liability may arise when the supervisor had actual knowledge that the subordinates were committing the alleged constitutional violation and acquiesced in its commission. *Id.* (*citing Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (stating that supervisor liability requires "allegations of personal direction or of actual knowledge and acquiescence")).   Under the second situation liability can be imposed upon a "defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy, the enforcement (by the defendant-supervisor or [his] subordinates) of which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010), *cert. denied*, 131 S.Ct. 2150 (2011).

When an official is sued under § 1983 for conduct "arising from his or her superintendent responsibilities," the plaintiff must demonstrate not only that a subordinate employee violated her rights but that the supervising official "by virtue of his own conduct and state of mind did so as well." *Id.* at 1197 (*citing Iqbal*, <u>556 U.S. at 662</u>. The state of mind required for supervisory liability is the same as that for the underlying constitutional offense. *Porro*, 624 F.3d at 1328; *Dodds*, 614 F.3d at 1200 (citations omitted). Here, Lt. Conner admits in his deposition that he was the shift commander.  Ex. 3, 9:7-25; 10:1.  As shift commander he was

the supervisor of all officers when he arrived on scene.  At the time he arrived on scene Officer

Jones and Coleman were already on scene.  Ex. 3, 15:6-7.  While approaching the scene Lt.

Connor heard a taser being deployed.  Ex. 3, 12:16:19.  As soon as Lt. Conner sees the two

officers engaged with Mr. Ashley he determines that the use of the OPN to control Mr. Ashley's

legs is the appropriate course.  Ex. 3, 17:10-16; 21:13:25; 22-24:1-15.  Lt. Conner applied the

OPN on Mr. Ashley's right leg until the OPN broke.  Ex. 3, 24:16-18.  During this same time

period, Officer Smith arrives and is applying her OPN to Mr. Ashely's left leg.  Ex. 3, 24:19-21.

Here, the evidence is clear that at the time that Lt. Conner arrives at the scene he is the

acting supervisor.  Additionally, there are significant issues of fact as to whether or not Lt.

Connor, acting in his supervisory capacity, violated Mr. Ashley's constitutional rights by the

force used against him by Lt. Conner personally, and how Lt. Connor directed the other officers

at the scene to proceed with the use of excessive force.  As well, it is clear from the established

training that Lt. Conner was never required to complete by the Department, that medical

attention is required immediately to protect the person with symptoms of excited delirium.  Lt.

Conner failed to recognize the medical emergency until up to five minutes after Mr. Ashely was

in a prone position, in handcuffs and being subdued by a police officer sitting on both his lower

legs. Expert Dr. Melinek testifies that Mr. Ashley being restrained with weight being applied to

his back and shoulders, as well as his arms and legs in a hogtied type position with one officer

sitting on his legs, folding and restraining them, are mechanisms which rendered Mr. Ashley

susceptible to sudden death. Ex. 18, 69:14-18.

All of the uncontroverted evidence proves that Lt. Conner should be held responsible

for the death of Mr. Ashley through his personal actions and his actions as a supervisor on the

scene.  Clearly, Lt. Conner was personally involved in the death of Mr. Ashley, he was the

ranking officer on scene and directed himself and other officers to use unreasonable force on Mr. Ashley and finally his mind set is clearly stated by him that he knew Mr. Ashely wasn't "a big man, but it took six or seven of us or a few of us to control him.  He had no adverse effect to the pain compliance measures.  He had super human strength for a man of that size. So at the very least, he was under some sort of intoxication." Ex. 3, 34:19-25. Lt. Conner admits his deliberate indifference to handling the medical emergency differently by stating "whether those actions were caused by drugs or some other stimulus, our reaction to his actions would have been the same." Ex. 3, 35:20-23.

Therefore, the Plaintiff has presented uncontroverted evidence that establishes, at a minimum, a dispute of fact relating to Lt. Conner and his actions that must allow Plaintiff's Fifth Claim for relief to proceed.

2.  <u>The Plaintiff presents evidence that allows Municipal Liability</u>

First, the Plaintiff has presented significant legitimate evidence that the individually named officers have committed a constitutional violation against Mr. Ashley, refer to excessive force analysis under II.A. herein. Next, Plaintiff submits evidence that the training promulgated by the city is not sufficient enough to properly train its officers in the recognition of and treatment of an individual exhibiting signs of excited delirium.  Secondarily, if the Court finds that the policies and procedures as to training were sufficient prior to the death of Mr. Ashley, then it is clear from the facts in this matter that the Denver Defendants did not actually make the officers involved complete the training it promulgated.  Under either theory, the Plaintiff has satisfied her burden of proof at this time and her Sixth claim for relief must be allowed to proceed to jury trial.

