*Gail Waters vs.*

*City and County of Denver, et al.*

*Deposition of Chief Clarence Robert Chapman*

*September 11, 2013*



Stevens-Koenig Reporting
216 16th Street, Suite 1600
Denver, CO 80202
303-988-8470 (Office) 303-988-8478 (Fax)
www.SKReporting.com

Original File ChapmanC091113

Case 1:12-cv-01856-MSK-NYW Document 142-17 Filed 12/06/13 USDC Colorado Page 2 of 3

Gail Waters vs.　　　　　　　　　　　　　　　　　Deposition of Chief Clarence Robert Chapman
City and County of Denver, et al.　　　　　　　　　　　　　　　　　September 11, 2013

Page 93

1　lessen the chances for sudden death. Do you see that?
2　　A　Yes.
3　　Q　Subparagraph capital B, it says, Do not
4　leave prisoner in a prone position.
5　　　　Do you think that the officers in this
6　case did that?
7　　A　Well, that's a do-you-still-beat-your-wife
8　question. I don't think the officers in this situation
9　left Mr. Ashley in a prone position.
10　　Q　Did they sit him up right away?
11　　A　No, not right away.
12　　Q　Or did they turn him to his side right
13　away?
14　　A　Yes, they turned him to his side.
15　　Q　Do you think that they in any way
16　restricted his ability to breathe?
17　　A　No, I don't believe they did.
18　　Q　Do you have any evidence as to whether or
19　not somebody had a knee on the back of Mr. Ashley while
20　they were trying to restrain him?
21　　A　I think it's possible that at some split
22　second or some time they did. I mean, there's all kinds
23　of statements, even by Officer Jones that Mr. Ashley was
24　strong enough to push him up. And I'm sure you've seen
25　Officer Jason Jones; he's a pretty big guy.

Page 94

1　　Q　Justin Jones.
2　　A　I'm sorry. Justin. He's a pretty big
3　guy. And so at some point in time, yeah, during the
4　tussle, there probably was a knee, an arm, or a body
5　momentarily on Mr. Ashley's back. But I don't think
6　it -- by my reading of the materials, there was no knee
7　or arm or body on the back for a significant period of
8　time. But I would never discount to say that nobody was
9　ever on his back or a knee was ever on his back. The
10　thing about it is what I'm looking for and reading in the
11　materials, was it intentional, was it placed on his back
12　for an extended period of time? I didn't see anything
13　like that.
14　　Q　But you don't know?
15　　A　I wasn't there. I don't know.
16　　Q　All right. What did you review of
17　Dr. Gary Vilke's report to assist you in drawing
18　conclusions in this case?
19　　A　Nothing that comes to mind.
20　　Q　You just have it referenced in one of the
21　materials that you reviewed. So I just wanted to find
22　out what exactly you reviewed of his report and how it
23　affected you in coming to the conclusions in this case.
24　　A　The defendant law firm in this case or law
25　firm for the defendants in this case sent it to me, and I

Page 95

1　read everything they sent. But I didn't really apply it
2　to my opinions because I look at it as a medical opinion,
3　and I don't have any training in medicine.
4　　Q　Okay.
5　　　　(Deposition Exhibit 30 marked.)
6　　Q　(BY MR. FLESCH) I'm handing you what's
7　been marked as Exhibit 30. And I will tell you this is a
8　medical document. It's called the White Paper Report on
9　Excited Delirium. Have you ever seen this?
10　　A　I don't believe I have. It doesn't look
11　familiar. I don't recall ever seeing this.
12　　Q　All right.
13　　A　I may have, but I don't remember.
14　　Q　The sixth page of the document -- and I'm
15　looking at the paragraph that begins, Epidemiology.
16　　A　Yes.
17　　Q　You'll see in that paragraph a sentence
18　that says, A published observational study suggests that
19　the incidence of death among patients manifesting signs
20　and symptoms consistent with excited delirium is 8.3
21　percent. Do you see that?
22　　A　Yes.
23　　Q　Now, you testified earlier that there
24　weren't studies out there about incidences of death,
25　correct?

Page 96

1　　A　Yes.
2　　Q　It seems that this study would suggest
3　that there is. Do you dispute this study?
4　　A　I don't know the scope of this study.
5　　　　MR. ZIPORIN: Object to the form and
6　foundation.
7　　Q　(BY MR. FLESCH) Okay.
8　　A　Yes. I couldn't verify this one way or
9　another. How many deaths are they talking about -- 100,
10　1,000, 10,000 -- over what period of time? I have no
11　idea.
12　　Q　Okay. But now we're talking about the
13　characteristics of the study. You testified earlier
14　there weren't any studies available; is that correct?
15　　A　Not in regards to police contact.
16　　Q　I see.
17　　A　I don't see that this says anything about
18　police contact.
19　　Q　Okay. So if you can then turn to another
20　two more pages. And the top portion of this column
21　starts out, Clinical perspectives, and then it says, Law
22　enforcement. Do you see that?
23　　A　Yes.
24　　Q　The third paragraph down, there is a
25　sentence that starts, "It is important for law

Case 1:12-cv-01856-MSK-NYW   Document 142-17   Filed 12/06/13   USDC Colorado   Page 3 of 3

Gail Waters vs.
City and County of Denver, et al.

