**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

**Civil Action No. 12-cv-01856-MSK-BNB**

**GAIL WATERS, as personal representative of the Estate of Alonzo Ashley,**

    **Plaintiff,**

v.

**CITY AND COUNTY OF DENVER,
PHILLIP COLEMAN, in his official and individual capacity;
PETE CONNER, in his official and individual capacity;
JOE GASCA, in his official and individual capacity; and
JUSTIN JONES, in his official and individual capacity,**

    **Defendants.**

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION
FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment **(#129)**, the Plaintiff's Response **(#142)**, and the Defendants' Reply **(#151)**.

## I. ISSUES PRESENTED

In this action, the Plaintiff Gail Waters asserts eight claims against the City and County of Denver ("the City") and four of employees of the Denver Police Department related to the death of Alonzo Ashley: (1) use of excessive force in violation of the Fourth Amendment, pursuant to 42 U.S.C. §1983; (2) wrongful death, pursuant to C.R.S. § 13-20-202 ; (3) a survival action, pursuant to C.R.S. § 13-20-101; (4) conspiracy to violate § 1983; (5) failure to supervise, pursuant to § 1983; (6) inadequate policies and training, pursuant to § 1983; (7) assault; and (8) battery. The Defendants move for summary judgment on all of Plaintiff's claims.[1]

---

[1] The Plaintiff concedes to the lack of evidence supporting the claim for conspiracy to violate

## II. FACTS

The Court recites the following as undisputed facts and, where there is a dispute, construes the facts most favorably to the non-movant, here the Personal Representative of Mr. Ashley's estate.[2]

On July 18, 2011, while at the Denver Zoo with his girlfriend, Mr. Ashley was involved in an altercation with a member of the Zoo's security staff. The Denver Police Department was notified about the incident, which was reported as a domestic violence incident. Officer Justin Jones responded to the call and was the first officer to arrive on the scene. Upon arrival, a Zoo employee told him that, in fact, Mr. Ashley had assaulted a Zoo security officer and that Zoo personnel had "eyes on" Mr. Ashley.

When Officer Jones arrived, people were gathered in a semicircle around Mr. Ashley. Mr. Ashley was "bouncing around" stating that "he was King Kong and he was a lion and he was going to eat somebody." As Officer Jones approached, he pulled his taser from its holster, pointed it at Mr. Ashley, and ordered him to get on the ground. Mr. Ashley complied immediately and sat on the ground.

Mr. Ashley soon stood up again and began walking towards the Zoo's exit. Officer Jones followed Mr. Ashley for about fifteen yards, until Mr. Ashley stopped walking as he approached a planter. Officer Jones noticed that Mr. Ashley was sweating profusely. After stopping, Mr.

---

§ 1983 and "agrees to dismiss Claim Four, Conspiracy in its entirety with prejudice."

[2] The Defendants challenge several exhibits submitted by the Plaintiff on the grounds that they are "hearsay, unauthenticated, and not properly considered for summary judgment purposes." The Court concludes it is unnecessary to consider these exhibits for purposes of ruling on this Motion. Thus, the Court did not rely on the contested exhibits in constructing the statement of facts.

Ashley moved towards Officer Jones. Officer Jones attempted to grab Mr. Ashley's arms to put them behind his back.

After seeing Officer Jones' grab Mr. Ashley, Zoo security officer Totten joined the struggle. Mr. Ashley began throwing punches. As Mr. Totten tried to control Mr. Ashley's legs, Officer Jones punched Mr. Ashley twice in the abdominal area, then deployed his taser in drive stun mode to Mr. Ashley's back. At least two additional Zoo employees also joined the struggle in an attempt to keep Mr. Ashley from getting off the ground.

As the struggle continued, more police officers arrived at the scene and joined the struggle. After Officer Phillip Coleman arrived, Officer Jones deployed his taser a second time, this time on Mr. Ashley's side. Officer Coleman also deployed his taser twice. Other police officers — Officer Pete Conner, Officer Smith, Officer Curtis — used Orcutt Policy Nunchaku (OPNs) to try to control Mr. Ashley's legs. Eventually, Officer Joe Gasca restrained Mr. Ashley's legs by using his weight to bend them towards Mr. Ashley's back.