Here, the Denver Defendants have presented Aaron Brill as its Rule 30(b)(6) representative expert on the training of officers in the recognition and treatment of those they encounter in their duties as police officers with excited delirium.  Ex. 23, Deposition of Aaron Brill, 15:25-16:2.  Officer Brill admits that excited delirium is discussed only in the "sudden custody death" portion of the Arrest Control Technique and Defensive Tactics Manual.  Ex. 23, 10: 2-7.  Additionally, there are some lesson plans for recruits but the information is the same.  Ex. 23, 11:1-3.  The training for new recruits on the issue of excited delirium is two hours, a power point presentation is shown, the video is shown and discussion. Ex. 23, 14-15.  He was unsure of any additional in-service training on videos related to excited delirium within the last 10 years.  Ex. 23, 11: 4-25; 12:1-4.  Since 2008 through 2011 he was certain there was no academy in-service on the issues of excited delirium.  Ex. 23, 16: 3-13. Officer Brill never mentioned that there was some training involved relating to excited delirium in the recertification of the use of Tasers by the Department in 2010.  Additionally, he was unaware of the continuing education for any police officer that was involved in this matter.  Ex. 23, 7:17-20. Thus, from the Denver Defendant's expert on the training of officers on excited delirium the only training its police officer would have received is in the Academy and potentially some additional random videos that are not regularly required.  No in-service training had been prepared since before 2008.  The training that is suggested is not enough to properly train the City's police force.  This opinion is further developed by Plaintiff's expert Mr. Montgomery when he opines in his deposition that the Officers were not sufficiently trained because "no one even mentioned the term excited delirium. And if they had been sufficiently trained, you would expect, certainly, at least I would, for them to mention that during their interviews." Ex. 24, 335:9-17.  He further opines that the training, if any, is insufficient because "how an officer behaves in the street under

stress typically reflects the kind of training they've received." Ex. 24, 337:19-21.  Montgomery

finishes his analysis of the lack of training after being asked: "So you don't have any facts that

support an opinion that Denver failed to train its officers with respect to excited delirium, true?"

"Only the behaviors of the officers and a lack of any mention, at least in the materials I reviewed,

of excited delirium.  When I see an officer say, gee, they might be tripped out on drugs or

something, what I prefer to see here is, hey, this could be a sign of excited delirium.  This is what

we may have here.  But someone not knowing or not using that term, it indicates to me that

there's a strong likelihood that they haven't received sufficient training in this area." Ex. 24, 338

18-25; 339:1-10  The additional facts developed in discovery confirm Mr. Montgomery's

opinions and validate what his analysis has been about the actions of the officers in the field.

  Next, the City has presented Theodore James Maher as its Rule 30(b)(6) representative

expert on training of the use of Tasers from 2008 to July 2011.  He admits that the entire police

department was to be recertified on the use of Tasers in 2010.  Ex. 25, 10:2-4.  He had not

reviewed any continuing education reports relating to the officers that were involved in this

particular case.  Ex. 25, 26: 9-12.  It is clear from the record that at the time of the offense in this

matter, Officer Gasca had not been recertified on the Taser. Ex. 4, 65:1-4 ("Are you required to

take this refresher recertification on the use of a Taser?" Response:  I haven't").  Officer

Coleman did not remember going through the recertification training relating to the use of his

Taser.  Ex. 2, 9:23-25.  Officer Coleman's training log does not mention any recertification on

the use of the Taser prior to this incident.  Ex. 26, Officer Coleman's Training Log.  Officer

Jones was unsure how the recertification of the use of the Taser is handled and he was unsure

whether he was recertified.  Ex. 1, 11:19-25;12:4-7.  Officer Jones's Continuing Education log

does not indicate his recertification on the use of the Taser prior to the incident in this matter.

Ex. 27, Officer Jones' Training Log. No classroom continuing education was given to Denver

Police Department officers to complete the Taser recertification in 2010.  Ex. 25, 28: 8-11.

Lt. Conner admits that his only recent training in the recognition of individuals presenting with

symptoms of excited delirium was through watching videos during roll calls "two, three, five

years in front of that" incident.  Ex. 3, 19:19-22.  Lt. Conner denies any other training prior to the

incident.  Ex. 3, 20:24-25; 21:1. If Lt. Conner had gone through the Taser Recertification in 2010

he would have been trained to recognize that Mr. Ashley was a medical emergency that needed

immediate medical treatment. See Ex. 28 "Taser Training Update PowerPoint. Lt. Conner only

called for an ambulance after Mr. Ashley had been tased, OPNs had been deployed and broken

on him and after he had been laying in a prone position handcuffed for up to five minutes with an

officer leaning on his legs after they had been crossed behind him.  Ex. 3, 31: 17-25; 32-35. No

police officer, other than Lt. Conner, ever called for emergency medical care at any time they

had contact with Mr. Ashley.

A plaintiff does not carry her burden by showing "general deficiencies" but rather must

"identify a specific deficiency that was obvious and closely related to [her] injury ... so that it

might fairly be said that the official policy or custom was both deliberately indifferent to his

constitutional rights and the moving force behind his injury." *Porro*, 624 F.3d at 1328 (citations

and internal punctuation omitted).