Deposition of Chief Clarence Robert Chapman
September 11, 2013

Page 97

1  enforcement officers to recognize that excited delirium
2  subjects are persons with an acute potentially
3  life-threatening medical condition."  Do you agree with
4  that statement?
5      A   Yes.
6      Q   Do you also agree with the statement that
7  "law enforcement officers must also be aware that
8  remorse, normal fear, and understanding of surroundings
9  and rational thoughts for safety are absent in such
10 subjects"?
11     A   Correct.
12     Q   Do you agree with that?
13     A   Yes.
14     Q   Do you then agree with the next sentence
15 in the following paragraph, which says, "Excited delirium
16 subjects are known to be irrational, often violent, and
17 relatively impervious to pain."  Do you agree with that?
18     A   Yes.
19     Q   Now, do any of those statements affect
20 your opinion in this matter?
21     A   No.
22     Q   In no way does it affect your opinion as
23 to how the officers would react to a person with excited
24 delirium?
25     A   No.  I agree with everything that was

Page 98

1  stated here in these few paragraphs.
2      Q   Okay.  So let's move on to the next
3  sentence.  Do you agree with the statement,
4  "Unfortunately, almost everything taught to law
5  enforcement officers about control of subjects relies on
6  a subject to either be rational, appropriate, or to
7  comply with painful stimuli"?  Do you agree with that?
8      A   Yes.
9      Q   You would agree with that following
10 statement, which essentially states that all of the
11 pain-compliance sort of maneuvers are traditionally
12 effective in controlling resisting subjects but are
13 likely to be less effective in excited delirium subjects.
14 Do you agree with that?
15     A   Yes, but you're taking this totally out of
16 context.  Yes, I agree with it, but you're taking it out
17 of context.
18     Q   How am I taking it out of context?
19     A   Because a strict reading of it, it says --
20 and let's go back.  Unfortunately, almost everything
21 taught to LEOs -- law enforcement officers -- about
22 control of subjects relies on a suspect to either be
23 rational, appropriate, or to comply with lawful stimuli.
24 It didn't say excited-delirium suspects; it said
25 subjects.  And that's a true statement, because when a

Page 99

1  police officer goes to the academy, when a police officer
2  takes remedial training, when a police officer takes
3  self-defense training, we are taught -- or police
4  officers are taught to deal with subjects who are
5  rational, appropriate, and can feel pain.  That's true.
6          But then the next sentence says, While,
7  these methods, pepper spray, batons are ineffective or
8  can be ineffective on excited delirium subjects.
9          So let's be true to what this is really
10 saying.  It doesn't say the police officers are
11 subjecting excited delirium people to the kinds of
12 training that is inappropriate.  It just says the
13 training for police officers doesn't address excited
14 delirium subjects.  It's true.
15     Q   Is there any training that does?
16     A   Yes.
17     Q   What is that?
18     A   CIT.  We talked about CIT training --
19 crisis intervention training -- that does address how to
20 deal with excited delirium subjects, and that is the
21 training that was received by officers in this particular
22 case.
23     Q   And you're talking about the verbal
24 de-escalation?
25     A   Yes.

Page 100

1      Q   Here you're also talking about getting
2  medical personnel involved --
3      A   Absolutely.
4      Q   Well, let me finish the question.
5      A   I'm sorry.
6      Q   That's okay -- medical personnel involved
7  in helping sedate the person?
8      A   Yes.
9      Q   Is that in the CIT training?
10     A   Oh, that I don't know.  That, I don't
11 know.  I know that there is a component that medical
12 personnel can use sedation.  And I got that from the
13 Denver Fire Department policies; that if they get there
14 and they can give a person a shot to sedate them, that
15 would be great.
16     Q   Okay.  Let's move on to this next page,
17 then.  On the left-hand column, the first full paragraph
18 it says -- the sentence begins, "Some of the goals of law
19 enforcement officers in these situations should be," and
20 then it lists things.
21     A   Uh-huh.
22     Q   You see the listing there?
23     A   Yes.
24     Q   Do you agree that the first thing should
25 be to recognize possible excited delirium?