Once restrained, Mr. Ashley was handcuffed and placed on his stomach. He remained in this position for two to five minutes after being handcuffed. During this time, Officer Conner called for medical assistance. The officers then noticed that Mr. Ashley had vomited. Officer Conner directed the other officers to move Mr. Ashley away from the vomit. The officers noticed that Mr. Ashley was no longer breathing. An officer began performing chest compressions. Within a few minutes, the paramedics arrived and administered emergency medical treatment at the scene. Mr. Ashley was pronounced dead upon arrival at a local hospital.

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed.R.Civ.P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward,* 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a prima facie claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

## IV.   ANALYSIS

### A. Excessive Force

The Plaintiff asserts that Officer Coleman, Officer Conner, Officer Gasca, and Officer Jones each violated Mr. Ashley's Fourth Amendment rights by using excessive force in restraining him.  The Defendants contend that the Plaintiff cannot establish a *prima facie* claim that the Defendants used excessive force, and, if Plaintiff can establish a *prima facie* case, that these Defendants are entitled to qualified immunity.  There is overlap between the substantive analysis and the qualified immunity analysis in so far as to whether there was a constitutional violation.  Because the actions of each Defendant differ, the Court begins with an assessment with that inquiry.

**1.  *Prima Facie* Case**

Under the Fourth Amendment, as applied to the states through the Fourteenth, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion."  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  However, the degree of force that law enforcement officers can use is limited.  *See Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007).  Officers are permitted to use only as much force as is necessary to secure their own safety and the safety of others.  *See id.* at 1131.  Whether the amount of force used is excessive turn on whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard for their underlying intent or motivation.

5

*See Cruz v. City of Laramie*, 239 Fed 1183, 1188 (10th Cir. 2001). Determining the reasonableness of the officers' actions requires careful attention to the facts and circumstances of each particular case. *Graham,* 490 U.S. at 396. Relevant factors include, but are not limited to, the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.*; *see also Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009). The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396. Thus, to succeed on her excessive force claims the Plaintiff must make a prima facie case that each Defendant's conduct was objectively unreasonable under the circumstances.

    **a. Officer Jones**

Officer Jones was the first officer on the scene and the first person to use force against Mr. Ashley. He grabbed Mr. Ashley's arm and tackled him to the ground. Once Mr. Ashley was on the ground, Officer Jones punched Mr. Ashley twice in the abdomen and tased him at least twice. Officer Jones asserts his conduct was reasonable because all three *Graham* factors weigh in his favor. He asserts that Mr. Ashley (1) assaulted a person, (2) posed a significant threat to Officer Jones and Zoo patrons, and (3) violently resisted arrest.

On this record, the Court finds that there is a genuine dispute of material fact as to whether the amount of force used by Officer Jones was excessive. Beginning with the severity of the crime, the Court notes that Officer Jones reported to the Zoo in response to a suspected domestic violence incident, but on his arrival, Zoo personnel informed him that Mr. Ashley had assaulted a Zoo employee. Although assault is by no means an insignificant offense, Colorado law treats it as a misdemeanor, and the amount of force used should be <u>reduced</u> accordingly. *See*

6

*Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) (quoting *Fogarty,* 523 F.3d at 1160); *see also* C.R.S. § 18-3-204. There was probable cause to arrest Mr. Ashley, and under some circumstances a forcible takedown is appropriate, especially if the officer is trying to prevent another assault. However, here it appears that Officer Jones followed Mr. Ashley for fifteen yards, taking no action and giving no instructions to him. Only after Mr. Ashley turned toward Officer Jones, did Officer Jones attempt to physically restrain him by pulling his arms behind his back. This was after Officer Jones noticed that Mr. Ashley was sweating profusely. As Mr. Ashley struggled, presumably with having his arms restrained, Officer Jones took him to the ground. The charge of assault may have justified an arrest, but the there is little evidence of a graduated used of force – accelerating in a matter of moments from grabbling Mr. Ashley's arms to punching him in the stomach to tasing him. This factor weighs strongly in favor of the Plaintiff.