Here, it is clear from the record and the expert opinion of Mr. Montgomery that the

training that the City did provide its officers relating to the recognition of excited delirium as a

serious medical condition and how to handle the situation in the field was inadequate.  The

Supreme Court left open the possibility in *Canton* that municipal liability for failure to train

police officers might arise from a single incident if,

> "[I]n light of the duties assigned to specific officers ... the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."

*Canton*, 489 U.S. at 390. Under Tenth Circuit case law, "a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy." *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000); *accord Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003).

Deliberate indifference can be satisfied by evidence showing that the defendant "knowingly created a substantial risk of constitutional injury." *Dodds*, 614 F.3d at 1206. "[A]local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir.1997) The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction. *Barney*, 143 F.3d at 1307. To establish the causation element, the challenged policy or practice must be "closely related to the violation of the plaintiffs federally protected right." Schwartz, at § 7.12[B]. This requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404, 117 S.Ct. 1382.

Here, it is clear from the record that the City was well aware of the dangers of significant injury or death presented by persons with excited delirium, based on the curriculum in the Academy training on in custody deaths Ex. 29 and the training on the recertification of the Taser in 2010. Ex. 28.  Additionally, Officer Maher and Lt. Conner relayed specific instances they had been involved in to indicate that this type of in custody death occurs and is not unknown to the City.  See Officer Maher's recollection of events in 1994 or 95.  Ex. 25, 44:6-14 and Lt. Conner at Ex. 3, 34:24-25; 35:1-9.

It is also clear that the City has been indifferent about actually teaching its officers the dangers of significant injury by the improper care of those exhibiting excited delirium in the field.  What is clear from the evidence is that the City, through its experts in the field of Taser training and training on excited delirium (Officer Maher and Brill) has the attitude that the officers can use force to "win" and that they have trained their Officers in this fashion.  Ex. 23, 36: 7-14.  The training to "win" caused the officers in this case to use unreasonable force in attempting to take Mr. Ashley into custody and that force killed him.  The City falls short in its lack of significant training of its officers and its unwillingness to make sure that the training it did promulgate was actually used.  Here, from the testimony of the Officers involved, they were not mandated to complete the minimal training prepared by the City and that lack of diligence on the part of the City must make it liable.

### III.    CONCLUSION

Plaintiff has provided sufficient proof to overcome qualified immunity and support her claims of excessive force in violation of the Fourth Amendment and failure to provide adequate medical treatment in violation of the Fourteenth Amendment. Plaintiff has also established sufficient evidence of willful and wanton conduct in support of all of her state law claims.

Furthermore, Plaintiff has provided sufficient proof to impose municipal liability on the claims of Failure to Supervise and Inadequate Training and Policies.

WHEREFORE, for all the reasons set forth above, Plaintiff requests that this Court not enter summary judgment upon claims one, two, three, five, six, twelve, thirteen, or her Fourteenth Amendment failure to provide adequate medical treatment claim as requested by the Defendants.

Respectfully submitted this 6th day of December, 2013.


s/ William W. Frankfurt
**William W. Frankfurt**
Frankfurt Law Office, P.C.
1884 Gaylord Street
Denver, CO  80206
Telephone:  (303) 830-0090
Facsimile:   (303) 830-0129
E-mail:  wfrankfurt@comcast.net

s/ Kevin C. Flesch
**Kevin C. Flesch**
The Law Office of Kevin C. Flesch, LLC
333 W. Hampden Ave., # 710
Englewood, CO  80110
E-mail:  kevinflesch@fleschlaw.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I do hereby certify that on this 6th day of December, 2013, electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Wendy J. Shea
Jessica R. Allen
Cristina Pena Helm
Office of the City Attorney, Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202-5332
Telephone: 720-913-3112
Facsimile: 720-913-3182
wendy.shea@denvergov.org
jessica.allen@denvergov.org
cristina.helm@denvergov.org

Eric M. Ziporin
Monica N. Kovaci
Senter Goldfarb & Rice, LLC
1700 Broadway, Suite 1700
Denver, CO 80290
303-320-0509
303-320-0210
mziporin@sgrllc.com
mkovaci@sgrllc.com
*Attorneys for the Denver Defendants*

Brett M. Godfrey
Julie N. Richards
Godfrey & Lapuyade, P.C.
9557 S. Kingston Court
Englewood, Colorado 80112
Telephone: 303-228-0700
Facsimile: 303-228-0701
godfrey@godlap.com
richards@godlap.com
*Attorneys for DZF and employees*

/s William W. Frankfurt
William W. Frankfurt # 31074
Attorney for the Plaintiff
Frankfurt Law Office, P.C.
1884 Gaylord Street
Denver, CO 80206
Telephone: 303-830-0090
Fax: 303-830-0129
wfrankfurt@comcast.net