The second factor focuses on whether Mr. Ashley posed an immediate threat to the safety of officers or other bystanders. Mr. Ashley neither carried a weapon nor made any overt threats, and he did not approach either Officer Jones or any bystanders. He responded to the directive to be seated, and although he got up, he moved slowly toward to the Zoo exit. Taking all facts most favorably to the Plaintiff, as the Court must, there was no threat to any bystander and the only threat was to Officer Jones' safety once he sought to restrain Mr. Ashley. This factor weighs slightly in favor of the Defendant.

Under the third Graham factor, the Court considers whether Mr. Ashley was actively resisting arrest or trying to evade arrest by flight. There is no evidence suggesting that Mr. Ashley's lumbering toward the exit was an effort to resist arrest, nor reasonably considered an attempt to flee. Mr. Ashley was walking, not running, and he stopped after fifteen yards. There

was no warning to Mr. Ashley that he was under arrest, any threat to use force, or any directives to submit to arrest. What is troublesome here is the length of time that Officer Jones' observed and followed Mr. Ashley, and his observation that he was sweating profusely, before using force to arrest him. The use of that force appears to have triggered Mr. Ashley's response and the escalation in force to subdue him. This factor tips slightly in favor of the Plaintiff.

Applying the *Graham* factors, the Court finds that there is sufficient evidence to support a *prima facie* case that Officer Jones used an excessive amount of force.

### b. Officer Coleman

Officer Coleman was the second officer to arrive on the scene. When he arrived, Officer Jones and three Zoo employees were holding Mr. Ashley on the ground. Officer Coleman joined the struggle and, at some point, he used his taser twice on Mr. Ashley.

The Court again considers the *Graham* factors. Officer Coleman asserts that the factors support a conclusion that his conduct was objectively reasonably because Mr. Ashley committed a severe crime, posed an immediate threat, and actively resisted arrest.

Here, the analysis under the first *Graham* factor weighs in favor of Officer Coleman. He encountered Mr. Ashley as he struggled with Officer Jones. There was probable cause to arrest Mr. Ashley as it appeared that he was resisting arrest. by Officer Jones. Accordingly, this factor weighs slightly in favor of Officer Coleman.

But the second *Graham* factor weighs against Officer Coleman. When he arrived, Officer Coleman observed Officer Jones and three zoo employees holding Mr. Ashley on the ground. In that position he was restrained, and it was unlikely that Mr. Ashley posed a threat to the safety of any bystanders. Officer Coleman might have worried that Mr. Ashley posed some threat to Officer Jones and the Zoo personnel. However, the accounts of Mr. Ashley's behavior vary, and

Officer Coleman specifically testified that "Mr. Ashley was extremely tense and he kept flailing his arms." Thus, taken in the light most favorable to the Plaintiff, it is not clear that Mr. Ashley's "flailing" arms was resistance that posed a risk to the officers and Zoo employees holding him. Further, it is doubtful that Mr. Ashley posed a serious threat to those trying to detain him when he was unarmed and outnumbered five to one.

As with Officer Jones, the third *Graham* factor weighs slightly in the Plaintiff's favor. Because he was on the ground, Mr. Ashley was not evading arrest by flight. However, he was struggling with Officer Jones and the Zoo personnel. Thus, it is possible that a reasonable officer would have assumed that Mr. Ashley was resisting arrest, however the "flailing arms" and numbers of officers restraining Mr. Ashley raise a significant question as to whether and reasonable officer would have viewed the resistance to be meaningful.

On the other hand, Officer Coleman also testified that Mr. Ashley seemed "extremely strong" and said something to the effect of "help me Grandma. I don't want to go." Unusual strength and mental confusion are both signs of a physiological condition known as excited delirium. It is often impossible to control individuals experiencing excited delirium using traditional pain compliance techniques. Paradoxically, these individuals are physiologically more likely to die from a prolonged struggle, but also more likely to physically resist restraint. As a result, law enforcement officers receive training on how to recognize the symptoms of excited delirium and respond appropriately. The Court finds that the Plaintiff has presented sufficient evidence to create a genuine factual issue regarding whether Officer Coleman used appropriate force.

  **c. Officer Conner**

When Officer Conner arrived on the scene he saw Mr. Ashley lying on his side with Officer Jones, Officer Coleman, and two Zoo employees holding him down. Officer Conner testified that he heard a taser being used as he arrived. Officer Conner joined the struggle by applying his OPN to Mr. Ashley's legs. When that was unsuccessful, Officer Conner assisted a Zoo employee with handcuffing Mr. Ashley's right wrist. Officer Conner also helped control Mr. Ashley's left arm to so that wrist could be handcuffed. Officer Coleman argues that his conduct was objectively reasonable because Mr. Ashley was resisting arrest.

The first *Graham* factor weighs in favor of Officer Connor. Officer Conner arrived on scene to an unarmed individual resisting arrest by four men.

The second factor weighs slightly against Officer Connor. He encounters four men holding Mr. Ashley down. There was no apparent danger to bystanders. There is no evidence of danger to the officers restraining Mr. Ashley – only that they were having difficulty restraining him.

With regard to the third *Graham* factor, the Court concludes that the evidence presents a factual issue as to whether Officer Conner use of force was excessive given Mr. Ashley's apparent excited delirium. Officer Conner testified that Mr. Ashley "had no adverse effect to the pain-compliance measures" and "some super human strength for a man of that size" and that he believed Mr. Ashley "was under some type of intoxication" or "maybe excited delirium." Thus, Officer Conner not only observed specific symptoms, he also recognized the possibility that Mr. Ashley was experiencing excited delirium. However, when taken in the light most favorable to the Plaintiff, it appears that Officer Conner acted to restrain Mr. Ashley as if he were simply resisting arrest, rather than suffering from excited delirium. Thus, there is sufficient evidence to create a factual issue regarding whether Officer Conner's conduct was objectively reasonable.

### d. Officer Gasca

When Officer Gasca arrived he saw two people with their knees on Mr. Ashley's shoulders. Then, Officer Gasca joined the struggle by securing Mr. Ashley's legs by crossing Mr. Ashley's ankles and bending Mr. Ashley's "knees back up and put[ting] his ankles to his buttocks and kneel[ing] down on them." Officer Gasca remained in this position for several minutes after Mr. Ashley was handcuffed.

Officer Gasca argues that he used an objectively reasonable amount of force because Mr. Ashley was resisting arrest. Although Officer Gasca relies primarily on the third *Graham* factor to support his argument, the Court considers all three in its analysis.

As discussed above, first *Graham* factor weighs slightly in favor of Officer Gasca

The Court finds that the second *Graham* factor weighs against Officer Gasca's use of force. First, when Officer Gasca arrived, Mr. Ashley was on the ground with two people kneeling on his shoulders. He was fully restrained. In this position, Mr. Ashley was unlikely to pose a threat to the safety of any of the officers or bystanders. In addition, Officer Gasca testified that Mr. Ashley had vomited before his arrival and that he saw him vomit afterward. Yet, Officer Gasca used body weight to keep Mr. Ashley on his stomach and to press his legs into his back. It is unlikely that Mr. Ashley would have posed a threat to the officers given his restraint and his vomiting.

In regard to the third *Graham* factor, the Court once again concludes that there is a genuine factual dispute regarding whether a reasonable officer would have recognized signs of excited delirium or simply believed Mr. Ashley was resisting arrest. Officer Gasca testified that Mr. Ashley exhibited "[s]uperior-human strength" and "profuse[] sweating" and that "the officer's just couldn't control him." All of these characteristics are indicative of excited

11

delirium. Thus, there is sufficient evidence to create a factual issue regarding whether Officer Gasca should have recognized the symptoms of excited delirium and, if so, whether he should have adapted his conduct accordingly.[3]

### 2. Qualified Immunity

The doctrine of qualified immunity protects government officials who perform discretionary government functions from liability for civil damages and the obligation to defend the action. *See Johnson v. Fankell,* 520 U.S. 911, 914 (1997); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity requires a "two-step sequence." *Pearson v. Callahan,* 555 U.S. 223 (2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009). Only if the plaintiff has satisfied both steps is qualified immunity defeated. The Court has discretion begin its analysis with either prong. *See Pearson,* 555 U.S. at 223; *Green,* 574 F.3d at 1299.

The first prong of the qualified immunity analysis requires a plaintiff to show that the defendant's actions deprived him or her of a constitutional or statutory right. *See Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir.1995). A plaintiff must precisely articulate the right that was allegedly violated and specifically identify the defendant's conduct that violated the right. *See Green,* 574 F.3d at 1300. At the summary judgment stage, this prong requires a plaintiff to present sufficient competent evidence to establish a prima facie claim. Pursuant to the prior analysis, the Court finds that this standard is satisfied.

---

[3] Being held in a prone position is especially dangerous for individuals experiencing excited delirium.

The second prong of the qualified immunity analysis requires a plaintiff to show that the identified right was clearly established based on the specific facts of the case. *See Brosseau v. Haugen,* 543 U.S. 194, 199–200 (2004). The inquiry focuses on whether prior caselaw from the Supreme Court or Tenth Circuit put the defendants on notice that the alleged conduct would be unconstitutional. *See Gomes v. Wood,* 451 F.3d 1122, 1134 (10th Cir.2006); *see also Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir.2010). However, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Becker v. Bateman*, 709 F.3d 1019, 1023 (10th Cir. 2013) (quoting *Morris*, 672 F.3d at 1196).

### a. Officer Jones

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Typically, the relevant inquiry is whether, at the time of the incident, there was binding authority from the Supreme Court or Tenth Circuit recognizing that particular conduct would constitute a violation of federal law. *See York*, 523 F.3d at 1211–12. However, because excessive force requires a fact-intensive inquiry, there is rarely a published opinion involving the exact same factual circumstances. *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). Thus, where a defendant's conduct presents a particularly clear violation of *Graham* itself, the Tenth Circuit does "not require a second decision with greater specificity to clearly establish the law." *Id.*

Here, Officer Jones grabbed, and then tackled, an unarmed individual suspected of misdemeanor assault who did not pose an immediate threat to any bystanders. Once Officer Jones had Mr. Ashley on the ground, Officer Jones punched him twice in the abdomen and used his taser twice, even though he had the assistance of several other Zoo employees and law

enforcement officers. As discussed above, the *Graham* factors do not support Officer Jones' use of force. Specifically, the third *Graham* factored weighed only slightly in favor of the use of force, while the second factor weighed heavily against it and the first factor weighed against more than a minimum amount of force. Thus, Mr. Ashley's right to free from Officer Jones' forceful takedown, in addition to the subsequent force, was clearly established under *Graham*.[4] Accordingly, the Plaintiff has met her burden to demonstrate that Officer Jones should have been on notice that there was not a "legitimate justification" for his conduct. *See id* at 1285.

### b. Officer Coleman, Officer Conner, and Officer Gasca

For the remaining three individual defendants, their liability for excessive force largely depends on whether their conduct was objectively reasonable given Mr. Ashley's symptoms of excited delirium. The Court concludes that there was sufficient authority to put the Defendants on notice that an officer's failure to adjust his or her conduct in light of individual's symptoms of excited delirium could give rise to an excessive force claim.

For example, in *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) an officer "applied pressure to [the decedent's] upper body, including his neck and shoulders, by using either one or both knees and his hands" despite the decedent's "apparent intoxication, bizarre behavior, and vigorous struggle made him a strong candidate for positional asphyxiation." *Id.* at 1152, 1148. There, the Tenth Circuit reversed the district court's grant of summary judgment in favor of the defendant because holding the decedent in this manner "was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions." *Id.* at 1155.[5]

---

[4] Although the facts in *Morris* are analogous to the situation here, the Tenth Circuit's opinion dates after the incident at the Zoo. *See* 672 F.3d at 1195-98.

[5] Notably, in *Weigel*, the *Graham* factors weighed more heavily towards the use of force than in this incident. There, the decedent posed a greater threat to the safety of officers and bystanders

The incident at issue here occurred in July 2011, nearly three years after the Tenth Circuit decided *Weigel*. Accordingly, there was sufficient precedent to put the Defendants on notice that a reduced use of force is appropriate for an individual suffering from excited delirium. Thus, summary judgment is not appropriate on the Defendants qualified immunity defense.

**B. Failure to Supervise**

The Plaintiff asserts that Officer Conner acted unconstitutionally by allowing other officers that he supervised to use excessive force against Mr. Ashley. Officer Conner argues that the Plaintiff cannot establish that he personally participated in, authorized, or supervised any conduct of other officers.

Ordinarily, the doctrine of common-law doctrine of respondeat superior does not apply to §1983 actions. *Winters v. Bd. of Cnty. Comm'rs*, 4 F.3d 848, 855 (10th Cir. 1993). Supervisory liability requires proof that a supervisory defendant authorized, supervised, or participated in conduct which caused the constitutional deprivation. *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001).

Officer Conner was present at the scene and actively involved in the attempts to restrain Mr. Ashley. There is no evidence to suggest that he directed, authorized or supervised the conduct of Officer Jones or Officer Coleman before his arrival. However, after he arrived he acknowledges that he was the highest ranking officer on the scene, that he gave directions to the other officers, and that he took responsibility for calling an ambulance. Despite being a supervisory officer and recognizing that Mr. Ashley was experiencing excited delirium, Officer Conner testified that he did not intervene when the other officers continued to hold Mr. Ashley on his stomach for between two and five minutes after being handcuffed. These facts are

---

and was trying to evade arrest by flight when he fled from police across an interstate after his car struck a patrol officer's car from behind.

sufficient to state a prima facie claim against Officer Conner for all actions taken by his subordinates after he arrived at the scene.

## C. Inadequate Policies and Training

The Plaintiff argues that the City failed to provide training "sufficient enough to properly train its officers in the recognition of and treatment of an individual exhibiting signs of excited delirium."

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Instead, a municipality is responsible under § 1983 only for constitutional injuries that result from the execution of the government's official policy or custom. *Id.* In order for a municipality to be liable under § 1983 for inadequate training on the use of force, a plaintiff must show that "(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training." *Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (quoting *Allen v. Muskogee,* 119 F.3d 837, 841-42 (10th Cir.1997), *cert. denied,* 118 S.Ct. 1165 (1998)). To establish that a municipality's policymakers were deliberately indifferent, a plaintiff must show that the "need for more or different training" was obvious and the inadequacy was likely to result in the violation of constitutional rights. *See Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). The City argues that the Plaintiff cannot establish any of these elements.

It is undisputed that the City provided its officers with some training related to recognizing and dealing with individuals experiencing excited delirium. Plaintiff asserts that this standard training is insufficient in degree and frequency to adequately prevent the use of deadly force against individuals exhibiting signs of excited delirium. However, the Plaintiff has failed to present evidence that any inadequacies in training were the product of deliberate indifference.

The Plaintiff asserts that "based on the curriculum in the Academy training on in custody deaths" the "City was well aware of the dangers of significant injury or death present by persons with excited delirium." However, the fact that the City offered training on a topic shows only that the City recognized a need for some degree of training on the subject; it does not show that "the need for <u>more or different</u> training is [] obvious." *See id.* (emphasis added). Further, there is no evidence that the City made any deliberate choice to limit its training on excited delirium. Thus, the Plaintiff "merely enumerates the multiple ways in which [s]he contends the Officers were inadequately trained, but without proffering any evidence of knowledge of the purported deficiencies on the part of the City." *See id.* As a result, the Plaintiff has failed to produce sufficient competent evidence to establish deliberate indifference, and, therefore, the City cannot be liable for any inadequacies in its training.

Accordingly, the City is entitled to summary judgment on this claim.

**D. State Law Claims**

The Plaintiff also asserts four claims under Colorado law: (1) wrongful death, pursuant to C.R.S. § 13-21-202; (2) a survival action, pursuant to C.R.S. § 13-20-101; (3) assault; and (3) battery. The Defendants assert that the Colorado Governmental Immunity Act (CGIA) bars all of the Plaintiff's state law claims because there is no evidence that their conduct was willful and wanton.

Under the CGIA, public employees are generally immune from liability in tort claims based on conduct that occurs within the scope of their employment. C.R.S. § 24–10–118(2)(a). However, public employees may be liable in tort for conduct that is "willful and wanton." C.R.S. § 24–10–118(2)(a).

According to the Colorado Supreme Court, in order for conduct to be to "willful and wanton" public employees "must be <u>consciously aware</u> that their acts or omissions create danger or risk to the safety of others, and they then act . . . without regard to that danger or risk." *Gray,* 284 P.3d at 198 (citing *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994)) (emphasis added). It is the Plaintiff's burden to prove that the Defendants actions were willful and wanton. *Smith v. Board of Ed.,* 83 P.3d 1157, 1167 (Colo. App. 2003).

Here, the Plaintiff has failed to present any evidence that any of the Defendants were <u>consciously aware</u> that their actions endangered Mr. Ashley's safety. The Plaintiff points to testimony by the Defendants that the use of force, particularly the OPNs, was a conscious "effort[] to establish pain compliance." However, a person can be aware that their actions will cause someone pain without being aware that those actions will pose a risk to that person's safety. For example, Officer Conner testified that he uses an OPN to provide an "initial shock," which makes it easier to apply handcuffs. Specifically, he stated that "if you apply it to any area that [an individual is] not focused on, A, you can get it on much easier and much safer; and, B, the initial shock of the pain takes his mind off whatever he's focused on . . . [s]o as he moves that focus from one end of his body to another . . . you can more safely and easily apply the handcuffs." The Plaintiff has not presented any evidence to contradict the testimony that the officers used OPNs for any purpose other than to facilitate the application of handcuffs or that any of the officers were aware at the time that their actions endangered Mr. Ashley's safety.

18

To the extent that the Plaintiff asserts that the Defendants were willful and wanton because they "consciously disregarded" the signs of excited delirium exhibited by Mr. Ashley, there is no evidence in the record to support this conclusion. Indeed, the evidence presented arguable supports a contrary conclusion. Specifically, only Officer Conner testified that he considered the possibility of delirium while the struggle with Mr. Ashley was ongoing. His testimony shows that he called for an ambulance because of the possibility that Mr. Ashley was under the influence of drugs or experiencing excited delirium. The Plaintiff has presented no evidence to contradict Officer Conner's position that he called for medical assistance upon recognizing potential signs of excited delirium. The other Defendants testified only to observing some of the individual signs of excited delirium—for example, Officer Jones noticed Mr. Ashley "sweating profusely," Officer Coleman noted Mr. Ashley's high pain tolerance, and Officer Gasca commented on Mr. Ashley's "[s]uperior-human strength." However, the failure to recognize a single symptom as evidence of a specific disorder is not the same as consciously disregarding a readily apparent condition. The Plaintiff has not presented any evidence that would establish that any of the Defendants consciously disregarded the possibility that Mr. Ashley was suffering from excited delirium based on his behavior.

Accordingly, the Plaintiff has failed to meet her burden to produce sufficient evidence to support a conclusion that the Defendants' actions were willful and wanton and, therefore, exempt from the immunity provided under the CGIA. The Defendants are therefore entitled to summary judgment on the Plaintiff's state law claims.

### V.     Conclusion

**IT IS THEREFORE ORDERED** that

(1) For the foregoing reasons, the Defendants' Motion for Summary Judgment (**#129**) is

   **GRANTED IN PART** and **DENIED IN PART**.

(2) Claims Two, Three, Four, Six, Twelve, and Thirteen are **DISMISSED** against all

   Defendants.

Dated this 29th day of September, 2014.

**BY THE COURT:**

_____
Marcia S. Krieger
Chief United States District Judge